## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE LONDON SILVER FIXING, LTD. ANTITRUST LITIGATION | 14-MD-02573-VEC 14-MC-02573-VEC |
| This Document Relates to: | The Honorable Valerie E. Caproni |
| ALL ACTIONS | |

**<u>PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS</u>**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iv

PRELIMINARY STATEMENT .......................................................................................... 1

DEFENDANTS' FAILED ATTEMPTS AT MISDIRECTION ........................................... 2

    A. Strawman #1: The Complaint is nothing more than paid-for expert work. .................... 3

    B. Strawman #2: The Complaint is inconsistent with prior allegations. ............................ 4

FACTUAL OBSERVATIONS OF MANIPULATIVE CONDUCT ............................................ 6

    A. The Silver Fix causes a dysfunction in competitive market forces. ............................... 6

    B. Defendants' spot market activity demonstrates an agreement to fix prices. .................... 8

    C. Defendants capitalized on the pricing dysfunction they created by trading based on an
        informational advantage over uninformed market participants. .................................. 10

    D. Defendants' manipulative conduct permanently impacted silver market prices............ 12

    E. Government investigations confirm the nature of Defendants' scheme. ....................... 12

ARGUMENT ................................................................................................................... 14

    I.  THE RELEVANT PLEADING STANDARD: RULE 8(a) ................................................. 14

    II. PLAINTIFFS PLAUSIBLY PLEAD A SHERMAN ACT CLAIM.................................. 15

        A. Count I: Price Fixing ..................................................................................... 15

        B. Count II: Bid Rigging..................................................................................... 16

        C. Count III: Unreasonable Restraint of Trade................................................. 16

        D. Plaintiffs plead circumstantial evidence to support the inference of a conspiracy. ....... 17

    III.      PLAINTIFFS HAVE ANTITRUST STANDING TO BRING THEIR CLAIMS ....... 20

        A. Plaintiffs adequately plead "antitrust injury." ................................................ 20

            1. Plaintiffs satisfy the three-part antitrust injury test. .................................. 21

i

2. Plaintiffs suffered actual injury regardless of when they traded silver and silver financial instruments. ............................................................................................. 21

3. Plaintiffs' actual injuries are not speculative................................................................ 22

4. Defendants' mischaracterization of antitrust injury fails. .......................................... 22

B. Plaintiffs plausibly plead that they are "efficient enforcers" of the antitrust laws......... 24

1. Plaintiffs plausibly plead that they suffered direct injury............................................ 24

a. Privity is not a prerequisite to antitrust standing. .................................................. 25

b. Investors have antitrust standing to sue for injuries suffered in commodity exchange trading, including that which is caused by anticompetitive conduct in corresponding physical markets............................................................................. 26

c. Silver investors have antitrust standing to sue for injuries suffered on the COMEX by anticompetitive conduct in the physical silver market........................................ 28

d. Defendants' umbrella standing argument is unavailing............................................ 29

2. Plaintiffs are sufficiently motivated to enforce the antitrust laws. ............................. 30

3. Plaintiffs' damages are real, not speculative, and do not present difficulties in apportionment........................................................................................................... 31

IV.     PLAINTIFFS PLAUSIBLY ALLEGE CEA MANIPULATION CLAIMS ............... 31

A. The Complaint's CEA claims, which derive from the same abuse of market power that subjects defendants to numerous violations of the antitrust laws, are evaluated under the notice pleading requirements of Rule 8(a). ............................................................. 31

B. If Rule 9(b) is applied, the CEA mandates a relaxed, less rigorous standard. ............... 33

C. Plaintiffs plausibly allege the four elements of a CEA manipulation claim. ................. 33

1. As Fixing Members and some of the world's largest silver market makers, Defendants had the ability to influence silver market prices. ..................................... 33

2. Defendants intended to cause artificial silver prices. .................................................. 34

a. CEA manipulative intent may be inferred by a showing that Defendants had the motive and opportunity to manipulate or from Defendants' conscious misbehavior or recklessness. ........................................................................................................ 35

        i.      Defendants were motivated by greed and had the opportunity to manipulate silver prices by virtue of their roles as Fixing Members and some of the world's largest silver market makers. ................................... 35

        ii.     Conscious misbehavior or recklessness. ................................................. 36

    3. Silver market prices were artificial during the Class Period. .................................... 38

    4. Defendants' manipulation proximately caused artificial silver prices. ...................... 39

  D. The Complaint also states plausible claims for CEA aiding and abetting and principal-agent liability............................................................................................................... 41

  E.  Plaintiffs adequately allege CEA actual damages.......................................................... 42

  F.  Plaintiffs also plausibly allege a CEA manipulative device claim................................ 43

    1. Defendants' manipulative conduct preceding August 15, 2011 is actionable............ 43

    2. Defendants incorrectly state the elements of a manipulative device claim............... 44

    3. "Insider trading" that serves to advantage Defendants over their clients violates Rule 180.1. ....................................................................................................................... 45

V. PLAINTIFFS PLAUSIBLY ALLEGE AN UNJUST ENRICHMENT CLAIM................ 45

VI.      PLAINTIFFS' CEA AND ANTITRUST CLAIMS ARE TIMELY ........................... 46

  A. Plaintiffs allege continuing antitrust violations; therefore each violation restarted the statute of limitations period........................................................................................... 47

  B.  Plaintiffs' CEA claims are timely. ................................................................................ 48

  C.  Defendants' fraudulent concealment tolled Plaintiffs' claims. ...................................... 49

CONCLUSION..................................................................................................................... 49

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Anderson News, L.L.C. v. Am. Media Inc.*,
 680 F.3d 162 (2d Cir. 2012) ............................................................................. 6, 14, 15, 17

*Associated Gen. Contractors of Cal., Inc. v. Carpenters*,
 459 U.S. 519 (1983) ................................................................................................ 25, 31

*BPP Ill., L.L.C. v. Royal Bank of Scot. Group Public Ltd.*,
 No. 13-4459-cv, 2015 U.S. App. LEXIS 7850 (2d Cir. May 13, 2015) ........................47

*Baena v. Woori Bank*,
 515 F. Supp. 2d 414 (S.D.N.Y. 2007) .........................................................................38

*Bell Atl. Corp. v. Twombly*,
 550 U.S. 544 (2007) ................................................................................................5, 14

*Blue Shield of Va. v. McCready*,
 457 U.S. 465 (1982) ...........................................................................................24, 25, 26

*Cange v. Stotler & Co.*,
 826 F.2d 581 (7th Cir. 1987) ....................................................................................34

*Cargill, Inc. v. Hardin*,
 452 F.2d 1154 (8th Cir. 1971) ..................................................................................35

*Carpenters Pension Trust Fund of St. Louis v. Barclays Public Ltd.*,
 750 F.3d 227 (2d Cir. 2014) ...............................................................................4, 24, 25

*DiPlacido v. CFTC*,
 364 F. App'x 657 (2d Cir. 2009) ............................................................................34, 40

*FTC v. Ind. Fed'n of Dentists*,
 476 U.S. 447 (1986) ..................................................................................................17

*Gatt Communs., Inc. v. PMC Assocs.*,
 711 F.3d 68 (2d Cir. 2013) .....................................................................................21, 22

*Gracey v. J.P. Morgan Chase & Co.* (*In re Amaranth Natural Gas Commodities Litig.*),
 730 F.3d 170 (2d Cir. 2013) ...................................................................................41, 42

*Gross v. New Balance Athletic Shoe, Inc.*,
 955 F. Supp. 242, 245-46 (S.D.N.Y. 1977) ...................................................................29

*Grosser v. Commodity Exch., Inc.*,
    639 F. Supp. 1293 (S.D.N.Y. 1986) .............................................................28, 29

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*,
    392 U.S. 481 (1968) .........................................................................................47

*Harris v. City of N.Y.*,
    186 F.3d 243 (2d Cir. 1999) .............................................................................46

*Hinds Cnty. v. Wachovia Bank*,
    700 F. Supp. 2d 378 (S.D.N.Y. 2010) ........................................................ 19, 32

*Hoover v. HSBC Mortg. Corp.*,
    9 F. Supp. 3d 223 (N.D.N.Y. 2014) .................................................................45

*Ill. Brick Co. v. Illinois*,
    431 U.S. 720 (1977) ..............................................24, 25, 26, 27, 28, 29, 31

*ImagePoint, Inc. v. JPMorgan Chase Bank*,
    27 F. Supp. 3d 494 (S.D.N.Y. 2014) ................................................................45

*In re Aluminum Warehousing Antitrust Litig.*,
    No. 13-md-2481, 2015 U.S. Dist. LEXIS 38743 (S.D.N.Y. Mar. 26, 2015) .......... passim

*In re Amaranth Natural Gas Commodities Litig.*,
    269 F.R.D. 366 (S.D.N.Y. 2010) .....................................................................42

*In re Amaranth Natural Gas Commodities Litig.*,
    587 F. Supp. 2d 513 (S.D.N.Y. 2008) .........................................................36, 42

*In re Amaranth Natural Gas Commodities Litig.*,
    612 F. Supp. 2d 376 (S.D.N.Y. 2009) ..............................................................36

*In re Commodity Exch., Inc. Silver Futures & Options Trading Litig.*,
    560 F. App'x 84 (2d Cir. 2014) .......................................................................37

*In re Copper Antitrust Litig.*,
    98 F. Supp. 2d 1039 (W.D. Wis. 2000) ............................................................29

*In re Copper Antitrust Litig.*,
    2000 WL 34230131 (W.D. Wis. 2000) .............................................................29

*In re Credit Default Swaps Antitrust Litig.*,
    No. 13md2476 (DLC), 2014 U.S. Dist. LEXIS 123784
    (S.D.N.Y. Sept. 4, 2014) ........................................................................... 24, 30

*In re Crude Oil Commodity Futures Litig.*,
913 F. Supp. 2d 41 (S.D.N.Y. 2012) ....................................................... passim

*In re Crude Oil Commodity Litig.*,
06 CIV. 6677, 2007 WL 1946553 (S.D.N.Y. June 28, 2007) ......................................... 42

*In re Dairy Farmers of Am., Inc.*,
767 F. Supp. 2d 880 (N.D. Ill. 2011) .............................................................45

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*,
No. 9 Civ. 3690, 2015 U.S. Dist. LEXIS 84152 (N.D. Ill. June 29, 2015) .................... 25

*In re DDAVP Direct Purchaser Antitrust Litig.*,
585 F.3d 677 (2d Cir. 2009) ......................................................... 20, 24, 26, 30

*In re Ins. Brokerage Antitrust Litig.*,
618 F.3d 300 (3d Cir. 2009) ......................................................... 17

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
935 F. Supp. 2d 666 (S.D.N.Y. 2013) ......................................................... 22, 34

*In re Natural Gas Commodity Litig.*,
337 F. Supp. 2d 498 (S.D.N.Y. 2004) .............................................. 36, 39, 48

*In re Natural Gas Commodity Litig.*,
358 F. Supp. 2d 336 (S.D.N.Y. 2005) .............................................................32

*In re Platinum & Palladium Commodities Litig.*,
828 F. Supp. 2d 588 (S.D.N.Y. 2011) ......................................................... 34, 44

*In re Publ'n Paper Antitrust Litig.*,
690 F.3d 51 (2d Cir. 2012) ......................................................... 18

*In re Soybean Futures Litig.*,
892 F. Supp. 1025 (N.D. Ill. 1995) .............................................34, 35, 40, 44

*In re Sumitomo Copper Litig.*,
182 F.R.D. 85 (S.D.N.Y. 1998) ......................................................... 38

*In re High Fructose Corn Syrup*,
295 F.3d 651 (7th Cir. 2002) .............................................................19

*In re Tronox, Inc.*,
No. 09 Civ. 6220 (SAS), 2010 U.S. Dist. LEXIS 67664 (S.D.N.Y. June 28, 2010) .......40

*In re Uranium Antitrust Litig.*,
    552 F. Supp. 518 (N.D. Ill. 1982) ............................................................................. 25

*In the Matter of Ind. Farm Bureau Coop. Ass'n, Inc.*,
    No. CFTC Dkt. No. 75-14, 1982 CFTC LEXIS 25 (Dec. 17, 1982) .................. 34, 35, 36

*Klehr v. A.O. Smith Corp.*,
    521 U.S. 179 (1997) ............................................................................................. 47

*Laydon v. Mizuho Bank*, No. 12-cv-3419 (GBD),
    2014 U.S. Dist. LEXIS 46368 (S.D.N.Y. Mar. 28, 2014) ...................................... *passim*

*Law Offices of Curtis v. Trinko, L.L.P.*,
    305 F.3d 89 (2d Cir. 2002) ...................................................................................25

*Leist v. Simplot*,
    638 F.2d 283 (2d Cir. 1980) .................................................................................33

*Loeb v. Sumitomo Corp.*,
    306 F.3d 469 (7th Cir. 2002) ............................................................................. *passim*

*Matter of Global Minerals & Metals Corp.*,
    *CFTC Docket No. 99-11*, 1999 WL 1023586 (CFTC 1999) ...........................................31

*N.C. State v. FTC*,
    135 S. Ct. 1101 (2015) ......................................................................................... 15

*New York v. Hendrickson Bros.*,
    840 F.2d 1065 (2d Cir. 1988) ..............................................................................49

*Ocean View Capital v. Sumitomo Corp. of Am.*,
    1999 WL 1201701(S.D.N.Y. 1997)......................................................................29

*Philip Morris, Inc. v. Heinrich*,
    No. 95 Civ. 0328 (LMM), 1996 U.S. Dist. LEXIS 9156 (S.D.N.Y. June 25, 1996) ....... 16

*Pollock v. Citrus Assocs. of N.Y. Cotton Exch., Inc.*,
    512 F. Supp. 711 (S.D.N.Y. 1981) ......................................................................27

*Sanner v. Bd. of Trade*,
    62 F.3d 918 (7th Cir. 1995) .................................................................................27

*Santa Fe Indus. v. Green*,
    430 U.S. 462 (1977) .............................................................................................44

*Sheehan v. Form*,
>104 F.3d 940 (7th Cir. 1997) ........................................................................ 40

*Simmtech Co. v. Barclays Bank Public Ltd.* (*In re Foreign Exch. Benchmark Rates Antitrust Litig.*),
>No. 14 Civ. 1364 (LGS), 2015 U.S. Dist. LEXIS 9826
>(S.D.N.Y. Jan. 28, 2015) ...................................................................... *passim*

*Sperry v. Crompton Corp.*,
>8 N.Y.3d 204 (2007) ..................................................................................45

*Starr v. Sony BMG*,
>592 F.3d 314 (2d Cir. 2010) ...................................................................14, 19

*Strax v. Commodity Exch., Inc.*,
>524 F. Supp. 936 (S.D.N.Y. 1981) ...................................................... *passim*

*Strobl v. N.Y. Mercantile Exch.*,
>768 F.2d 22 (2d Cir. 1985) ................................................................ 15, 26, 27

*Tenneco, Inc. v. FTC*,
>689 F.2d 346 (2d Cir. 1982) .......................................................................17

*Texas v. Penguin Group (USA) Inc. (In re Elec. Books Antitrust Litig.)*,
>No. 11 MD 2293, 2014 U.S. Dist. LEXIS 57473 (S.D.N.Y. Apr. 24, 2014 .....................22

*Todd v. Exxon Corp.*,
>275 F.3d 191 (2d Cir. 2001) ...................................................................17, 18

*Transnor, Ltd. v. BP N. Am. Petrol.*,
>736 F. Supp. 511 (S.D.N.Y. 1990) ................................................................42

*Transnor, Ltd. v. BP N. Am. Petrol.*,
>738 F. Supp. 1472 (S.D.N.Y. 1990) ..............................................................40

*U.S. Commodity Futures Trading Comm'n v. Amaranth Advisors, L.L.C.*,
>554 F. Supp. 2d 523 (S.D.N.Y. 2008) ......................................................36, 37

*U.S. Gypsum Co. v. Ind. Gas Co.*,
>350 F.3d 623 (7th Cir. 2003) .......................................................................26

*United States v. Apple, Inc.*,
>No. 13-3741-cv, 2015 U.S. App. LEXIS 11271 (2d Cir. June 30, 2015) ........... 15, 17, 20

*United States v. Koppers Co.*,
>652 F.2d 290 (2d Cir. 1981) ........................................................................16

*United States v. Parnon Energy Inc.*,
    875 F. Supp. 2d 233 (S.D.N.Y. 2012) ..................................................................... *passim*

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
    401 U.S. 321 (1971) ....................................................................................................47


**<u>Codes</u>**
15 U.S.C. § 1 (2012) ...................................................................................................15


**<u>Rules</u>**
Fed. R. Civ. P. 9(b) ............................................................................................ *passim*

**<u>Other</u>**

76 Fed. Reg. 41,398 (July 14, 2011)...........................................................................44

## PRELIMINARY STATEMENT

Silver prices are dictated by a combination of three of the world's largest banks.  Each trading day at noon London time, Defendants Bank of Nova Scotia ("BNS"), HSBC, and Deutsche Bank (collectively, the "Fixing Members") conduct a closed silver "auction," known as the London Silver Fixing (the "Silver Fix").  When it concludes, the Fixing Members release a number that is supposed to represent the current market price of silver (the "Fix Price") as determined by the group's competitive bids and offers.  However, throughout the Class Period, the Fixing Members conspired with Defendant UBS, the third largest silver market maker, to manipulate the Fix Price and the prices of physical silver and silver financial instruments to artificial levels that did not reflect the competitive forces of supply and demand, generating increased profits for Defendants at the expense of Plaintiffs' and the Class.

The importance of the Fix Price cannot be overstated.  Roughly $30 billion in physical silver and silver financial instruments are priced based on the Fix Price each year.  As some of the largest participants in the silver market, Defendants trade both physical silver and silver financial instruments that are priced based on results of the daily Silver Fix they control.

Defendants abused their position of control over the Silver Fix to disrupt the competitive market forces that determine silver prices.  Defendants shared confidential, market-sensitive information, including the details of their trading positions, their clients' names, incoming silver orders, and the Fix Price before its public release.  They engaged in classic anticompetitive trading strategies, including "jamming" client stop-loss orders, *i.e.*, forcing Class members to sell silver at artificially lower prices, and "front running," *i.e.*, placing trades ahead of large incoming orders that they knew would move silver prices.  Defendants also coordinated their activity as "market makers" who both buy and sell physical silver in the "spot market," *i.e.*, for immediate delivery, agreeing to quote prices at anticompetitive levels that did not reflect supply and

1

demand.  Through this concerted action, Defendants bent the market to their will, forcing silver prices to break from established market trends throughout the Class Period.

Defendants' scheme was designed to financially benefit their "trading positions," *i.e.*, those created to speculate on price movements in the silver market and generate profit, as distinct from "hedging positions," *i.e.*, those created to offset risk or financial losses on silver market positions.  By trading based on inside information, including advance knowledge of the Fix Price and incoming order flow, Defendants and their co-conspirators stood to generate greater returns than what they could have achieved by competing honestly, giving them a significant advantage over "uninformed" market participants, who suffered actual losses from Defendants' manipulative conduct.

These Defendants are experts at this form of manipulation and far from "ingénues making their first appearance at the debutante ball."[1]  UBS settled with FINMA, the Swiss financial regulator, for $139 million to resolve charges related to "clear attempts to manipulate fixes in the precious metals market," including the Silver Fix.  The FINMA settlement details how UBS coordinated its market activity with other currently unidentified co-conspirators.  To influence silver market prices UBS employed *identical* tactics to those it and Fixing Member HSBC used in their concerted manipulation of the foreign exchange ("FX") market.  The overlap in conduct is significant.  Both UBS and HSBC trade silver and other precious metals from their respective FX desks, implicating here the same group of traders and managers who rigged the FX market.  ¶ 12 (citing *UBS FINMA Report*).

## DEFENDANTS' FAILED ATTEMPTS AT MISDIRECTION

Rather than address the substance of Plaintiffs' allegations, Defendants create strawmen

---

[1] *In re Natural Gas Commodity Litig.*, 337 F. Supp 2d 498, 500 (S.D.N.Y. 2004) (rejecting defendants' claim of "Snow-white innocence" when they had paid the CFTC to resolve the same claims).

that are contradicted by the Complaint's factual allegations.[2]  Defendants' weak attempts to discredit the Complaint's well-pled allegations must be disposed of before going any further.[3]

### A. Strawman #1: The Complaint is nothing more than paid-for expert work.

Defendants' main argument—that the entire Complaint should be disregarded because it is based solely on "paid-for" expert work (Def. Br. at 21)—is false.  No matter how many times Defendants repeat this (and they do at least sixteen times) it still has no basis in fact or law.  The expert work underlying both the First and Second Consolidated Amended Complaint was in large part completed independently, before this case was filed.  Defendants know this; they attached a copy of Professor Caminschi's supposedly "undisclosed" and "unexplained" paper as Exhibit 1 to their declaration.[4]

A simple chronological review also disproves Defendants' argument.  Professor Caminschi began working on the Silver Linings paper in 2013.  On May 16, 2014, he first discussed the results at a University of Western Australia seminar,[5] and on July 7, 2014, he released a public working copy of the paper (which Defendants attach to their declaration).[6]  The Consolidated Amended Complaint,[7] incorporating this paper's findings,[8] was not filed until January 26, 2015, over six months after the paper's public release.

Defendants' argument that the Complaint is "premised on undisclosed methodologies" that "are not entitled to a presumption of truth – especially because the 'experts' … theories have

---

[2] The "Complaint" or "¶_" refers the Second Consolidated Amended Class Action Complaint.  ECF No. 63.

[3] "Def. Br." refers to ECF No. 76.

[4] *Lacovara Decl.* (ECF No. 77), at Ex. 1 (Andrew Caminschi, *Any Silver Linings? London Silver Fixing impact on public markets before and after the introduction of contemporaneous futures trading*, (July 7, 2014).

[5] https://web.archive.org/web/20140313122812/http://www.business.uwa.edu.au/students/research-seminars.

[6] *Lacovara Decl.*, at Ex. 1 (attaching *Silver Linings* "[c]urrent as of July 7, 2014").

[7] Consolidated Amended Class Action Complaint ("CAC"), ECF No. 34, at 4 n.12.

[8] *Compare e.g.*, *Lacovara Decl.*, at Ex. 1 at 69 to CAC at 88; Ex. 1 at 70 to CAC at 94; Ex. 1 at 77 to CAC at 95.

not been tested" should be rejected.  Def. Br. at 2.  Besides attaching this purportedly "undisclosed" paper to their Declaration, Defendants ignore that the *Silver Lining's* research was presented at several conferences in the last year and received two awards.[9]

Further, contrary to Defendants' argument, the Second Circuit accepts the use of expert economic analysis at the pleading stage and recognizes that any challenge to these results "is a question of fact that can be answered only upon a more fully developed record." *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC.*, 750 F.3d 227, 234 (2d Cir. 2014) (reversing dismissal of securities fraud case where loss causation allegations were supported by expert economic analysis).  It is inappropriate to resolve a challenge to Plaintiffs' economic work now.

**B.  Strawman #2: The Complaint is inconsistent with prior allegations.**

Defendants next misquote the Complaint and *Silver Linings* in an attempt to create factual "inconsistences."  These attempts are easy to spot and should be rejected.

*First*, they say that "[t]he Complaint speculates that Defendants suppressed prices to capitalize on their 'short' trading positions in silver."  Def. Br. at 3.  This, Defendants claim, is inconsistent with the CAC because the "Initial Complaint alleged that Defendants would sometimes make gains by 'establish[ing] long COMEX silver futures positions,' an act that would have resulted in *losses* had prices been suppressed persistently."  Def. Br. at 18.

Not so.  The CAC and this Complaint both allege that Defendants placed trades in the silver market based on their advance knowledge of the Fix Price and incoming order flow.  Below is the full paragraph that Defendants selectively misquote:

> In a scheme akin to front running, the Fixing Members, with complete and unaudited control over the Silver Fix, colluded with each other about where to fix the price of silver, and then either directly or through contact with their trading

---

[9] *Silver Linings* was awarded the best paper presented on Derivatives/Quantitative finance by the UNSW Business School and the best paper which has used SIRCA Data from the Curtin University Curtin Business School.

desks, established positions in the silver market that would financially benefit from where they know the price of silver was going to be fixed following the public release of the Silver Fix to the general market.   For example, if Defendants' decided that the Silver Fix was going to be higher than currently reflected in the price of COMEX silver futures contracts, Defendants' would establish long COMEX silver futures positions that would increase in value once the Silver Fixing results were released to the public and the price of silver increased.

CAC ¶ 135; *compare* Def. Br. at 18 (quoting in part CAC ¶ 135).

The foregoing allegations fit directly with the claim that Defendants generate illicit profits by taking positions in the silver market based on their advance knowledge of the Fix Price. ¶ 11.  This rebuts Defendants' related "inconsistency" that because silver prices increased during the Class Period, they could not have profited from the alleged scheme.  Def. Br. at 18.  This too ignores the Complaint's allegations regarding how Defendants profited from their scheme, which focuses on trading based on advance knowledge of silver prices and order flow, not on holding large short positions, which would increase in value if the price of silver decreased over time.[10]

*Second*, Defendants claim that *Silver Linings* provides an alternate explanation for the pricing dysfunction described in the Complaint, namely that "fixing results . . . are . . . driven by…price changes observed in the public markets."  Def. Br. at 3; *id.* at 24 (quoting *Silver Linings*, *Lacovara Decl.* Ex. 1 at 51-52)  However, when quoted in its entirety, *Silver Linings* concludes that the Fixing Members and their co-conspirators' anticompetitive conduct (not the

---

[10] *Cf. In re Commodity Exchange Inc., Gold Futures and Options Trading Litigation,* No. 14-md-02548 (VEC) ("*Gold Fixing Litigation*"), ECF No. 44. at ¶ 14 (alleging the gold defendants profited by suppressing gold prices for years by holding massive short positions in the futures market, which increased as the price of gold decreased).

acts of uninformed market participants) is the more plausible[11] explanation for the dysfunction in market prices during the Silver Fix:

> Combined, these results can be interpreted in one of two ways. The first we refer to as the "leakage" interpretation. Under this interpretation, short-term prices of public traded instruments are driven by the London silver fixing. Fixing participants are leaking the prices fixing information by trading in the exchange traded instrument prices ahead of the publication of the fixing price. The alternative interpretation we call "market push." Under the market push interpretation the direction of causality is reversed. Here it is the fixing results that are being driven by the price changes observed in the public markets. Participants of the public markets are "pushing" (manipulating) the short-term prices of the public instruments to influence the fixing results . . . **I argue the leakage interpretation is more plausible** . . . .

*Silver Linings*, at 51-52 (emphasis added). Thus, Defendants' claim that the CAC is inconsistent with the Complaint are baseless and should be entirely rejected.[12]

## FACTUAL OBSERVATIONS OF MANIPULATIVE CONDUCT

Contrary to Defendants' assertions, the Complaint's allegations are based on observations of the silver market, which are facts that are presumed to be true at the motion to dismiss stage. *Anderson News, L.L.C. v. Am. Media Inc.*, 680 F.3d 162, 185 (2d Cir. 2012) ("[I]n determining whether a complaint states a claim that is plausible, the court is required to proceed on the assumption that all [factual] allegations in the complaint are true") (underline in original).

**A. The Silver Fix causes a dysfunction in competitive market forces.**

The Complaint demonstrates, with more than 200 separate charts and exhibits, factual observations of, *inter alia*: (a) silver market prices; (b) COMEX silver futures trading volume; (c) spot market price volatility; (d) Defendants' individual spot market price quotes; (e) returns

---

[11] The Complaint's factual allegations are therefore far beyond the requisite plausible pleading standard. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007) ("[f]actual allegations [are] enough to raise a right of relief above the speculative level" when they present claims that are "plausible on [their] face.").

[12] This Court need not consider the CAC because it is entirely consistent with the Complaint. *See Lawrence R. Buchalter Alaska Trust v. Phila. Fin. Life. Assur. Co.*, No. 12 Civ. 6808, 2015 U.S. Dist. LEXIS 43026, at *47-8 (S.D.N.Y. Mar. 31, 2015) (courts in the Second Circuit consider prior pleadings only in "rare circumstances" when "the plaintiff directly contradicts the facts set forth in his original complaint . . . .").

available during the Silver Fix; and (f) the daily Fix Price.  These factors establish that the Silver Fix causes a "dysfunction," *i.e.*, a break from preceding and succeeding silver pricing dynamics unexplained by other market factors.  ¶ 170; Fig. 30.

This dysfunction is visible as a drop in silver prices that *only* happens during the Silver Fix while the Fixing Members are on the phone.  ¶¶ 120-21; Fig. 2.  The price drop is the largest of the day (¶¶ 120-21; Fig. 2) and statistically significant, distinguishing it from all other price decreases during the trading day.  ¶¶ 122-23; Fig. 3.  It is also unique in its *intensity*, which is greater than price changes at any other time of day (¶¶ 125-26; Fig. 4; App. A), its *timing*, which follows the start of the Silver Fix as it changes throughout the year (¶ 171; Fig. 31), its *frequency*, at times occurring on more than 90% of the trading days (¶ 129; Fig. 5), and its *persistence*, ignoring whether silver prices are increasing or decreasing (¶¶ 131-33; Figs. 7 & 8).

The observed drop in silver prices occurs in the spot and futures markets[13] and coincides with a significant spike in COMEX silver futures trading volume as well as a significant increase in spot market price volatility.  ¶¶ 140-46, 153-54; Figs. 14-15, 19. These spikes, which are caused by trading during the Silver Fix, reach their peak while the Fixing Members are still on the phone, *before* the Fix Price is released to the public.  ¶ 172; Fig. 32.  The timing is significant because a sharp increase in trading volume and price volatility *during* the Silver Fix goes against well-established economic principles, which dictate that the silver market should react with increases in volume and volatility *after* new information like the Fix Price is released to the public.  ¶¶ 143-48; Figs. 16 & 17.  These spikes in volume and volatility indicate that the Fixing Members and their co-conspirators are trading based on advance knowledge of the Fix Price, while it is still private information.  ¶¶ 143-44, 146.

---

[13] App. C (providing 140-plus examples of decreases in spot and futures prices around the start of the Silver Fix).

The location of these volume and volatility spikes within the trading day is also significant. These spikes occur *before* the start of COMEX silver "pit hours," when the New York-based exchange is fully open and where most of the COMEX silver futures volume is traded. ¶¶ 153-54; Figs. 19 & 20. Spikes in trading volume before the larger market opens are *not* caused by competitive market activity, but instead the Fixing Members' and their co-conspirators' trading during the Silver Fix. ¶¶ 153-54; Figs. 19 & 20.[14]

### B. Defendants' spot market activity demonstrates an agreement to fix prices.

The Complaint directly connects the Defendants' conduct to this observed pricing dysfunction by examining their market making activity in the silver spot market. Each Defendant, as a market maker, issues price quotes with two components: (1) a "bid price" at which they offer to buy silver; and (2) an "ask price" at which they offer to sell silver. ¶¶ 198-99. These price quotes are undeniably associated with each Defendant. ¶¶ 161-66.

Defendants consistently alter their bid and ask price quotes prior to the start of the Silver Fix, causing the above-referenced pricing dysfunction.[15] On more than 1900 days during the Class Period, Defendants' spot market price quotes change direction *before* the start of the Silver Fix (¶ 161), forcing a "reversion," *i.e.*, a change in direction, in which silver market prices break from an established directional trend during the Silver Fix. ¶ 155. The Complaint examines in detail all silver spot market quotes around the start of the Silver Fix on six of these 1900 days,[16]

---

[14] Defendants' allegations that Plaintiffs intentionally ignore the "large volumes of physical silver and silver financial instruments traded . . . in London and Dubai" is makeweight. Def. Br. at 25. COMEX is the dominant silver futures market. *Silver Linings* at 4. The Dubai silver futures contracts that Defendants cite did not begin trading until March 2006, and are cash settled to COMEX silver prices. *Lacovara Decl.* Ex 9, at 1.

[15] Defendants raise two challenges to this analysis: (1) the accuracy of the data used (which was obtained from Thomson Reuters); and (2) that bid-ask quotes are not indicative of actual prices. Def. Br. at 23. These arguments ignore Plaintiffs' allegations that by lowering their price quotes, Defendants caused prices of COMEX silver futures to artificially decrease. ¶¶ 155-66.

[16] The six examples that the Complaint discusses at length are exemplar of the remaining 1900 examples identified by Plaintiffs. That Plaintiffs elected to conserve the Court's resources by not including a detailed analysis of all 1900 examples does not make the Complaint any less plausible as "it should never take thousands of pages to state a

describing precisely how each Defendant caused a reversion in silver prices by lowering its bid and ask quotes *minutes before* the release of the Fix Price.  ¶¶ 157-66; Figs. 21 to 28.  The observed change in Defendants' quotes coincides with the decrease in prices of physical silver and silver financial instruments, which begins *prior to* the start of the Silver Fix, regardless of whether prices are higher or lower than the Fix Price at the start of the Fixing Members' daily conference call.  ¶¶ 131-33; Figs. 7 & 8.

This pattern, where Defendants' consistently lower their spot market price quotes *in advance* of the Silver Fix, indicates collusion—not competition.  ¶¶ 155-56.  In an unmanipulated market, the Fix Price should be evenly distributed, ending up higher or lower than the price of silver at the start of the Silver Fix roughly the same number of times.  ¶ 130.  Were Defendants honestly competing, they would not blindly lower their price quotes in advance of the Silver Fix at the risk of "guessing" the wrong direction.  This is especially true: (a) during years where the Fix Price comes out lower than the market price of silver at noon London time with an abnormally high frequency, *e.g.*, 60%, 70%, or even 80% of the time (¶ 130; Fig. 6); and (b) on days when the Silver Fix is extremely short in duration, *e.g.*, less than two minutes, providing little to no market information outside of the Silver Fix to guide Defendants' prices quotes precisely in the right direction.  ¶¶ 165-66; Figs. 27 & 28.  Regardless of the Silver Fix's duration or the distribution of Fix Prices in a given year, Defendants consistently and correctly alter their bid and ask quotes *before* the Fix Price is publicly released, demonstrating that they know where silver prices will be in the future.

Defendants' agreement to fix silver prices and share market-sensitive information is also evidenced by the nature of their "bid-ask spreads," or difference between the price at which they

---

claim."  *In re Aluminum Warehousing Antitrust Litig*. ("*Aluminum*"), No. 13-md-2481, 2015 U.S. Dist. LEXIS 38743, at *21-22 (KBF) (S.D.N.Y. Mar. 26, 2015).

offer to buy ("bid") and sell ("ask") silver in the spot market.  Measuring the bid-ask spread is one way to evaluate the market's level of certainty future silver prices will be.  ¶ 201.  Well-established economic principles dictate that if Defendants were competing and did not know the results of the Silver Fix in advance, the bid-ask spread for their silver spot market quotes should be wider before the Silver Fix and narrower once the Fix Price is released to the public and provides certainty about global silver prices.  *Id.*

This expected change does not occur.  The bid-ask spread between the Defendants' quotes remains consistently wider and does not react to the Fix Price's release,[17] unlike other market makers, who narrow their spread upon the release of the Fix Price. ¶¶ 202, 205; Figs. 44 & 46.  The fact that Defendants' spreads do not respond to the Fix Price's release demonstrates that they have advance knowledge of the Fix Price.

### C. Defendants capitalized on the pricing dysfunction they created by trading based on an informational advantage over uninformed market participants.

By manufacturing a pricing dysfunction in the silver market, Defendants created an arbitrage condition, unavailable to market participants outside of their cartel, capable of generating risk-free returns based on their advance knowledge of where silver prices and order flow would be in the future.  ¶ 177.  While the rest of the market must wait for the Fix Price to be released, "informed" traders, like the Defendants and their co-conspirators, trade with knowledge of the Fix Price in advance of its public release.  ¶¶ 177-83.  This trading is evidenced by the large spikes in trading volume and price volatility observed during the Silver Fix, which consistently predicted the direction of the Fix Price more than 83% of the time.  ¶¶ 149-52.  The level of accuracy jumps to 96.3% on days where there are large returns to be gained, indicating

---

[17] Defendants' position that a wider bid-ask spread would not result in supra-competitive pricing is incorrect.  Def. Br. at 19.  Because the bid-ask spread "create[s] a starting point" for market prices, an artificially wider spread *a fortiori* results in artificial prices.  *See In re NASDAQ Market-Markers Antitrust Litig.*, 172 F.R.D. at 125.

that Defendants further coordinate their informed trading to capitalize on these larger risk-free returns.  ¶ 152.

By trading based on inside information, Defendants and their co-conspirators enjoy outsized returns regardless of market conditions.  ¶¶ 183-84; Figs. 37 & 38.  Whether silver prices moved up or down, by sharing information about the Fix Price and their incoming order flow in advance of the rest of the market, Defendants are in a position to generate profits irrespective of overall trends in the silver market.[18]

Defendants' short-term trading positions benefit from their manipulative conduct.  ¶ 208.  All Defendants report holding large precious metals trading positions, including physical silver and silver financial instruments, during the Class Period.  ¶¶ 208-12; Figs. 48-51.  These positions, which are used to generate a profit, are substantially larger than their "hedging positions," used to offset financial risk.  ¶ 208.  Thus, Defendants are not "price neutral" and directly benefitted from changes in silver prices.[19]  While each Defendant reports these positions differently, *e.g.*, HSBC includes silver positions as part of its FX trading desk (¶ 208) and UBS reports its silver positions with other commodities (¶ 210), all Defendants hold large, unhedged, silver trading positions that financially benefit from their scheme.  ¶ 212.

To understand Defendants' motivation one need only look at how profitable it is to trade based on inside information.  Compared to "uninformed" market participants like Plaintiffs and the Class, who do not know the outcome of the Fix Price before its public release, Defendants generate an additional 25 basis points per day in the COMEX silver futures market and 40 basis

---

[18] Defendants argue that they would have to "maintain large, unhedged short positions for a 15-year period . . . to benefit from long-term price suppression." Def. Br. at 18.  But, the Complaint alleges that Defendants generated illicit profits in all market conditions, regardless of direction, by establishing trading positions based on their advance knowledge of silver prices, not by persistently suppressing silver prices to benefit their large short positions.  ¶ 183; Fig. 37 & 38.

[19] Defendants' position that they were "price neutral" due to "regulatory incentives to hedge trading risk" (Def. Br. at 6 n.4) is not supported by the regulatory guidance they cite which only *suggest* minimum capital requirements.

points per day in the spot silver market.  ¶¶ 180-81.  Defendants stood to gain at least an annualized return of more than 87% on COMEX silver futures positions and a 172% annualized return on silver spot market positions.  *Id.*  This is in contrast to an uninformed trader who returned only four basis points per day, five to ten times *less* than those in the know.  ¶ 182.

**D.  Defendants' manipulative conduct permanently impacted silver market prices.**

During the Class Period, Defendants' manipulative conduct had a lasting impact on silver prices and the prices of silver financial instruments.  While the large, uncontested drop in silver prices described above occurs around the start of the Silver Fix, its impact continues throughout the day, causing artificially lower prices in both the physical silver and COMEX silver futures markets.  ¶¶ 173-76; Figs. 33 & 34.  These artificial prices persist throughout the trading day, well beyond Fix Price's release.  *Id.*  As a result, regardless of when Plaintiffs initiated their physical silver and silver financial instrument positions during the trading day, the cumulative impact of this progressive lowering of silver prices injured Plaintiffs when they liquidated those positions at artificially lower prices, receiving less than they should have in a competitive and unmanipulated market.  ¶¶ 230-234; App. D.  This caused Plaintiffs, who as a result lost money on their silver transactions, actual injuries.  ¶¶ 18-27.

**E.  Government investigations confirm the nature of Defendants' scheme.**

These factual observations are confirmed by UBS' FINMA settlement for "clear attempts to manipulate fixes in the precious metals markets" (¶¶ 12-13, 155-56) and the conduct identified in both UBS' and HSBC's CFTC and FCA settlements for their coordinated FX market manipulation.  ¶ 213.  These regulators found that Defendants' scheme in both the precious metals and FX markets focused on creating an informational advantage for cartel members by sharing private information about the Defendants' trading books, including both client orders and their own proprietary trading positions.  ¶ 215.

The overlap in manipulative tactics that UBS and HSBC employed in the FX and silver markets is no coincidence.  UBS' and HSBC's precious metals and FX trading units are irrefutably intertwined: they trade from the same desk and are subject to the same management and monitoring processes (or lack thereof). ¶ 214.  As UBS' precious metals and FX "businesses are closely integrated" (¶ 240), it is unsurprising that UBS used the same techniques to manipulate both markets.  ¶¶ 214-15.  For example, to manipulate the silver market, UBS shared information with *third parties*,[20] including stop-loss orders, flow information, and client names. ¶¶ 12, 169, 220, 224.  These findings are reiterated in UBS' FX settlements with the CFTC (finding UBS exchanged client orders and other private information with traders at other banks to manipulate benchmark rates) and FCA (stating UBS triggered clients' stop-loss orders and shared clients' identities and order information with traders at other firms). ¶ 13.

Similarly, HSBC's Global Banking and Markets unit includes FX and precious metals.  ¶ 15.  HSBC reports its precious metals earnings as part of its FX business.  ¶ 208; Fig. 48.  HSBC settled with the CFTC and FCA for its FX-related misconduct, which included colluding with traders at other firms to trigger clients' stop-loss orders and sharing clients' confidential information (¶¶ 13, 213), behavior consistent with what is observed here.

Because both banks' FX desks colluded to manipulate the FX markets, it is at least facially plausible that these same desks, made up of the same employees and managers, duplicated these manipulative strategies and techniques in the silver market.  ¶ 13.  Given the factually identical behavior described across markets, Defendants' FINMA, CFTC, and FCA settlements are highly relevant at the pleading stage.[21]

---

[20] Defendants concede UBS' conduct in the silver market was "partly coordinated with other banks."  Def. Br. at 27.

[21] *In re Foreign Exch. Benchmark Rates Antitrust Litig.,* No. 13 Civ. 7789, 2015 U.S. Dist. LEXIS 9826 at *29 (S.D.N.Y. Jan. 28, 2015) ("*FX Litig.*") ("the reported investigations and their outcomes merely buttress the critical allegations" in the complaint).

Regulators are still investigating the Silver Fix.  ¶ 15.  Since filing the Complaint, the DOJ revoked UBS' Non-Prosecution Agreement ("NPA") for UBS' LIBOR manipulation, finding that UBS breached the NPA by continuing to manipulate the FX market after obtaining leniency in its fourth DOJ matter in six years.[22]  UBS pled guilty to wire fraud, agreeing to comply with all DOJ inquiries into its manipulation of "the foreign exchange spot and precious metals markets."[23]  These recent facts further support the plausibility of Plaintiffs' claims.[24]

## ARGUMENT

## I.   THE RELEVANT PLEADING STANDARD: RULE 8(a)

As Defendants acknowledge (Def. Br. at 12-13), Rule 8(a) applies to antitrust claims. *See Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 182 (2d Cir. 2012).  Pleading under Rule 8(a) requires only "a short and plain statement of the claim," sufficient "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Twombly*, 550 U.S. at 545.  Rule 8(a) is satisfied where the "[f]actual allegations [are] enough to raise a right of relief above the speculative level," *Twombly*, 550 U.S. at 555 (citation omitted), and presents claims that are "plausible on [their] face."  *Id.* at 570.  Rule 8(a) "does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of an agreement[.]"  *Id.* at 556.

The court must review the complaint as a whole, accept all well-pleaded factual allegations as true, and draw all reasonable inferences in plaintiff's favor.  *Anderson News,* 680 F.3d at 182.  Importantly, "[a] court ruling on [a 12(b)(6)] motion may not properly dismiss a complaint that states a plausible version of the events merely because the court finds a different

---

[22] Plea Agreement, *United States v. UBS AG*, Case No. 15-cr-00076, ECF No. 6 (May 20, 2015).

[23] *Id.* at 3.

[24] *See Starr v. Sony BMG Music Entm't,* 592 F.3d 314, 325 (2d Cir. 2010) (permitting plaintiffs to plead that the DOJ "launched two new investigations into whether defendants engaged in collusion and price fixing[.]").

version more plausible." *Id.* Therefore, any competing counterfactual scenarios a defendant poses must be rejected. *Id.*

## II.   PLAINTIFFS PLAUSIBLY PLEAD A SHERMAN ACT CLAIM

This case arises from the Defendants' concerted effort to manipulate the price of silver and silver financial instruments for their financial benefit. Antitrust law prohibits "cartels, price fixing, and other combinations or practices that undermine the free market." *N.C. State Bd. of Dental Exam'rs v. FTC*, 135 S. Ct. 1101, 1109 (2015). "[P]rice manipulation is an evil that is always forbidden under every circumstance by both the Commodity Exchange Act and the antitrust laws." *Strobl v. New York Mercantile Exchange*, 768 F.2d 22, 28 (2d Cir. 1985).

Section 1 of the Sherman Act proscribes "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. Where, as here, Defendants jointly (1) "impose[] their view of proper pricing, supplanting the market's free play" by (2) "raising, depressing, fixing, pegging, or stabilizing prices," they violate Section 1. *United States v. Apple, Inc.*, No. 13-3741, 2015 U.S. App. LEXIS 11271, at *90, 95 (2d Cir. June 30, 2015). The precise "machinery employed is immaterial." *Id.* at *90.

Plaintiffs allege three causes of action under Section 1: price fixing, bid rigging, and otherwise unreasonably restraining trade.

### A. Count I: Price Fixing

"Group efforts to raise, lower, or stabilize prices directly interfere with the free play of market forces and constitute unlawful price fixing." *Aluminum*, 2015 U.S. Dist. LEXIS 38743, at *76. When competitors in the same market engage in horizontal price fixing, it is *per se* illegal. *Id.* at *74-75; *see also Apple*, 2015 U.S. App. LEXIS 11271, at *74-75 ("Horizontal price-fixing conspiracies traditionally have been, and remain, the archetypal example of a *per se* unlawful restraint on trade.") (internal quotations omitted). The Silver Fix was supposed to

determine the Fix Price through a competitive auction for silver among the Fixing Members.  By jointly dictating the price of silver during the Class Period at artificial levels that did not reflect competitive market forces, Defendants engaged in price fixing in violation of the Sherman Act.

Plaintiffs allege that the Fix Price was the product of concerted action between direct horizontal competitors.  Plaintiffs transacted in silver and silver financial instruments that were priced based on the Fix Price and Defendants manipulated the Fix Price for their benefit.  On these facts, Plaintiffs plausibly allege a *per se* illegal price fixing conspiracy.  *See FX Litig.*, 2015 U.S. Dist. LEXIS 9826, at *13-14 (finding a per se price fixing conspiracy because "(i) the Fix is a 'pricing mechanism' and the 'primary benchmark for currency trading globally'; (ii) the Fix is the price at which Plaintiffs bought FX instruments from Defendants; and (iii) Defendants manipulated this price[.]").

### B.  Count II: Bid Rigging

Conspiracies between firms to submit collusive, non-competitive, rigged bids are per se violations of the Sherman Act.  *United States v. Koppers Co*., 652 F.2d 290, 294 (2d Cir. 1981).  Where, as here, Plaintiffs "allege[] facts detailing an extensive bid rigging scheme involving the Defendants," they have alleged "precisely the type of conduct that the Sherman Act prohibits."  *Philip Morris, Inc. v. Heinrich*, No. 95 Civ. 0328, 1996 U.S. Dist. LEXIS 9156, at *26-29 (S.D.N.Y. June 25, 1996).  Plaintiffs, who sold and held physical silver and silver financial instruments, allege that Defendants abused their position of control over the Silver Fix to manipulate the results of a competitive daily silver auction to artificially lower levels during the Class Period.  This is classic bid rigging in violation of the Sherman Act.

### C.  Count III: Unreasonable Restraint of Trade

Plaintiffs allege that Defendants' conspiracy to fix prices, rig bids, and to otherwise manipulate the price of silver caused actual anticompetitive effects in the form of artificially low silver prices.  Where, as here, a "complaint that sufficiently pleads a per se violation need not separately plead harm to competition."  *FX Litig.*, 2015 U.S. Dist. LEXIS 9826, at *35.  However, by pleading the anticompetitive price effects of Defendants' conspiracy and overt acts, Plaintiffs adequately allege an unreasonable restraint of trade under a rule of reason analysis.  *FTC v. Indiana Federation of Dentists*, 476 U.S. 447, 458 (1986).

### D.  Plaintiffs plead facts to support an inference of a conspiracy.

Circumstantial evidence is "the lifeblood of antitrust law." *Tenneco, Inc. v. F.T.C.*, 689 F.2d 346, 361 (2d Cir. 1982).  Conspiracies may be "proven through inferences that may fairly be drawn from the behavior of the alleged conspirators."  *Anderson News*, 680 F.3d at 183 (internal quotations omitted).  When assessing conspiracy allegations, Defendants' conspiracy may be inferred when "interdependent conduct is accompanied by circumstantial evidence and plus factors such as defendant's use of facilitating practices." *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001).  Plaintiffs are not required to plead direct evidence of conspiracy, *i.e.*, an "actual, verbalized communication of any sort among Defendants" to meet this standard.  *Aluminum*, 2015 U.S. Dist. LEXIS 38742, at *86.

Circumstantial evidence of an agreement, or plus factors "serve as proxies for direct evidence of an agreement."  *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 360 (3d Cir. 2004).  Plus factors can "include: a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications."  *Apple, Inc.*, 2015 U.S. App. LEXIS 11271, at *58-59. Although Plaintiffs need only "establish at least one 'plus

17

factor,'" the Complaint plausibly alleges at least seven "plus factors" from which a conspiracy may be inferred.  *See In re Brokerage Antitrust Litig.*, 618 F.3d 300, 323 (3d Cir. 2010).

First, Defendants used **interfirm communications** to implement their scheme. ¶¶ 169, 220, 224.  The Silver Fix itself is a daily telephone call.  ¶¶ 96.  *See, e.g., In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 65 (2d Cir. 2012) ("ample evidence of conspiratorial behavior" where defendants communicated in "private phone calls and meetings—for which no social or personal purpose [was] persuasively identified").  Additionally, UBS' FINMA settlement details how Defendants used electronic communications to share nonpublic information, including the triggering the prices of their clients' stop-loss orders (¶ 224-25) and flow information about large incoming and pending client orders (¶¶ 220-21).  UBS and its co-conspirators used this information to engage in front running of incoming Silver Fix orders (¶ 226-29).

Second, by communicating non-public client information and their own proprietary trading positions with their co-conspirators, Defendants **acted against their individual economic self-interests**.  ¶¶ 215, 219.  As horizontal competitors who compete for clients in the silver market, it was against Defendants' interest to share their clients' names and order information with their horizontal competitors.  ¶ 217.  Defendants also shared information regarding their proprietary trading positions.  ¶¶ 177, 208-12.  In a competitive market, where Defendants compete for trading profit, sharing information regarding their proprietary positions would be against each Defendant's economic interests as it would tip off a competitor to their view of the silver market.  Here, it facilitated Defendants' ability to coordinate their trading activity, an essential element of their conspiracy.  ¶¶ 213, 216, 221.

Third, Defendants' **exchange of nonpublic information** is, in and of itself, a plus factor that indicates the existence of a price-fixing agreement.  *See Todd*, 275 F.3d at 198 ("Information

exchange is an example of a facilitating practice that can help support an inference of a price-fixing agreement."); *see also FX Litig.*, 2015 U.S. Dist. LEXIS 9826, at * 27 (conspiracy evinced by defendants' use of electronic communications "to share market-sensitive information with rivals' including price information, customer information, and their net trading positions before the setting of the Fix.") (internal quotations omitted).

Fourth, the ***structure of the Silver Market*** facilitated collusion among Defendants because: (a) the Fixing Members maintained sole control over the Fix Price; (b) the Silver Fix had high barriers to entry; and (c) lacked any regulatory oversight. *See In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 654-55 (7th Cir. 2002) (holding that the "structure of the market was such as to make secret price fixing feasible.").  The daily "auction" was closed to the public and only the Fixing Members could join the daily, secret conference call.  ¶¶ 1, 94, 100. No one else was allowed to become a Fixing Member, creating a significant barrier to entry.

Fifth, ***government regulators are still investigating*** Defendants for their Silver Fix manipulation.  *See Starr*, 592 F.3d at 325 (permitting plaintiffs to plead the existence of government to support the plausibility of plaintiffs' allegations); *see also Hinds County v. Wachovia Bank N.A.,* 700 F. Supp. 2d 378, 394-95 (S.D.N.Y. 2010) ("A plaintiff may surely rely on governmental investigations[.]") (citation omitted).  In February 2015, the DOJ and CFTC began investigating the Defendants for rigging the precious metals markets, including an inquiry into the Silver Fix.  ¶ 235.

Sixth, the Complaint includes ***economic evidence*** demonstrating that the markets for silver and silver financial instruments are susceptible to manipulation.  Courts routinely use economic evidence as a plus factor where a defendant has not yet admitted to participating in the alleged price fixing conspiracy.  *See In re High Fructose Corn Syrup*, 295 F.3d at 655 ("evidence

that the market behaved in a noncompetitive manner" is important where evidence is suggestive rather than conclusive.).  Here, the Complaint presents overwhelming economic evidence indicating that the silver market behaved in a noncompetitive manner, as discussed *supra* at 6-12.

Seventh, Plaintiffs allege a ***common motive*** among Defendants to financially benefit their silver positions.  ¶¶ 177-98, 208-12.[25]  *See infra* at Section IV.C.2.a.i.

## III.  PLAINTIFFS HAVE ANTITRUST STANDING TO BRING THEIR CLAIMS

Antitrust standing exists where a Plaintiff alleges "antitrust injury" and is an "efficient enforcer" of the antitrust laws.  *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 688 (2d Cir. 2009).  Defendants challenge Plaintiffs' Complaint under both prongs of the antitrust standing test.  Def. Br. at 27-34.  We discuss both below in turn.

### A.  Plaintiffs adequately plead "antitrust injury."

Antitrust injury is an injury "of the type the antitrust laws were intended to prevent flowing from that which makes defendants' acts unlawful."  *In re Crude Oil Commodity Futures Litig.*, 913 F. Supp. 2d 41, 56-57 (S.D.N.Y. 2012) (citation omitted).  As articulated in *FX*:

> Courts in the Second Circuit employ a three-step process for determining whether a plaintiff has sufficiently alleged antitrust injury.
>
> First, the party asserting that it has been injured by an illegal anticompetitive practice must identify the practice complained of and the reasons such a practice is or might be anticompetitive.
>
> Second, courts identify the actual injury the plaintiff alleges, i.e., the ways in which the plaintiff claims it is in a worse position as a consequence of the defendant's conduct.

*FX Litig.*, 2015 U.S. Dist. LEXIS 9826, at *39-40.

---

[25] Defendants' argument that Plaintiffs must plead a "common motive" is wrong.  *See Apple, Inc*., 2015 U.S. App. LEXIS 11271, at *65 ("'Antitrust law has never required identical *motives* among conspirators' when their independent reasons for joining together lead to collusive action.") (citation omitted).

### 1.  Plaintiffs satisfy the three-part antitrust injury test.

The Complaint satisfies all three *Gatt* factors.  First, Plaintiffs have identified a practice that "is or might be anticompetitive": the Defendants' use of the Silver Fix to fix the prices of silver and silver financial instruments at artificial levels that did not reflect competitive market forces.  *Gatt*, 711 F.3d at 76; *supra* at 1, 12.

Second, this anticompetitive conduct resulted in "actual injury" to Plaintiffs.  The Complaint details how Defendants left Plaintiffs in a "worse position" because the physical silver and silver financial instruments they held would have been more valuable had Defendants not manipulated the silver market.  ¶¶ 102-18, 230-34; App. D.  Plaintiffs suffered actual injury when they sold silver and silver financial instruments at artificially lower prices.  ¶¶ 230-34.

Finally, comparing the "anticompetitive effect" of the collusive Silver Fix with the alleged injury—consequential losses on Plaintiffs' silver futures contracts and other silver positions—there is a match between the alleged effect, *i.e.*, that the prices of physical silver and silver financial instruments were artificially lower than they would have been in a competitive market, and the actual injury, *i.e.*, a reduction in value of Plaintiffs' physical silver and silver financial instruments.  *Gatt*, 711 F.3d at 76.

### 2.  Plaintiffs suffered actual injury regardless of when they traded silver and silver financial instruments.

Defendants' argument that Plaintiffs did not suffer "actual injury" because they did not trade "at the affected times of the conspiracy's 'on' days," *i.e.*, when prices dropped during the Silver Fix is fundamentally flawed.  Def. Br. at 32.  Plaintiffs are not required to plead that they traded at the exact moment that Defendants engaged in manipulative conduct to demonstrate actual injury.  *FX Litig.*, 2015 U.S. Dist. LEXIS 9826, at *38 (rejecting same argument because it "demand[s] for specifics that are not required, and that Plaintiffs could not be reasonably

21

expected to know, at the pleading state.").  Contrary to Defendants' position that their manipulative conduct was "related to a 10-minute portion of only certain trading days" (Def. Br. at 32), the Complaint establishes a lasting impact beyond the Silver Fix's end.  ¶¶ 173-176. Plaintiffs identify the specific the days that they sold physical silver and silver financial instruments at artificially lower prices caused by Defendants' manipulative conduct and how that caused them injury.  ¶¶ 230-234; App. D.  This sufficiently pleads actual injury.[26]

### 3.  Plaintiffs' actual injuries are not speculative.

Defendants also argue that Plaintiffs' actual injury is too "speculative in nature" to establish antitrust standing.  Def. Br. at 30.  This is false.  Plaintiffs allege a "concrete and particularized" injury as a direct result of Defendants' manipulative conduct, sufficient to demonstrate actual injury. *FX Litig.,* 2015 U.S. Dist. LEXIS 9826, at *37; *see also Aluminum*, 2015 U.S. Dist. LEXIS 38743 at *55.  Plaintiffs' injuries flow from Defendants' manipulative trading strategies and their manipulation of the Fix Price, which *directly* impacts the value of physical silver and silver financial instruments.  ¶¶ 3, 102, 118.  This is distinct from the LIBOR cases Defendants' rely on, as there are not "independent factors that could influence perceptions in the market, and pricing decisions."  Def. Br. at 31.  Only one "factor" determines the prices of silver and silver financial instruments—the Silver Fix.  ¶¶ 103-112.

### 4.  Defendants' mischaracterization of antitrust injury fails.

Defendants argue that their anticompetitive conduct did not cause an antitrust injury because it did not "harm[] competition, as opposed to Plaintiffs personally."  Def. Br. at 33. Their reliance on the *Laydon* is unavailing.  *Laydon* followed the *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 935 F. Supp. 2d 666 (S.D.N.Y. 2013) ("LIBOR I") determination

---

[26] *See Texas v. Penguin Group (USA) Inc. (In re Elec. Books Antitrust Litig.)*, No. 11 MD 2293, 2014 U.S. Dist. LEXIS 57473, at *29-30 (S.D.N.Y. Apr. 24, 2014) ("the fact that a given e-book's price fell does not prove that the price was not inflated.").

that there was no antitrust injury because "the setting of the [Yen] LIBOR benchmark rate . . . is a cooperative effort where in otherwise competing banks agreed to submit estimates of their borrowing costs to facilitate calculation of an interest rate index." *Laydon v. Mizuho Bank, Ltd.*, 12-cv-3419, 2014 U.S. Dist. LEXIS 46368, at *29 (S.D.N.Y. Mar. 28, 2014).  This reasoning does *not* apply because the Silver Fix is a competitive auction based on actual transactions.  ¶¶ 2 (Fix Price based on supply and demand resulting from a competitive silver auction); ¶¶ 96, 97, 104 (explaining Silver Fix's auction for 1,000 ounce silver bars).

Defendants also fail in their attempts to reattribute the alleged injury to competition.  Def. Br. at 33.  The Complaint specifically alleges that Defendants "caus[ed] a dysfunction in the normal competitive process of silver pricing that fixed the prices of silver and silver financial instruments at artificial, anticompetitive levels for [their] financial benefit."  ¶ 4.  The Complaint also demonstrates how the Defendants' conduct caused "an observable dysfunction in the competitive pricing dynamics of the silver market."  ¶ 119.  This break from competitive pricing caused Plaintiffs to transact at artificial prices and suffer antitrust injury.  ¶¶ 230-34.

Defendants argue that market participants were not "required to reference the Silver Fix price."  Def. Br. at 34.  But the Complaint alleges that the Fix Price was the price of silver used throughout the world, (¶¶ 3, 103), determined the price of physical silver, the commodity underlying COMEX silver futures contracts (¶¶ 106-08), and was the price at which Plaintiffs and the Class transacted physical silver and silver financial instruments during the Class Period ¶ 102, 230; c*f Aluminum*, 2015 U.S. Dist. LEXIS 38743, at *61 (allegations that "Midwest Premium" was an industry-standard price component made it plausible that plaintiffs were "forced to pay that premium).

**B. Plaintiffs plausibly plead that they are "efficient enforcers" of the antitrust laws.**

In addition to sufficiently pleading "antitrust injury," Plaintiffs sufficiently plead that they are "efficient enforcers" of the antitrust laws. Plaintiffs "plausibly allege facts that support [their] suitability as a plaintiff[s] to pursue the alleged antitrust violation." *Aluminum*, 2015 U.S. Dist. LEXIS 38743. There are "four 'efficient enforcer' factors": (1) the directness or indirectness of the asserted injury; (2) the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement; (3) the speculativeness of the alleged injury; and (4) the difficulty of identifying damages and apportioning them among direct and indirect victims so as to avoid duplicative recoveries." *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d at 687-88 (citation omitted). This multi-factor approach to antitrust standing builds on *Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982), which governs the "determination of the plaintiff's right to maintain an action under § 4." *Associated General Contractors of Cal., Inc. v. California State Council of Carpenters*, 459 U.S. 519, 538 (1983) ("*AGC*").

**1. Plaintiffs plausibly plead that they suffered direct injury.**

"Directness in the antitrust context means close in the chain of causation." *See In re Credit Default Swaps Antitrust Litig.*, No. 13-md-2476, 2014 U.S. Dist. LEXIS 123784 (S.D.N.Y. Sept. 4, 2014). This essentially involves a proximate causation analysis. *Lotes Co. Ltd. v. Hon Hai Precision Indus. Co.*, *Ltd.*, 753 F.3d 395, 411-12 (2d Cir. 2014) (considering, *inter alia*, whether the alleged injury (a) was in the scope of the risk that defendant's wrongful act created; (b) was a natural or probable consequence of defendant's conduct; (c) the result of a superseding or intervening cause). Plaintiffs' injuries here result from Defendants' manipulation of the Fix Price, which determined the value of the silver and silver financial instruments they traded and are sufficiently direct to confer antitrust standing.

24

### a.   Privity is not a prerequisite to antitrust standing.

Defendants' reliance on the direct purchaser analysis in *Ill. Brick Co. v. Illinois*, 431 U.S.

720 (1977) is unfounded.  *Illinois Brick* only applies in the context of a "distribution chain"

where "customers and customers of customers are only affected by the anticompetitive scheme

through the imposition of prices higher than prices in a competitive market . . . the only harm

suffered . . . is that part of the higher prices that are passed on to it."  *Law Offices of Curtis v.*

*Trinko, L.L.P.*, 305 F.3d 89, 106-07 (2d Cir. 2002).  *Illinois Brick* specifically "focused on the

risk of duplicative recovery engendered by allowing every person ***along a chain of distribution***

to claim damages arising from a single transaction that violated the antitrust laws."  *Blue Shield*

*of Va.*, 457 U.S. at 474-75 (1982).  However, "[w]here these dangers are not present, *Illinois*

*Brick* does not operate as a bar to an antitrust claim."  *In re Uranium Antitrust Litigation*, 552 F.

Supp. 518, 520 (N.D. Ill. 1982).[27]  As one district court recently held:

> Since *Illinois Brick* came down in 1977, antitrust defendants have tried to stretch
> its application to stand for the proposition that 'a defendant cannot be sued under
> the antitrust laws by any plaintiff to whom it does not sell (or from whom it does
> not purchase),' but, as the Seventh Circuit has noted, '[s]uch a rule would
> eliminate in one fell swoop all competitor suits based on exclusionary practices,'
> which is 'a step that the Supreme Court has never taken.' *Loeb [Indus. v.*
> *Sumitomo Corp.*, 306 F.3d [469,] 481 [(7th Cir. 2002)]. And the Supreme Court
> subsequently clarified that 'the chain-of-distribution inquiry in Illinois Brick was
> meant only to preclude duplicate recovery.' *Id.* (citing [*Blue Shield of Va. v.*
> *McCready*, 457 U.S. [465,] 468-70 [(1982)]; *see also id.* at 482 ('The reason the
> plaintiffs' suit in *Illinois Brick* failed was not because the defendants did not sell
> to them. Rather, it was because the defendants did sell to a third party who . . .
> could recover for any injury they claimed.').

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, No. 9 Civ. 3690, 2015 U.S. Dist.

---

[27] *See also, e.g., Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 481 (7th Cir. 2002). ("*Illinois Brick* does not stand for the proposition, as the defendants would seem to have it, that a defendant cannot be sued under the antitrust laws by any plaintiff to whom it does not sell.").

LEXIS 84152, at *19-20 (N.D. Ill. June 29, 2015).[28]

This case does not involve a claim by customers of Defendants' customers, claiming that an overcharge was passed down to them through a chain of distribution. Plaintiffs' injuries flow from Defendants' anticompetitive conduct around the Silver Fix and resulting Fix Price, which directly determine the value of their physical silver and silver financial instruments. ¶¶ 102-118. In contrast to *Illinois Brick*, where an initial overcharge was passed down the chain to each subsequent purchaser, with each level of the chain suffering a different injury, there is no "distribution chain" in this case. All Plaintiffs were impacted equally when they sold silver or silver financial instruments on a date where prices were artificially lower as a result of Defendants' conduct. *See* App. D.[29]

> **b. Investors have antitrust standing to sue for injuries suffered in commodity exchange trading, including that which is caused by anticompetitive conduct in corresponding physical markets.**

In *Strobl v. New York Mercantile Exchange*, 768 F.2d 22, the Second Circuit squarely held that private parties may bring suit under both the Sherman Act and the Commodity Exchange Act. This forecloses Defendants' privity argument. *Illinois Brick*-style direct purchaser privity cannot be a prerequisite to antitrust standing in light of *Strobl* and the CEA's legislative history, which states that "price manipulation is an evil that is always forbidden under every circumstance by both the Commodity Exchange Act and the antitrust laws[.]" *Id.*

---

[28] *Accord Aluminum*, 2015 U.S. Dist. LEXIS 38743, at *56-68 (sustaining antitrust claims by purchasers of aluminum where most plaintiffs did not buy directly from defendants).

[29] Antitrust standing is routinely found in numerous circumstances where there is no privity, *i.e.*, plaintiffs are not direct purchasers. *See, e.g., In re DDAVP*, 585 F.3d at 687-88 (competitor and consumers both had standing to sue for antitrust violation despite lack of privity); *see also Aluminum*, 2015 U.S. Dist. LEXIS 38743, at *63-64 (parties may have standing to sue for damages suffered in one market, where the anticompetitive conduct occurred in another related or "inextricably intertwined" market); *United States Gypsum Co. v. Indiana Gas Co.*, 350 F.3d 623, 627-28 (7th Cir. 2003) (where a cartel "elevates price throughout the market" parties having paid the "higher price" thus "suffer antitrust injury" and such "injury through elevation of price in the affected market satisfies any distinct 'antitrust standing' requirement").

at 28.  *Strobl* explained that "the legislative history of the 1974 amendments [to the CEA] reveals that Congress desired the continued application of the antitrust laws to those anti-competitive practices that also violate the Commodity Exchange Act."  *Id*. at 28.

Defendants' proposed privity-only rule would bar antitrust standing to seek redress for injuries that may "also violate the Commodity Exchange Act," (*i.e*, injuries suffered in commodity exchange trading), and thus directly conflicts with *Strobl*.  On an exchange, ***nobody is in privity*** with anyone other than the (mechanical) central clearinghouse entity (who acts as the buyer to every seller and the seller to every buyer, undertaking no price risk itself).  Defendants' prophylactic "privity-only" rule would place a large portion of the nation's economy wholly outside the bounds of the antitrust laws, an argument which has been expressly rejected in this District, as it would "preclude the application of the antitrust laws to any economic activity effected through an exchange system, since it is impossible to show that a particular purchaser bought from a particular seller in such a context."  *Strax v. Commodity Exchange, Inc*., 524 F. Supp. 936, 940 (S.D.N.Y. 1981) (recognizing antitrust standing of silver futures traders on the COMEX, and explaining that *Illinois Brick* does not apply in this setting).

Numerous cases, ignored by Defendants, hold that investors have antitrust standing to sue for injuries suffered in commodity exchange trading, including for injuries caused by anticompetitive conduct in corresponding physical markets as demonstrated here.  *See, e.g., Sanner v. Board of Trade*, 62 F.3d 918, 929 (7th Cir. 1995) ("[P]articipants in the cash market can be injured by anticompetitive acts committed in the futures market . . . The futures market and the cash market for soybeans are thus 'so closely related' that the distinction between them is of no consequence to antitrust standing analysis."); *Loeb Indus., Inc.*, 306 F.3d at 483,

n.2 ("conspiracy to rig prices for the entire physical market, accomplished through manipulation of the Comex futures market").[30]

> ### c. Silver investors have antitrust standing to sue for injuries suffered on the COMEX by anticompetitive conduct in the physical silver market.

The silver market is no stranger to unsuccessful challenges to antitrust standing, specifically for those that traded COMEX silver futures and options contracts, where the application of *Illinois Brick*, has been rejected. *See, e.g., Grosser v. Commodity Exchange, Inc*., 639 F. Supp. 1293, 1318-1322 (S.D.N.Y. 1986); *Strax*, 524 F. Supp. at 937-38.

*Strax* arose when the Hunt Brothers cornered the silver market and impacted COMEX futures contracts. *Id*. at 937. Plaintiff Strax, like a number of the Plaintiffs in this case, traded COMEX silver futures contracts and brought claims under the Sherman Act and the Commodity Exchange Act ("CEA"). Similar to Defendants here, the defendants argued against antitrust standing under *Illinois Brick* "because Strax does not allege that he or the members of the proposed class entered into transactions directly with the defendants, but only that defendants' actions had a primary impact on the market in which Strax traded as a whole[.]" *Id*. at 939. The Court rejected defendants' argument, expressly noting that *Illinois Brick* "does not bar Strax's claim." *Id.* at 940 (defendants' position would "preclude the application of the antitrust laws to any economic activity effected through an exchange system, since it is impossible to show that a particular purchaser bought from a particular seller in such a context. Such a proposition finds no support in law or policy."). *Grosser*, which revisited *Strax* post-*AGC* and *Macready*, held

---

[30] *See also In re Crude Oil Commodity Futures Litig*., 913 F. Supp. 2d 41, 57 (S.D.N.Y. 2012) (antitrust standing established by the "close relationship" between physical and futures markets for WTI crude oil); *Pollock v. Citrus Associates of the New York Cotton Exchange, Inc*., 512 F. Supp. 711 (S.D.N.Y. 1981) (holding *Illinois Brick* inapplicable to orange juice futures trading).

that silver futures traders have antitrust standing to sue for damages suffered in exchange

trading. *Grosser*, 639 F. Supp. at 1317-18.

### d.  Defendants' umbrella standing argument is unavailing

Defendants are incorrect in arguing that to escape *Illinois Brick*, Plaintiffs invoke an

"umbrella theory of liability."  Def. Br. at 29.  The "umbrella theory of liability" relates to claims

for damages where a plaintiff purchased goods from a nonconspiring retailer who unwittingly

charged higher prices as a result of the alleged conspiracy.  *See Gross v. New Balance Athletic*

*Shoe, Inc.*, 955 F. Supp. 242, 245-46 (S.D.N.Y. 1977) (buying New Balance shoes from a non-

conspiring retailer due to the fact that these "pure" retailers unwittingly priced their products

under the "umbrella" of a conspiracy inflating market prices).

The "umbrella theory" is not in play in this case.  Plaintiffs do not allege that the

Defendants caused their competitors to elevate prices under an "umbrella" of the

supracompetitive prices that the cartel charged.  Rather, Plaintiffs allege that the Fix Price

determines the price of the entire silver market—so nothing is alleged to be affected by actions

of non-culpable entities.  *See Loeb*, 306 F.3d at 484.  Because the Defendants' cartel set all silver

prices to anticompetitive levels by rigging the Silver Fix, there is no umbrella under which

innocent prices laid—the Defendants' conduct directly affected all prices. *See Pollock*, 512 F.

Supp. at 719 n.9 (distinguishing between umbrella liability, where "[a] price fixing arrangement

allows a relatively small seller to raise its price to the level protected by the price 'umbrella,'"

and manipulation of a futures market, where "the price throughout the market allegedly rose as a

result of the defendants' activities" and rejecting application of *Illinois Brick*).[31]  The "umbrella

theory," thus has no application here.

---

[31] Defendants' reliance on *Ocean View Capital v. Sumitomo Corp. of America*, 98 Civ. 4067, 1999
WL 1201701(S.D.N.Y. 1997) is misplaced.  Defendants omit that the *Ocean View* court lacked power over the

## 2.   Plaintiffs are sufficiently motivated to enforce the antitrust laws.

The Second Circuit has explained the standard by which to judge whether an antitrust

plaintiff has sufficient motivation to sue under *AGC*:

> The second factor simply looks for *a* class of persons naturally motivated to
> enforce the antitrust laws. "Inferiority" to other potential plaintiffs can be
> relevant, but it is not dispositive.

*DDAVP*, 585 F.3d at 689.  Antitrust standing will lie, where, as here, Plaintiffs are "naturally

motivated to enforce the antitrust laws due to their distinct injuries."  *In re Credit Default Swaps*,

2014 U.S. Dist. LEXIS 123784, at *26 (plaintiffs held to be efficient enforcers where third

parties "lost profits on their venture, whereas plaintiffs paid supracompetitive prices.").

Moreover, when it is the case that denying the plaintiffs a remedy may "leave a significant

antitrust violation undetected or unremedied," *AGC*, 459 U.S. at 542, the second factor will

support standing.  *DDAVP*, 585 F.3d at 689.

Defendants' argument that there are "superior alternative plaintiffs" ignores the nature of

the Silver Fix.  The Fix Price is the global price of silver.  ¶ 102.  It is used by everyone from

jewelers, to miners, central bankers and COMEX silver futures traders to price benchmark and/or

settled their transactions involving physical silver and silver financial instruments.  *Id.*  Because

the Fix Price directly impacts the value of multiple silver investments, there is no "best" plaintiff

in this case.  Rather, all silver market participants, by virtue of the fact that "all business, whether

---

dispute.  *See In re Copper Antitrust Litig.*, 2000 WL 34230131, at *15 (W.D. Wis. 2000) (noting that the opinion
cited by Defendants here was "ineffectual," even between the parties to that case). The actual binding decision found
plaintiffs had standing, explicitly rejecting the attempt to shoehorn the case into the same *Illinois Brick*/"umbrella
liability" dichotomy argued by Defendants here. *See id.* (plaintiffs in physical copper market had standing for acts in
"exchange contract" market, absent privity with defendants); *In re Copper Antitrust Litig. (Ocean View Cap. v.
Sumitomo Corp. of Am.)*, 98 F. Supp. 2d 1039, 1051-53 (W.D. Wis. 2000) (allegations of a "relationship" between
prices sufficed to confer standing), *aff'd sub nom, Loeb*, 306 F.3d at 484 (concluding that "damage from the
defendants' conduct was felt in two separate markets: the futures market and the physical copper market," and that
there was a proper plaintiff for each market).

for large or small amounts, is conducted solely on the basis of a single Fixing Price," are equally

impacted by, and thus motivated to prosecute, Defendants' violations of the antitrust laws.

### 3. Plaintiffs' damages are real, not speculative, and do not present difficulties in apportionment.

The Complaint contains economic evidence, including expert findings based on

sophisticated economic models and regression analyses.  As a general matter, some complexity

is inherent in every antitrust plaintiff's estimate of the but-for price and resulting

damages.  However, the market is "not so complicated that one cannot estimate to a reasonable

degree of accuracy the amount of damage a party has sustained."  *Loeb*, 306 F.3d at

490.  Moreover, there have been great advances in computer-assisted economic analyses during

the thirty years since *AGC* was decided that reduce many of the concerns regarding the

complexity of damage calculations.  *See Loeb*, 306 F.3d at 493.

Finally, there is no need to apportion damages at all.  Unlike *Illinois Brick*, this is not

a distribution chain pass-on case.  Each Plaintiff and Class member suffered its own antitrust

injury and damages resulting from the same antitrust violations directly at Defendants' hands.

## IV.    PLAINTIFFS PLAUSIBLY ALLEGE CEA MANIPULATION CLAIMS

### A. The Complaint's CEA claims, which derive from the same abuse of market power that subjects defendants to numerous violations of the antitrust laws, are evaluated under the notice pleading requirements of Rule 8(a).

Courts in this District apply a "case-specific approach" to determine the appropriate

pleading standard for CEA violations.  *U.S. Commodity Futures Trading Comm'n v. Parnon*

*Energy Inc.*, 875 F. Supp. 2d 233, 244-45 (S.D.N.Y. 2012) ("*Parnon*").[32]  Under the "case-

specific approach," CEA manipulation claims that arise from an abuse of market power are

---

[32] The CFTC has described CEA manipulation as a form of "restraint of trade," providing additional justification for the application of Rule 8(a) to Plaintiffs' CEA manipulation claims. *In the Matter of Global Minerals & Metals Corp.*, CFTC Docket No. 99-11, 1999 WL 1023586, *n. 51 (CFTC Nov. 12, 1999) ("[a]fter all, manipulation is an example of an illegal restraint of trade").

subject to Rule 8(a) notice pleading.  *See id.*  Here, as in *Parnon*, Plaintiffs' CEA claims are not grounded in misleading statements, but on Defendants' abuse of market power through their control of the Silver Fix and as the first, third, sixth, and fifteenth largest silver market makers, combined with repeated high volume, uneconomic and manipulative trades that caused artificial fluctuations in silver futures and spot market prices.  ¶¶ 1, 40, 56, 73, 100, 199, 293-95 (Defendants control the Silver Fix and are the first, third, sixth, and fifteenth largest silver market makers); ¶¶ 177-97 (Defendants capitalized on the pricing dysfunction they created in the silver market by trading in advance of the public release of the Fix price); ¶¶ 5-6, 119-69 (prices in the silver spot market and silver futures market drop by an average of more than 15 basis points around the start of the Silver Fix).

Defendants' attempts to transform Plaintiffs' CEA claims into those that "sound in fraud" based on allegations that Defendants "created a false impression about supply and demand of silver" are unavailing.  Def. Br. at 34.  This allegation by itself does not subject the Complaint to a heightened pleading standard.  Unlike *LIBOR I*, on which Defendants rely, this case does not involve false reports or "estimates" about market prices.  Rather, it involves the literal fixing of silver prices and the manipulation of both the physical and futures markets through, *inter alia*, an abuse of their positions of power as Fixing Members and some of the world's largest silver market makers.  The precise means by which Defendants' abused their market power does not change this inquiry. For example, in *Hinds Cnty.*, Judge Marrero held that allegations that defendants submitted "sham courtesy bids," used "code language" to pre-arrange "collusive" bids, and "repeatedly and falsely assured" plaintiffs that bids were solicited fairly and competitively did not abrogate application of Rule 8(a) to plaintiffs' claims which centered on anticompetitive conduct to rig prices.  *See Hinds Cnty.,* 700 F. Supp. 2d at 389-92.

**B.  If Rule 9(b) is applied, the CEA mandates a relaxed, less rigorous standard.**

If this Court finds that Rule 9(b) applies to any portion of Plaintiffs' CEA claims (which it does not), the Court should apply the more relaxed, flexible version used in other CEA manipulation cases.  *See, e.g., Natural Gas*, 358 F. Supp. 2d at 343 ("Plaintiffs must satisfy the flexible Rule 9(b) standard that other courts in this District have found applicable to market manipulation claims, rather than the more generic standard applicable to allegations of fraudulent statements . . . ").  To satisfy the relaxed CEA manipulation Rule 9(b) standard, the Complaint need only allege "'what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market. . . .'" *Id.* (citation omitted).  The Complaint satisfies this standard and particularizes Defendants' dominant positions in the silver market (¶¶ 1, 40, 56, 73, 100, 199, 293-95), providing examples of each Defendants' individual, as well as collective, manipulative acts (¶¶ 177-229) on specific dates (¶¶ 155-69; App. D), and describes the artificial prices resulting from their manipulative conduct (¶¶ 5-6, 119-69).

**C.  Plaintiffs plausibly allege the four elements of a CEA manipulation claim.**

To state a claim for CEA manipulation, a plaintiff must allege that: (1) defendants possessed the ability to influence market prices; (2) defendants specifically intended to do so; (3) an artificial price existed; and (4) defendants caused the artificial prices.  *DiPlacido v. U.S. Commodity Futures Trading Comm'n*, 364 F. App'x 657, 661 (2d Cir. 2009).[33]

> **1.  As Fixing Members and some of the world's largest silver market makers, Defendants had the ability to influence silver market prices.**

While the ability to influence market prices can manifest itself in various ways, having

---

[33] In applying these elements, it is important to remember that the CEA is unqualifiedly remedial legislation. *See Leist v. Simplot*, 638 F.2d 283, 315 (2d Cir. 1980). Congress depends on the "critical" role of private suits to deter violations of the CEA. *See Cange v. Stotler & Co., Inc.*, 826 F.2d 581, 584 (7th Cir. 1987).

market power or a dominant position in the market automatically satisfies this requirement. *See Parnon*, 875 F. Supp. 2d at 245. Evaluating market power "is fact-intense, and courts reserve dismissal on this issue for pleadings containing only bare and conclusory allegations." *Id.* The Complaint undeniably surpasses this standard.

The Fixing Members and their co-conspirator UBS controlled the Silver Fix and dictated the global price of silver each day during the Class Period. ¶¶ 1, 100, 293-95. Not only did Defendants have complete control over the Silver Fix, but BNS, UBS, HSBC, and Deutsche Bank were the first, third, sixth, and fifteenth most active silver market makers in the world during the Class Period. ¶¶ 40, 56, 73, 199. Defendants claim that because they were only four of sixty-five silver market makers during the Class Period, it was impossible for them to influence silver market prices. Def. Br. at 41 n.27. This blatantly ignores the Complaint's allegations which specifically demonstrate how each Defendant caused prices to be artificial by manipulating their silver spot market quotes. *E.g.*, ¶ 161 and Fig. 24 (December 15, 2009: Deutsche and UBS); ¶ 162 and Fig. 25 (September 20, 2005: HSBC and UBS); ¶ 164 and Fig. 26 (June 6, 2006: Deutsche, HSBC, and UBS).[34] This establishes the ability to influence the prices of silver and silver financial instruments. *LIBOR I*, 935 F. Supp. 2d at 714 (LIBOR contributor panel banks undeniably had the ability to influence LIBOR).

### 2. Defendants intended to cause artificial silver prices.[35]

---

[34] Courts recognize that the elements of CEA manipulation are "factually and legally interdependent," thus the Complaint's well-plead allegations that Defendants had the ability to influence silver market prices improves the plausibility of Plaintiffs' intent and causation allegations. *See In re Soybean Futures Litig*. 892 F. Supp. 1025, 1045 (N.D. Ill. 1995) ("*Soybean Futures*"); *Parnon*, 875 F. Supp. 2d at 248.

[35] Contrary to Defendants' argument (Def. Br. at 35-38), a "strong inference of scienter," is not required. *See In re Platinum & Palladium Commodities Litig*., 828 F. Supp. 2d 588, 598 (S.D.N.Y. 2011) (rejecting Defendants "strong inference of scienter" argument and holding that "a defendant must have acted with the purpose . . . of causing . . . a price or price trend in the [particular] market that did not reflect the legitimate forces of supply and demand[.]") (internal quotation and citation omitted); *see* FED. R. CIV. P. 9(b) ("[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally.").

CEA manipulative intent is "conduct [which] has been intentionally engaged in which has resulted in a price which does not reflect the basic forces of supply and demand." *Cargill, Inc. v. Hardin*, 452 F.2d 1154, 1163 (8th Cir. 1971); *see also In re Indiana Farm Bureau Coop. Assoc.*, 1982 CFTC LEXIS 25, at *17 (C.F.T.C. Dec. 17, 1982) ("[I]n order to prove the intent element of a manipulation . . . it must be proven that the accused acted (or failed to act) with the purpose or conscious object of causing or effecting a price or price trend in the market that did not reflect the legitimate forces of supply and demand[.]").

Intent to cause artificial prices is a subjective inquiry and because "it is impossible to discover a[] manipulator's state of mind, intent must of necessity be inferred from the objective facts and may, of course, be inferred by a person's actions and the totality of the circumstances." *Indiana Farm Bureau*, 1982 CFTC LEXIS 25, at *14.  Given the subjective, fact-intensive, and *ad hoc* nature of manipulative intent, courts typically refuse to decide this issue even on summary judgment. *See e.g., Soybean Futures*, 892 F. Supp. at 1058-59 (denying summary judgment on CEA intent).

> **a.  CEA manipulative intent may be inferred by a showing that Defendants had the motive and opportunity to manipulate or from Defendants' conscious misbehavior or recklessness.**

Manipulative intent may be alleged by facts "(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *Laydon*, 2014 U.S. Dist. LEXIS 46368, at *20.  Though not required, the Complaint alleges both possible varieties of manipulative intent.

> **i.  Defendants were motivated by greed and had the opportunity to manipulate silver prices by virtue of their roles as Fixing Members and some of the world's largest silver market makers.**

Motivated by greed, Defendants used their positions of control over the Silver Fix and leading market makers to capitalize on an opportunity to manipulate silver prices to generate illegitimate profits.  The Complaint specifically alleges that Defendants created a pricing dysfunction in the silver market that allowed them and their co-conspirators to reap ill-gotten trading profits through their manipulation of the Silver Fix, the silver spot market, and the prices of silver financial instruments.  ¶¶ 11, 177, 212.  Because Defendants were "'informed traders' with advance knowledge of the Fix price direction," Defendants were able to capitalize by establishing positions in the market that would increase in value once the Fix price was released to the public.  ¶¶ 177-91 and Figs. 35-42.  The Complaint details the difference in returns of informed traders with advance knowledge of the Fix Price against uninformed traders, alleging that informed traders, like the Fixing Members and their co-conspirator UBS, stood to gain a return of "more than 87% per year simply by using their advance information."  ¶¶ 177-193; Figs. 35, 39-40.[36]

### ii.    Conscious misbehavior or recklessness.

CEA manipulative intent may also be inferred through allegations of conscious misbehavior or recklessness.  Here, one could reasonably infer from each Defendant's actions and the totality of the circumstances (*see Indiana Farm Bureau*, 1982 CFTC LEXIS 25, at *14) that Defendants intentionally and/or recklessly[37] caused or effected an artificial price trend in the silver market that did not reflect legitimate forces of supply and demand.  *In re Amaranth*

---

[36] *See Laydon*, 2014 U.S. Dist. LEXIS 46368, at *20 (finding allegations that defendants "stood to gain tremendous profits from manipulating Euroyen TIBOR and Yen-LIBOR" sufficient to infer motive); *U.S. Commodity Futures Trading Comm'n v. Amaranth Advisors, L.L.C.*, 554 F. Supp. 2d 523, 533 (S.D.N.Y. 2008) ("profit motives render the inference of intent even more plausible.").  No other silver market participants could achieve these lucrative results.

[37] *Amaranth*, 587 F. Supp. 2d at 531 (plaintiff must allege defendant's conduct "is 'at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'").

*Natural Gas Commodities Litig.*, 612 F. Supp. 2d 376, 383-84 (S.D.N.Y. 2009) (express allegations of deliberate misconduct or recklessness, *e.g.*, ignoring obvious signs of misconduct, are sufficient to plead manipulative intent).

This inference is especially appropriate here where Defendants are some of the world's largest silver market makers with complete control over the Fix Price. *See In re Natural Gas*, 337 F. Supp. 2d at 500 (the court was "not persuaded that these Defendants are ingénues making their first appearance at the debutante ball").  Defendants were well aware of the basic features of the Silver Fix, the resulting Fix Price, and the impact that it had on the market for silver and silver financial instruments.  The Complaint contains numerous examples of Defendants' misconduct from which conscious misbehavior or recklessness can be inferred, including that Defendants:

- created a statistically significant drop in the price of silver and silver financial instruments by actively trading silver and silver financial instruments during the Fix (¶¶ 171-80; Figs. 33 & 35);

- coordinated their spot market quotes around the start of the Silver Fix, knowing it would cause artificial silver prices (*e.g.*, ¶ 161; Fig. 24 (December 15, 2009: Deutsche and UBS); ¶ 162 and Fig. 25 (September 20, 2005: HSBC and UBS); ¶ 164 and Fig. 26 (June 6, 2006: Deutsche, HSBC, and UBS))[38];

- actively traded silver financial instruments, including silver futures contracts, at the time they knew silver market prices were being manipulated (¶¶ 188-93; Figs. 39 & 40)[39];

- concealed their manipulation from regulators and the market (¶¶ 254-58)[40];

- fixed the bid-ask spread between their price quotes (¶¶ 198-207);

- shared private, market-sensitive information to coordinate their trading in advance of the Silver Fix (¶¶ 213-29); and

---

[38] *See also Amaranth*, 554 F. Supp. 2d at 532-33 (knowledge that selling near the close of trading hours has the effect to exacerbate and cause artificial prices "reveal[s] an intent to manipulate prices").

[39] *Parnon*, 875 F. Supp. 2d at 249-50 (finding that defendants' manipulative intent can be inferred from their trading activity following their awareness of a market not reflective of legitimate supply and demand).

[40] *See Baena v. Woori Bank*, 515 F. Supp. 2d 414, 421 (S.D.N.Y. 2007) ("The significance of the subsequent lies is that they speak to whether defendants acted with scienter—an intent to deceive . . . . The subsequent lies—the cover up—if proven, would be strong circumstantial evidence of [defendants'] . . . 'conscious misbehavior'[.]").

- constantly communicated with each other via electronic chat rooms, as confirmed by the UBS FINMA settlement, to engage in classic manipulative trading practices including: (i) "sharing client information and order flow (¶¶ 219-223); (ii) triggering client "stop loss orders" (¶¶ 224-25); (iii) front running their clients' fix orders (¶¶ 226-29); and (iv) maintaining an artificial bid-ask spread, "paying artificially less for silver and then reselling it at an artificially higher price" (¶¶ 198-207).

Together, these classic indicators of manipulative intent show that Defendants engaged in conscious misbehavior or at least were reckless in their manipulation of the price of silver and silver financial instruments including silver futures contracts during the Class Period.[41]

### 3. Silver market prices were artificial during the Class Period.

An artificial price is one that "does not reflect basic forces of supply and demand. *Parnon*, 875 F. Supp. 2d at 246. To determine whether artificial prices existed, "one must look at the aggregate forces of supply and demand and search for those factors which are extraneous to the pricing system, are not a legitimate part of the economic pricing of the commodity, or are extrinsic to that commodity market." *In re Sumitomo Copper Litig.*, 182 F.R.D. 85, 91. (S.D.N.Y. 1998). Courts consider a variety of factors in determining price artificiality, including "historical price comparisons, an evaluation of supply and demand factors, comparison of spreads, and comparison of the cash market for the commodity at issue." *Id.* at 90 n.6; *see also Parnon,* 875 F. Supp. 2d at 246 (market manipulation "is implicitly an artificial stimulus applied to (or at times a brake on) market prices, a force which distorts those prices, a factor which prevents the determination of those prices by free competition alone.").

---

[41] Defendants reliance on *In re Commodity Exch., Inc., Silver Futures & Options Trading Litig.*, 560 F. App'x 84 (2d Cir. 2014) and *In re Crude Oil Commodity Litig.*, 06 CIV. 6677 (NRB), 2007 U.S. Dist. LEXIS 47902 (S.D.N.Y. June 28, 2007) ("*Crude Oil*"), is misplaced. In those cases, the court relied on the fact that **no** administrative proceedings had been brought, and that plaintiffs had failed to allege even one specific manipulative act by defendants. *Silver*, 560 F. App'x 84; *Crude Oil*, 2007 U.S. Dist. LEXIS 47902, at *22. In stark contrast, here, Plaintiffs have plausibly alleged hundreds of manipulative acts by each Defendant, which include 1900 examples of reversions in futures market pricing caused by Defendants' spot market activity. ¶¶ 161-69; App. D.

The Complaint alleges that during the Class Period there was a dysfunction in silver pricing dynamics beginning at the start of the Silver Fix that reflected a breakdown in competitive market forces.  ¶ 120.  This pricing dysfunction was categorized by an abnormally large drop in silver prices and spike in volume and price volatility.  ¶¶ 120-24; Figs. 2 & 3. These features demonstrate that prices did not reflect supply and demand.  *First,* supply and demand principles dictate that "if silver legitimately went 'on sale' every day at the time of the Silver Fix, buyers should flock to purchase silver at the lower Fix price, buoying silver prices by increasing demand and reducing the intensity of any price change."  ¶¶ 7, 128, 147-478; Figs. 16 & 17. *Second,* the timing of the volume and volatilities spikes is a break from normal market activity, occurring when the futures markets are not fully open. ¶¶ 8, 126-27; Fig. 4.  *Third*, the Fix Price was lower than the price of silver at the start of the Silver Fix an abnormally large number of days, outnumbering times when it ended up higher.  ¶¶ 129-30; Figs. 5 & 6.  Together these facts demonstrate that the prices of silver futures contracts were artificial and did not reflect the basic forces of supply and demand.  *See supra* 1, 12.

### 4.  Defendants' manipulation proximately caused artificial silver prices.

"Many of the allegations addressing Defendants' ability to affect prices also relate to causation."  *Parnon*, 875 F. Supp. 2d at 248.  To plead CEA causation, a plaintiff must allege a causal relationship between the purportedly manipulative conduct and the alleged market response. *See DiPlacido*, 364 F. App'x at 661-62.  "It is enough" if a plaintiff alleges a defendant's actions "contributed to the price movement."  *Parnon*, 875 F. Supp. 2d at 248.

Here, there is a direct causal relationship between Defendants' manipulation of the Silver Fix and silver spot market and the dysfunction in the market. Silver is the "commodity underlying" silver financial instruments, including silver futures contracts.  ¶ 108. Therefore, any manipulation of the Fix price, which determines the price per ounce of physical silver underlying

these instruments, directly impacted their value.  ¶¶ 106-09, 113-14, 119; Fig. 1.[42]  Defendants

do not—and cannot—contest this fact, as the self-proclaimed purpose of the Silver Fix is to serve

a price-discovery function for the price of silver.   ¶ 3.

Additionally, the Complaint specifies that "a COMEX silver futures contract is 'priced

based on,' *i.e.*, it derives its value from, an underlying 5,000 ounces of physical silver.  ¶ 108.  If

the price of physical silver changes, so does the value of the COMEX silver futures contract."

*Id.*  The Complaint uses economic analyses to demonstrate this direct pricing relationship,

showing "that the prices of COMEX silver futures contracts are directly impacted by changes in

the Fix price, which determines the value of the physical silver underlying each COMEX silver

futures contract."[43] ¶¶ 113-14; Fig. 1.

Plaintiffs' regression analyses also show "that 99.85% of the variation in the price of

COMEX silver futures contracts between January 1, 2004 and December 31, 2013 is explained

by the results of the Silver Fix."  Fig. 1. *See Laydon,* 2014 U.S. Dist. LEXIS 46368, at *19

(finding that plaintiff adequately alleged CEA manipulation using "economic analyses [to] show

that Yen-LIBOR impacted Euroyen TIBOR prices during the Class Period and that false

---

[42] Confronted with this direct pricing relationship, Defendants erect a new pleading standard, whereby a complaint must "explain why buyers would continue to line up over a 15-year span to purchase futures during a period of declining prices."  Def. Br. at 40. First off, this requirement has absolutely nothing to do with the purpose of a complaint—providing a defendant notice of the allegations against it. *See Natural Gas*, 337 F. Supp. 2d at 508. Second, Defendants manage to provide an explanation for the steady stream of buyers on the prior page, stating that silver refiners and industrial producers use the Silver Fix as an opportunity to manage inventory or to hedge risk. Def. Br. at 39. Actors within the silver market use the silver futures market for various reasons, including hedging and speculating, so any contention that buyers would not purchase futures ignores the general purpose of the commodities markets.

[43] Defendants argue that "a regression analysis cannot demonstrate a causal relationship between two variables." Def. Br. at 40-41 (citing *Sheehan v. Daily Racing Form*, 104 F.3d 940, 942 (7th Cir. 1997)). *Sheehan* is an appeal of the admissibility of an expert's affidavit on summary judgment, not a case about the plausibility of causation allegations on a motion to dismiss. *See Sheehan*, 104 F.3d 940 at 943. Here, Plaintiffs need not provide record evidence at this stage, thus, Defendants' causation argument is ill-suited for a motion to dismiss and completely surpasses the pleading standard in this District.  *See In re Tronox, Inc*., No. 09 Civ. 6220, 2010 U.S. Dist. LEXIS 67664, at *56 (S.D.N.Y. June 28, 2010) ("The Second Circuit does not require plaintiffs, at the motion to dismiss phase, to hire expert witnesses to perform complex regression analysis. It is enough for plaintiffs to allege facts that would allow a factfinder to ascribe some rough proportion of the whole loss to the alleged misstatements.").

reporting of Yen-LIBOR caused artificial Euroyen TIBOR rates.").  Defendants' attempt to

diminish the significance of these allegations must be rejected as issues relating to CEA

causation are particularly ill-suited for a determination on the pleadings.  *See Soybean Futures*,

892 F. Supp. at 1058 (factual disputes as to the existence of artificial prices and causation

precludes even decision on summary judgment); *Transnor (Bermuda) Ltd. v. BP N. Am.*

*Petroleum*, 738 F. Supp. 1472, 1488 (S.D.N.Y. 1990) (denying summary judgment and holding

that it is the jury's task to weigh competing inferences of causation).

### D. The Complaint also states plausible claims for CEA aiding and abetting and principal-agent liability.

Plaintiffs plausibly allege a primary CEA manipulation claim against the Defendants.

The Complaint also alleges Defendants each aided and abetted that manipulation.  Under the

CEA, "aiding and abetting requires the defendant to in some sort associate himself with the

venture, that he participate in it as in something that he wishes to bring about, that he seek by his

action to make it succeed."  *Gracey v. J.P. Morgan Chase & Co.* (*In re Amaranth Natural Gas*

*Commodities Litig.*), 730 F.3d 170, 182 (2d Cir. 2013) (citation and internal quotation omitted).

The Complaint alleges numerous facts giving rise to an inference of each Defendants'

association and active participation in the manipulation, including *inter alia*, that Defendants: (1)

are sophisticated market participants who were responsible for the Silver Fix (¶¶ 96-101); (2) are

some of the largest silver market makers in the world during the Class Period (¶¶ 198-99); (3)

trade physical silver and silver financial instruments, including silver futures contracts, for profit

(¶¶ 208-12); (4) have a large financial incentive to manipulate the Silver Fix, and the prices of

silver financial instruments, including silver futures contracts (¶¶ 179-82); (5) continuously

communicate with each other with respect to the Silver Fix, the price of silver, and incoming

client order flow (¶¶ 213-29); (6) furthered the manipulation to financially benefit their physical

silver and silver financial instrument positions rather than silver prices reflective of prevailing (true) market conditions based on the laws of supply and demand (¶¶ 177-207); (8) trade silver financial instruments, including silver futures contracts, at times when they knew prices were being manipulated (¶¶ 177-97); and (9) coordinate their spot market quotes around the start of the Silver Fix, knowing it would cause artificial silver prices (*e.g.*, ¶ 161; Fig. 24 (December 15, 2009: Deutsche and UBS); ¶ 162 and Fig. 25 (September 20, 2005: HSBC and UBS); ¶ 164 and Fig. 26 (June 6, 2006: Deutsche, HSBC, and UBS)).  These allegations are more than sufficient to state a CEA aiding and abetting claim.  *See, e.g*., *Laydon*, 2014 U.S. Dist. LEXIS 46368, at *23-25 (allegations that defendants traded Euroyen TIBOR futures contracts at times they knew prices were being manipulated by other defendants sufficient to plead CEA aiding and abetting violations).[44]

CEA Section 2(A)(1) governs Plaintiffs' vicarious liability claim.  Liability may be imposed where (1) the agent participated in the alleged unlawful activity and (2) his actions were within the scope of his employment or office. *Guttman v. Commodity Futures Trading Commission*, 197 F.3d 33, 39 (2d Cir. 1999).  The Complaint includes numerous allegations supporting Section 2(a)(1) liability.  *See* ¶¶ 40, 54-55, 62, 74, 208-11 (Defendants employed traders who traded physical silver and silver financial instruments, including silver futures contracts); ¶ 1 (Defendants, through their employees, participated in the Silver Fix); ¶¶ 40, 56, 73, 199 (Defendants created the infrastructure by which their traders could participate through the Silver Fix and as the first, third, sixth, and fifteenth largest silver market makers).

### E.  Plaintiffs adequately allege CEA actual damages.

---

[44] *Amaranth*, 587 F. Supp. 2d at 542 (intent to manipulate sufficient to support CEA aiding and abetting claim imputed to floor broker who repeatedly executed "highly suspicious" trades on behalf of its client).

Defendants also argue that Plaintiffs lack CEA standing because the Complaint fails to allege Plaintiffs suffered actual damages.  Def. Br. at 44-45.  To plead CEA actual damages, Plaintiffs are not required to plead precise trading losses as "actual damages" under the CEA is flexible and purpose and context driven.  *Transnor (Bermuda) Ltd. v. BP N. Am. Petroleum*, 736 F. Supp. 511, 522-23 & n.15 (S.D.N.Y. 1990).  Allegations that a plaintiff either suffered a net loss or transacted at artificial prices are sufficient to allege CEA actual damages.  *See In re Amaranth Natural Gas Commodities Litig.*, 269 F.R.D. 366, 379-80 (S.D.N.Y. 2010) ("case law suggests that because plaintiffs transacted at artificial prices, injury may be presumed."); *In re Crude Oil Commodity Futures Litig.*, 913 F. Supp. 2d 41, 59-60 (S.D.N.Y. 2012) (rejecting that a plaintiff must allege the date and price of the specific derivatives they bought and sold, and the specific losses from those transactions to allege actual damages).  Here, Plaintiffs plausibly allege both.  *See* ¶¶18-27 (net loss allegations); ¶¶ 230-34 (Plaintiffs transacted at artificial prices); and App. D (examples of days where Defendants' manipulated silver prices and a corresponding list of dates upon which plaintiffs transacted in the silver market, including in silver futures and options contracts).[45]

**F. Plaintiffs also plausibly allege a CEA manipulative device claim.**

**1. Defendants' manipulative conduct preceding August 15, 2011 is actionable.**

Defendants acknowledge that Plaintiffs have standing to assert manipulative device claims for silver futures transactions on or after August 15, 2011, the effective date of CFTC Rule 180.1.  Def. Br. at 42.  Defendants do, however, contest Plaintiffs' ability to assert

---

[45] Defendants' counterfactual argument that Plaintiffs must allege that they transacted futures contracts "in the moments immediately before and after the Silver Fix" (Def. Br. at 45) in order to sufficiently plead CEA actual damages should be rejected as it contradicts the Complaint's allegations that artificiality in silver prices was not limited to the time surrounding the Silver Fix, but persisted well beyond the publishing of the Silver Fix (¶¶ 173-76 and Figs. 33-34), such that Plaintiffs and class members who transacted silver futures contracts at all times of day, including in or around the Silver Fix, were damaged by Defendants' price manipulation in violation of the CEA.

manipulative device claims for transactions that occurred before August 15, 2011.  Defendants

have not cited any case stating that Rule 180.1 does not apply to pre-August 15, 2011

transactions.  However, contrary to Defendants' position, we believe that allowing Plaintiffs to

pursue manipulative device claims for trades that occurred prior to the effective date of CFTC

Rule 180.1 is entirely consistent with the remedial purposes of the CEA, as the CEA was enacted

to deter and prevent all forms of price manipulation, including the use of manipulative devices.[46]

The addition of Rule 180.1 did not change the fundamental purposes of the CEA and Defendants

cannot now claim to be surprised by enforcement of the anti-manipulative device rules.

**2.  Defendants incorrectly state the elements of a manipulative device claim.**

In its guidance interpreting Rule 180.1, the CFTC has been clear that securities fraud

cases will provide some analytical analogies for resolving similar claims, but will not dictate the

requirements for proving CEA manipulative device violations.  *See* Prohibition on the

Employment, or Attempted Employment, of Manipulative and Deceptive Devices and

Prohibition on Price Manipulation, 76 Fed. Reg. 41,398, 41,399 (July 14, 2011) (to be codified at

17 C.F.R. §180.1); *compare Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476-77 (1977)

(finding "manipulation" is defined under securities laws in such a formalistic manner that it is

virtually a "term of art.") *with Soybean Futures*, 892 F. Supp. at 1044-46 (finding CEA

manipulation is "practical," "ad hoc" and "fact specific.").

Defendants offer no case supporting their view that reliance is an element of a CEA claim

and they flat-out ignore that this Court has repeatedly rejected the notion that Rule 10b-5 loss

---

[46] *See* 7 U.S.C. §5(b) ("*Purpose*. It is the purpose of this chapter to serve the public interests . . . To foster these public interests, it is further the purpose of this chapter to deter and prevent price manipulation or any other disruptions to market integrity . . . .").

causation is an element of a CEA claim.  *See Platinum & Palladium*, 828 F. Supp. 2d at 601; *In re Crude Oil Commodity Futures Litig.*, 913 F. Supp. 2d at 60-61.

### 3. "Insider trading" that serves to advantage Defendants over their clients violates Rule 180.1.

Defendants argue that their trading ahead of the public release of the Silver Fix does not amount to insider trading.  Defendants' argument means that they should have been able to reap illegitimate profits because of their advance, inside knowledge of the Fix Price's direction.  But this inside advantage, afforded only to them and their co-conspirators, was not the result of a superior business model, but rather the direct result of them dictating the Fix Price.  Inherent in Defendants' role as Fixing Members, and the largest silver market makers in the world, is a duty to not manipulate and trade based on inside, non-public knowledge to the detriment of silver market participants, including Plaintiffs and other Class members.

## V.   PLAINTIFFS PLAUSIBLY ALLEGE AN UNJUST ENRICHMENT CLAIM

Defendants argue that Plaintiffs unjust enrichment claim must be dismissed because the Complaint fails to allege: (1) "an actual, substantive relationship" between Plaintiffs and Defendants; and (2) "Defendants were enriched at Plaintiffs' expense."  Def. Br. at 50.[47]  New York law does not require "privity," "direct dealing," or an "actual, substantive relationship."  *See Sperry v. Crompton Corp.*, 863 N.E. 2d 1012, 1018 (N.Y. 2007) ("a plaintiff need not be in privity with the defendant to state a claim for unjust enrichment"); *Waldman v. New Chapter, Inc.*, 714 F. Supp. 2d 398, 400-06 (E.D.N.Y. 2010) (neither "'direct dealing,' or an 'actual, substantive relationship' with the defendant" is required).  It requires that the plaintiff's relationship with a defendant not be "too attenuated."  *Hoover v. HSBC Mortg. Corp. (USA)*, 9 F.

---

[47] The elements of unjust enrichment are: "(1) the defendant was enriched, (2) the enrichment was at the plaintiff's expense, and (3) the defendant's retention of the benefit would be unjust."  *ImagePoint, Inc. v. JPMorgan Chase Bank, N.A.*, 27 F. Supp. 3d 494, 516 (S.D.N.Y. 2014) (internal quotation marks and citation omitted).

Supp. 3d 223, 251 (N.D.N.Y. 2014).  The Complaint adequately pleads the relationship, alleging

that Defendants were members on the exchanges where silver futures and options contracts were

traded (¶¶ 33, 51-52, 61, 64, 72, 76) and that the only way for Class members to access these

exchanges was through a member of the exchange.  *See In re: Dairy Farmers of Am., Inc.*, 767 F.

Supp. 2d 880, 909 (N.D. Ill. 2011) ("Even if a direct economic transaction is required…there is

no doubt that at least some members of the class, which includes everyone who purchased milk

futures…, must have purchased their futures directly from [d]efendants."). The Class also

includes those who transacted in OTC physical silver and silver financial instruments.  As

Defendants are the first, third, sixth, and fifteenth largest silver market makers, the requisite

relationship is pled.  ¶ 199.

Plaintiffs allege that Defendants as "'informed traders' with advance knowledge of the

Fix price direction," capitalized by establishing positions in the market that would increase in

value once the Fix Price was released to the public at Plaintiffs' and the Class' expense.  ¶¶ 177-

97; Figs. 35-42. The Complaint details the difference in returns of informed traders with insight

into the result of the Silver Fix against uninformed traders, concluding that informed traders, like

the Defendants, stood to gain a return of "more than 87% per year simply by using their advance

information" in the COMEX silver futures market.  *Id.*

## VI.     PLAINTIFFS' CEA AND ANTITRUST CLAIMS ARE TIMELY

The statute of limitations is an affirmative defense that imposes a "heavy burden" on

defendants to prove a set of facts that defeats the legal consequences of their otherwise unlawful

conduct.  *Harris v. City of New York*, 186 F.3d 243, 251 (2d Cir. 1999).  Because a defendant's

competing statement of facts may not be credited on a motion to dismiss over plaintiff's well-

pled allegations, Rule 12(b)(6) dismissals on statute of limitations grounds are rare, limited to the

unique circumstances where a claim clearly is not timely.  *See id.*  The Second Circuit cautions

district courts to not "act[] too hastily" in dismissing complaints on statute of limitations grounds.  *See BPP Ill., LLC v. Royal Bank of Scot. Group, PLC*, No. 13-cv-4459, 2015 U.S. App. LEXIS 7850, at \*4-5 (2d Cir. May 13, 2015) (vacating district court's statute of limitations dismissal even though plaintiffs relied on *Wall Street Journal* and *Financial Times* articles suggesting USD LIBOR was manipulated five years prior to filing their initial complaint).

Defendants fail to contest the timeliness of (i) Plaintiffs' antitrust claims dating back four years from July 25, 2010 to the present, and (ii) Plaintiffs' CEA claims dating back two years from July 25, 2012.

**A. Plaintiffs allege continuing antitrust violations; therefore each violation restarted the statute of limitations period.**

"Each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971); *see also Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 502 n.15 (1968) (plaintiff may recover for "conduct which constitute[s] a . . . continuing and accumulating harm;" even if plaintiff "could have sued in 1912 for the injury then being inflicted, it was equally entitled to sue in 1955").  Further, "each overt act that is part of the violation and that injures the plaintiff, *e.g.*, each sale to the plaintiff, starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times."  *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) (quotation omitted).

Plaintiffs allege that: (1) the Fixing Members unilaterally fixed the price of silver each day until August 14, 2014 (¶ 271); (2) the Defendants' spot market activity forced a reversion in the silver market on at least 1900 days (¶ 161); (3) Defendants' manipulative conduct in the silver market caused a dysfunction in competitive pricing dynamics (¶ 119); and (4) as a result of

Defendants' scheme, silver prices and the prices of silver financial instruments were artificial throughout the Class Period (¶ 4). Thus, each of the Defendants' daily acts—whether it was the artificial fixing of the price of silver or quoting supracompetitive bid-ask prices to the market—represents a continuing violation of the Sherman Act that started the statutory period anew.

### B.  Plaintiffs' CEA claims are timely.

For Plaintiffs' earlier CEA claims, "Defendants bear a heavy burden in establishing" that Plaintiffs knew or through reasonable diligence should have known of their injuries.  *Crude Oil*, 913 F. Supp. 2d at 59 ("Inquiry notice exists only when uncontroverted evidence irrefutably demonstrates when plaintiff discovered or should have discovered the . . . conduct."). Defendants' sole basis in arguing that Plaintiffs were on inquiry notice of their CEA claims is an October 2008 press release issued by the CFTC.  Def. Br. at 47.  The entirety of the October 2008 press release relevant to Defendants' statute of limitations argument reads as follows: "**Silver Market Investigation** – In September 2008, the CFTC confirmed that its Division of Enforcement has been investigation complaints of misconduct in the silver market."  ¶ 243 n.74. This press release does not have the most basic of information to *even come close* to triggering inquiry notice of Plaintiffs' claims here.  *See In re Copper Antitrust Litig.*, 436 F.3d 782, 789-90 (7th Cir. 2006) (finding that the CFTC launching an investigation against a named defendant was insufficient to put plaintiffs on inquiry notice of their claims).  By way of example, the press release **fails** to identify the identities of the targets of the investigation, what the allegedly unlawful conduct entails, the time period the conduct took place, what instruments were impacted, etc.  Fatal to Defendants' statute of limitations argument is the fact that the CFTC announced on September 25, 2013, ten months before Plaintiffs filed their initial complaint herein, that it **closed** the very investigation that supposedly put Plaintiffs on inquiry notice.  ¶ 243 n.75.  As revealed in the September 25, 2013 press release, the CFTC's September 2008

48

investigation was entirely unrelated to the conduct complained of herein.[48]  Even more fatal, it was not until February 2015, that the CFTC and DOJ opened investigations into the manipulation of the Silver Fix.  ¶ 16.  For these reasons, Defendants' statute of limitations argument fails.

### C.  Defendants' fraudulent concealment tolled Plaintiffs' claims.

To toll the statute of limitations through allegations of fraudulent concealment, a plaintiff may show either: (i) that defendants took affirmative steps to conceal their misconduct; or (ii) that the alleged misconduct was inherently self-concealing.  *See Natural Gas*, 337 F. Supp. 2d at 513.  The question of whether fraudulent concealment tolls the statute of limitations is fact-intensive and should not be decided on a motion to dismiss.

As for Defendants' affirmative acts of concealment, Defendants, among other things: (i) represented that the Fix was the product of competitive market forces; (ii) avoided discussing the manipulation of the Fix in public forums; and (iii) maintained the secrecy of the Silver Fix until its demise in August 2014.  ¶¶ 119-76, 213-29, 244, 48.  Many of these same affirmative acts of concealment are also inherently self-concealing.  *See New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1083-1084 (2d Cir. 1988) (bid rigging and price-fixing conspiracies are inherently self-concealing).

Therefore, Defendants' fraudulent concealment tolled Plaintiffs' claims.

## CONCLUSION

For the foregoing reasons, the Defendants' Joint Motion to Dismiss should be DENIED.

---

[48] The CFTC's September 2008 investigation focused on whether COMEX silver futures prices were being manipulated artificially lower, relative to the prices of "retail" silver products like silver coins, by banks that held a large open short position in COMEX futures contracts, not Defendants rigging of the Silver Fix.  ¶ 243.  As alleged (¶ 255), the earliest Plaintiffs could have discovered that Defendants were rigging the Silver Fix was January 2014.  That Plaintiffs relied on a prior CFTC investigation to support the plausibility of their complaint, *i.e.*, that the CFTC - the governing body charged by Congress to interpret and enforce the CEA - believes that the silver market is susceptible to price manipulation by market participants, has no consequence on the timeliness of Plaintiffs' claims.

Dated:  July 13, 2015.

Respectfully submitted.

 s/ Vincent Briganti
Barbara J. Hart
Vincent Briganti
Geoffrey M. Horn
Raymond Girnys
Christian P. Levis
Michelle E. Conston
LOWEY DANNENBERG COHEN & HART, P.C.
One North Broadway
White Plains, NY 10601
Tel.: (914) 997-0500
Fax: (914) 997-0035
Email: bhart@lowey.com
Email: vbriganti@lowey.com
Email: ghorn@lowey.com
Email: rgirnys@lowey.com
Email: clevis@lowey.com
Email: mconston@lowey.com

 s/ Robert G. Eisler
James J. Sabella
Robert G. Eisler
Charles G. Caliendo
Peter A. Barile III
GRANT & EISENHOFER P.A.
485 Lexington Avenue
New York, NY 10017
Tel.: (646) 722-8500
Fax: (646) 722-8501
Email: jsabella@gelaw.com
Email: reisler@gelaw.com
Email: ccaliendo@gelaw.com
Email: pbarile@gelaw.com

***Interim Class Co-Counsel for Plaintiffs and
the Proposed Plaintiff Class***

Linda P. Nussbaum
Bart D. Cohen

50

Hugh D. Sandler
NUSSBAUM LAW GROUP, P.C.
570 Lexington Avenue, 19th Floor
New York, NY 10022
Tel.: (212) 702-7053
Fax: (212) 681-0300
Email: lnussbaum@nussbaumpc.com
Email: bcohen@nussbaumpc.com
Email: hsandler@nussbaumpc.com

J. Douglas Richards
Michael Eisenkraft
COHEN MILSTEIN SELLERS & TOLL PLLC
88 Pine Street, 14th Floor
New York, NY 10005
Tel.:  (212) 838-7797
Fax:  (212) 838-7745
Email: drichards@cohenmilstein.com
Email: meisenkraft@cohenmilstein.com

Manuel John Dominguez
2925 PGA Boulevard, Suite 200
Palm Beach Gardens, FL 33410
Telephone:  (561) 833-6575
Email: jdominguez@cohenmilstein.com

Fred Isquith
Thomas H. Burt
WOLF HALDENSTEIN ADLER FREEMAN
& HERZ LLP
270 Madison Avenue
New York NY 10016
Direct (212) 545-4669
Fax (212) 545-4653
Email:  Isquith@whafh.com
Email: burt@whafh.com

*Additional Counsel for Plaintiffs and the Proposed Plaintiff Class*