UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------- X

IN RE:                                                 :

                                                          :

LONDON SILVER FIXING, LTD.,             :

ANTITRUST LITIGATION                       :

                                                          :

*This Document Relates to All Actions*         :

--------------------------------------------------------- X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  10/3/2016
```

14-MD-2573 (VEC)

**OPINION & ORDER**

VALERIE CAPRONI, United States District Judge:

These consolidated cases involve the alleged manipulation and suppression of silver

prices during the period from January 1, 1999 "through the date on which the effects of

Defendants' unlawful conduct cease" (the "Class Period").  The Defendants are: Deutsche

Bank,[1] HSBC,[2] The Bank of Nova Scotia[3] (collectively the "Fixing Members") and UBS AG

("UBS" and together with the Fixing Members, the "Defendants").

Plaintiffs are individuals and entities that bought or sold physical silver or silver futures,

"mini" silver futures or options contracts through the Chicago Board of Trade ("CBOT"), NYSE

LIFFE or Commodity Exchange, Inc. ("COMEX") during the Class Period.[4]  Seeking to recover

losses suffered as a result of Defendants' alleged manipulation and suppression of silver prices

through the silver "fixing" process, Plaintiffs bring putative class action claims for (1) price

---

[1]      Named entities include Deutsche Bank AG and its subsidiaries and affiliates, including Deutsche Bank
Securities Inc.  On April 13, 2016, Plaintiffs notified the Court that they had reached a settlement with Deutsche
Bank, although no motion for approval of a settlement class has yet been presented to the Court.

[2]      Named entities include HSBC Holdings plc and its subsidiaries and affiliates, including HSBC Bank USA,
N.A.

[3]      Named entities include Bank of Nova Scotia and its subsidiaries, affiliates and divisions, including
Defendant Scotia Capital (USA) Inc. and ScotiaMocatta**.**

[4]      While the named Plaintiffs characterize themselves as those who "purchased and/or sold" silver
investments, Plaintiffs' claimed damages focus on investors who sold silver investments at allegedly artificially
depressed prices during the Class Period.  *See* Second Consolidated Class Action Complaint, Appendix D.

fixing, bid rigging and conspiracy in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 *et seq.*; (2) manipulation in violation of the Commodity Exchange Act ("CEA"), 7 U.S.C. § 1 *et seq.*; (3) principal-agent liability in violation of the CEA, 7 U.S.C. § 1 *et seq.*; (4) aiding and abetting manipulation in violation of the CEA, 7 U.S.C. § 1 *et seq.*; (5) manipulation by false reporting, fraud and deceit in violation of the CEA, 7 U.S.C. § 1 *et seq.*, and CFTC Rule 180.1(a); and (6) unjust enrichment.

On October 9, 2014, the United States Judicial Panel on Multidistrict Litigation transferred one related case from the Eastern District of New York to this Court for "coordinated or consolidated pretrial proceedings" with another case that had been filed in this District. *In re London Silver Fixing, Ltd., Antitrust Litig.*, 52 F. Supp. 3d 1381, 1381-2 (J.P.M.L. 2014); *see also* 28 U.S.C. § 1407. With the filing of eight additional "tag-along" actions, there are now ten cases comprising this consolidated multidistrict litigation. Pursuant to the Court's Order dated October 14, 2014, formal discovery has been stayed. *See* Order No. 1, *In re London Silver Fixing, Ltd., Antitrust Litig.*, 14-md-2573 (S.D.N.Y. Oct. 14, 2015) (VEC), Dkt. 4.[5] On November 25, 2014, the Court appointed Lowey Dannenberg Cohen & Hart, P.C. and Grant & Eisenhofer P.A. as interim class co-counsel. Dkt. 17. On January 26, 2015, Plaintiffs filed a first Consolidated Amended Class Action Complaint (the "FAC"), Dkt. 34, which Defendants moved to dismiss on March 27, 2015, Dkts. 56-61. On April 17, 2015, Plaintiffs filed a Second Consolidated Amended Class Action Complaint (the "SAC"). Dkt. 63. Defendants have moved to dismiss the SAC through two separate motions, the first filed by UBS, Dkt. 73, and the second filed by the Fixing Members, Dkt. 75. For the following reasons, UBS's Motion to Dismiss is

---

[5]      Unless otherwise noted, citations to the docket shall be to the MDL case docket for these consolidated actions, 14-md-2573.

GRANTED, and the Fixing Members' Motion to Dismiss is GRANTED IN PART and DENIED IN PART.

BACKGROUND[6]

### I.      The Silver Fixing

Since 1897, a small group of silver bullion dealers, including the Fixing Members and their predecessors, have met in London (initially in-person and later via teleconference) to set the daily benchmark price of silver.  SAC ¶ 95.  Throughout the Class Period until August 14, 2014, the Fixing Members, acting through London Silver Market Fixing, Ltd., met over a secure conference call line at 12:00 P.M. London time each business day to "fix" the price of physical silver (the "Silver Fixing" or the "Fixing").  *Id.* ¶ 96.  The Silver Fixing, which usually took less than ten minutes, was conducted through a private "Walrasian" auction.  *Id.*.  At the outset, the "Chairman" of the auction (a position that rotated among the Fixing Members) would announce the opening price, reflecting the current "spot price" of silver.  *Id.* ¶¶ 96-97.  Each of the Fixing Members would then declare how many bars of silver they wished to buy or sell at the opening price based on the net supply or demand for spot silver on their order books (reflecting both client orders and proprietary trading orders).  *Id.* ¶ 97.

After each Fixing Member announced its net order, the banks' orders would be netted against one another.  *Id.* ¶ 98.  If buying and selling interest were roughly equivalent, the Silver Fixing would be declared complete and the price would be declared fixed (the "Fix Price").  *Id.*  Otherwise, the Chairman would adjust the price upward or downward until buying and selling interest reached rough equilibrium, within 300 bars.  *Id.*  If the Chairman was unable to set a price that brought the discrepancy between buying and selling interest within 300 bars, the

---

[6]      The facts are taken from the Second Amended Complaint.

3

Chairman could unilaterally fix the price and then the Fixing Members would "divide the excess supply or demand pro-rata among themselves." *Id.* ¶ 99. Once finalized, the Fix Price was published to the market. *Id.* No other market participants or third parties played a role in influencing the Fix Price; the Fixing Members had sole control over the auction. *Id.* ¶¶ 100.

On April 29, 2014, Deutsche Bank left its position as a Fixing Member due to regulatory concerns, ultimately leading to the demise of the Silver Fixing and the creation of the "London Silver Price." *Id.* ¶¶ 244-53. The new pricing system uses an electronic trading mechanism, instead of a private telephone call, but otherwise retains an "auction-style process" to determine the Fix Price. *Id.* ¶ 15. Two of the former Fixing Members, HSBC and Bank of Nova Scotia, are members of the London Silver Fixing panel; UBS is accredited to participate in the London Silver Price but has never been a member of the Fixing Panel. *Id.* ¶¶ 80, 253.

## II.      The Impact of the Fix Price on the Silver Investments

Plaintiffs describe the Fix Price as the global benchmark "used to price, benchmark, and/or settle billions of dollars in physical silver and silver financial instruments" on a daily basis. *Id.* ¶ 102. According to the London Bullion Market Association: "The guiding principal behind the [precious metal fixings] is that all business . . . is conducted solely on the basis of a single published Fixing price." *Id.* ¶ 3 (quoting *A Guide to the London Precious Metals Markets*, LONDON BULLION MARKET ASSOCIATION, at 14, http://www.lbma.org.uk/assets/market/OTCguide20081117.pdf).

Thus, while there is no single forum or exchange for trading silver and silver-related investments, silver producers, consumers, investors, and central banks rely on the Fix Price in trading approximately $30 billion in silver and silver-related financial instruments each year. *Id.* ¶ 102. For example, physical silver (including silver bars and coins) is often traded over-the-counter ("OTC") with reference to the Fix Price. *Id.* ¶¶ 103-04. The Fix Price also has an

impact on the prices of exchange-traded silver futures and options contracts, as well as silver

swaps and forward agreements that are traded on an OTC basis. *Id.* ¶¶ 106-18.  Because those

instruments reflect a future obligation to buy or sell physical silver, silver "futures" contracts

increase or decrease in value in direct relationship to the price of physical silver, such that

"99.85% of the variation in the price of COMEX silver futures contracts between January 1,

2004 and December 31, 2013 is explained by the results of the Silver Fix." *Id.* ¶¶ 108, 113-14 &

Fig. 1.

Most market participants do not settle their futures contracts at maturation; rather they

offset their positions before expiry by purchasing contracts for an equal opposite position. *Id.* ¶

110.  As a result, the holders of "long" positions (who are obligated to purchase silver at an

agreed-upon price in the future) profit when the price goes up because they are able to sell their

offsetting contracts at a higher price. *Id.* ¶ 111.  In contrast, the holders of "short" positions (who

are obligated to sell silver at an agreed-upon price in the future) profit when the price goes down

because they are able to buy an offsetting contract for a lower price. *Id.*  Silver forwards work in

the same way, the key difference being that they are traded OTC as opposed to via an exchange.

*Id.*  ¶ 117.  Silver swaps—cash-settled agreements pursuant to which one party pays a fixed price

for a certain amount of silver, while the other pays a variable rate subject to the Fix Price—are

also Fix-dependent instruments.  *Id.* ¶ 116. Because the Fix Price has a direct impact on the price

of physical silver and silver-related financial instruments, such as futures contracts, Plaintiffs

allege that the Fixing Members controlled a key factor in the pricing of Plaintiffs' investments in

physical silver, silver futures, "mini" silver futures, and options contracts throughout the Class

Period. *Id.* ¶ 4.

### III.    Allegations of Manipulation

Plaintiffs claim that Defendants executed a "comprehensive strategy" of manipulation involving several distinct but related components.  SAC ¶ 118.  First, the Fixing Members allegedly abused their control over the Silver Fixing artificially to suppress the Fix Price on selected days throughout the Class Period.  *Id.*  Second, the Defendants are alleged to have improperly shared confidential order information and traded on that information in order to gain an unfair advantage over less-knowledgeable market participants.  *Id.*  Third, Defendants allegedly coordinated to maintain fixed bid-ask spreads, thereby gaining a pricing advantage and restraining competition in the silver spot market.  *Id.* ¶ 118.

### A.  Defendants Caused Price Distortions Around the Silver Fixing

In support of their claim that Defendants manipulated the Fix Price, Plaintiffs present data analyses demonstrating that pricing behaved in distinctive or "anomalous" ways around the Silver Fixing.  SAC ¶¶ 119-76.  First, Plaintiffs show that, in every year during the Class Period except for 2010, the Fix Price moved downward around the Silver Fixing much more frequently than it moved upward (*i.e.*, on approximately 60% to 70% of trading days).  *Id.* ¶¶ 129-30 & Figs. 5-6.  In addition, on a large number of trading days from 2008 onward, there was a statistically significant drop in spot silver prices beginning shortly before the Fixing call.  *Id.* ¶¶ 120, 125-27, Fig. 4 & App. A.[7]  This decline is also reflected in the pricing of silver COMEX futures, which showed a similarly precipitous decline around the Silver Fixing from 2007 through 2013.  *Id.* ¶¶ 121-23 & Figs. 2-3.[8]  According to Plaintiffs' analyses, from 2004 through 2013, the price of COMEX silver futures and spot silver dropped more than 15 basis points at the

---

[7]    Despite the fact that the Class Period begins in 1999, most of the aberrational pricing patterns alleged by Plaintiffs do not emerge until 2007.  *See id.* App'x A, B.

[8]    Plaintiffs' data shows a similarly significant, though slightly smaller, price decline around the closing of the COMEX trading day.  *See id.* Fig. 3.

start of the Silver Fixing on days when the Fix Price moved downwards from the prevailing spot price in the hours leading up to the Fixing.  *Id.* ¶¶ 173-75 & Figs. 33-34.  From 2006 onward, silver prices also consistently decreased during the Silver Fixing call regardless of whether the Fix Price was ultimately higher or lower than the prevailing spot price at the opening of the Fixing auction, with the decrease beginning shortly before the Fixing on days when the Fix Price moved downwards.  *Id.* ¶¶ 131-33, Figs. 7, 8 & App. B.  Declines in silver prices were also significantly larger than increases in silver prices around the Silver Fixing throughout the Class Period.  *Id.* ¶¶ 134-37 & Figs. 9-11.  According to Plaintiffs, these unusual downward price swings around the Silver Fixing did not occur at noon London time on British holidays, when the Fixing was not held.  *Id.* ¶¶ 171-72.  Plaintiffs further claim that these downward price movements "persisted" in the sense that, after a downward shift, prices did not fully recover to their pre-Fixing levels over the course of the remaining trading day.  *Id.* ¶¶ 173-76 & Figs. 33-34.[9]

Plaintiffs argue that this pattern of downward price swings and negative returns around the Silver Fixing is particularly unusual in light of the fact that, overall, the price of silver was rising throughout most of the Class Period.  *Id.* ¶¶ 138-39.  After gradually increasing from 2001 through 2005, a strong bull market prevailed for silver from January 1, 2005, through April 28, 2011, with prices increasing over seven-fold from $6.78 per ounce to $48.44 per ounce.  *Id.* ¶ 139 & Fig. 13.  According to Plaintiffs, these swings cannot be fully explained by natural market forces that come into effect during periods of high liquidity; unlike other fixings, the Silver Fixing takes place at noon London time, which is not the most liquid time of the trading day

---

[9]     Notably, one of the experts relied on by Plaintiffs takes the position that these downward swings may have been part of a short-term trading strategy.  *See* Defs.' Mem. at 24-25 (citing Ex. 1).  Defendants argue that Plaintiffs' claim of "persistence" fails as a result, but this simply raises a question of fact—an interesting one and one that could have a profound effect on damages and class certification—that cannot be resolved at the pleading stage.

because it is before the markets in the United States are fully open and before the COMEX silver

pit opens.  *Id.* ¶¶ 153-54 & Figs. 19-20.

To allege plausibly that Defendants were behind these distinctive or "dysfunctional"

pricing patterns, Plaintiff have identified 1900 days, representing slightly less than half of the

days within the Class Period through the filing of the SAC, on which Defendants' below-market

quotes in the minutes shortly before and during the Silver Fixing coincide with a downward

"reversion," *i.e.*, a change in direction of the prevailing market prices for silver.  *Id.* ¶¶ 155-66 &

Figs. 21-28.  Beginning in or around May 2012, Plaintiffs further claim that the average duration

of the Silver Fixing call began to shorten dramatically, from approximately 4 minutes to less than

2 minutes in length.  *Id.* ¶¶ 167-68 & Fig. 29.  Despite the shortened duration of the Silver Fixing

call, which on some days lasted less than a minute, Defendants' below-market quotes leading up

to the Fixing continued to correlate with reversionary downward shifts in the ultimate Fix Price.

*Id.* ¶¶ 165-68.

Plaintiffs claim that the frequency, intensity and timing of these downward price

movements, combined with the facts that (1) Defendants' spot quotes correlate with the

downward trends and (2) silver prices moved downwards at the Silver Fixing even against

upward market trends, leads to a strong inference that Defendants intentionally caused these

downward price movements through coordinated price manipulation.  *Id.* ¶¶ 119-169.

**B.  Defendants Profited From Manipulating the Fix Price**

Plaintiffs allege that Defendants benefitted from manipulating the Silver Fixing by

profiting from trades that they strategically placed based on their foreknowledge of the Fix Price.

In support of this theory, Plaintiffs demonstrate that downward price movements around the

Silver Fixing coincided with a significant spike in trading volume and price volatility.  *Id.* ¶ 140.

In particular, Plaintiffs present data from 2007 through 2013 showing a sharp increase in trading

in COMEX silver futures contracts, beginning just before the start of the Silver Fixing call and peaking (at a volume more than three-times that of the pre-Fixing volume) just two minutes into the Fixing call, at 12:02 p.m.  *Id.* ¶ 141 & Fig. 14.  Plaintiffs point to an allegedly-related pattern in the spot market, in which data from 2007 through 2013 shows that price volatility increased at the beginning of the Fixing call and then peaked while the Fixing call was ongoing.  *Id.* ¶¶ 145-46 & Fig. 15.  Plaintiffs posit that trading volume and price volatility should have peaked shortly after the Fix Price was published (not before), in accordance with the economic principle that markets tend to react *after* the announcement of significant information.  *Id.* ¶¶ 146-47 & Fig. 16.  Thus, Plaintiffs argue, the odd volatility is circumstantial evidence that the Fixing Members were trading on their advance knowledge of the Fix Price, and they could only have had such knowledge if they were colluding.  *Id.* ¶ 152.

Plaintiffs also analyzed the time period from 11:55 A.M. – 12:05 P.M., the five minutes before and after the start of the Fixing call, and found "hundreds" of days from 2007 through 2014 on which the price trend of COMEX silver futures changed direction during the Fixing window in conjunction with a contemporaneous increase in trading volume.  *Id.* ¶¶ 185-91 & Figs. 39, 40.  Noting that the Fixing call lasted on average approximately 4 minutes, *id.* ¶¶ 142, 185, Plaintiffs found that these spikes in trading volume occurred even though, on most days, the Fix Price had not yet been released to the market, suggesting that Defendants were trading on advance knowledge of what the Fix Price would be during the Silver Fixing call (for example, by establishing short positions that would be profitable when the price of silver decreased).  *Id.* ¶¶ 142-44.  Plaintiffs similarly identified "hundreds" of days from 2007 through 2013, on which there was a spike in trading volume of COMEX silver futures in the 30 minutes preceding the Fixing window and on which the price trend of silver futures changed and changed in the direction that correctly predicted the results of the Fixing.  *Id.* ¶¶ 192-97 & Figs. 35-36, 41-42.

Plaintiffs argue that this trading pattern is also circumstantial evidence that Defendants were trading on advance knowledge of the Fix Price, indicating collusion. *Id.* ¶ 193.  Plaintiffs further allege that, from 2007 through 2013, trades on COMEX silver futures placed during the Silver Fixing window successfully predicted whether the Fix Price would increase or decrease from the prevailing spot price before the call with 83.6% accuracy, as opposed to just 40% accuracy for trades placed before the Fixing call began. *Id.* ¶¶ 149-51 & Fig. 18.  Trades placed during the Fixing call on COMEX silver futures were more than 90% accurate when particularly large returns could be obtained by correctly "guessing" the direction in which the Fix Price would move. *Id.* ¶ 152 & Fig. 18.  Plaintiffs argue that this pattern suggests that Defendants (and not other less informed market participants) were the ones causing the observed increases in trading volume and price volatility during the Fixing call. *Id.*

In addition, Plaintiffs rely on statistical analyses to show that traders with advance knowledge of the Fix Price were able to generate significant risk-free returns on the trades they placed at the Fix Price, leading to significant profits. *Id.* ¶¶ 177-97.  Using their foreknowledge of the Fix Price as an "arbitrage condition," Defendants were able to capture profits in the COMEX silver futures market from price swings around the Silver Fixing averaging 25 basis points from 2007 through 2013, which would generate returns of more than 87% per year. *Id.* ¶¶ 179-80 & Fig. 35.  Likewise, in the spot silver market in 2011, Defendants could have used their foreknowledge of the Fix Price to obtain a 40 basis point advantage over uninformed traders, resulting in potential returns of 172% per year. *Id.* ¶ 181 & Fig. 36.  Plaintiffs argue that these

significant potential returns, which were available only to those with advance knowledge of the

Fix Price, motivated Defendants to collude to set the Fix Price. *Id.* ¶¶ 182-83 & Fig. 37.[10]

### C. Defendants Benefitted From Improperly Sharing and Trading on Confidential Order Information

Plaintiffs assert that Defendants further maximized profits by sharing and trading on

private order flow information, including information about Defendants' client orders and

proprietary trading positions. *Id.* ¶¶ 213-15. By sharing this information, Defendants were

allegedly able to front-run or otherwise take advantage of pending "fix orders" (*i.e.*, orders to

buy or sell a certain amount of silver at the Fix Price) and to coordinate their downward

manipulation of the Fix Price based on their collective market positions. *Id.* ¶¶ 216, 222, 226-28.

Defendants also allegedly shared the trigger prices of their clients' stop-loss orders, which

allowed Defendants in effect to force their clients to sell them silver at artificially low prices any

time Defendants were able to push silver prices down enough to trigger the stop loss. *Id.* ¶¶ 224-

25. In support of these allegations, however, Plaintiffs' rely exclusively on various regulatory

investigations and findings, discussed further *infra*, regarding the manipulation of foreign

exchange and precious metals markets, generally, not the silver market specifically. *Id.* ¶ 213.

### D. Defendants Benefitted From Maintaining Supra-Competitive Bid-Ask Spreads

Finally, Plaintiffs assert that Defendants, all of whom are large market makers with

respect to silver, used their foreknowledge of the Fix Price to maintain supra-competitive bid-ask

spreads that allowed them consistently to purchase silver at artificially low prices and sell it at

artificially high prices. *Id.* ¶¶ 198-200. Because the daily publication of the Fix Price is

---

[10]     Plaintiffs further allege that Defendants were particularly well-positioned to profit from their advance knowledge of the Fix Price due to their "large unhedged trading positions." *Id.* ¶¶ 208-212 & Figs. 48-51. This conclusion is substantially undermined, however, by the fact that Plaintiffs lack data on Defendants' trading positions with respect to silver, in particular, and they also lack comparative hedging information for UBS and Deutsche Bank. *Id.*

significant market information, Plaintiffs show that spot and futures bid-ask spreads in the silver market generally tend to be wider (reflecting less certainty) before the Fix Price is published, and narrower (reflecting relatively more certainty) after the Fix Price is published.  *Id.* ¶¶ 201-05 & Figs. 44-46.  Plaintiffs present data from 2000-2013 showing that, unlike other market participants, whose spot and futures bid-ask spreads tended to narrow upon the publication of the Fix Price, Defendants' spot bid-ask spreads stayed the same or widened at the Silver Fixing, suggesting that Defendants did not regard the Fix Price as "new" information.  *Id.* ¶¶ 206-07 & Fig. 47.  By maintaining these artificially wide spreads, Defendants were able to buy lower and sell higher than they otherwise would have had they been responding to the Fix Price as true market competitors.  *Id.* ¶¶ 198, 200.

IV.    **Regulatory Investigations**

Plaintiffs rely on various regulatory findings to suggest that Defendants were capable of conspiring to manipulate the Silver Fixing.  Plaintiffs note that various regulatory agencies, including the U.S. Department of Justice ("DOJ"), the U.S. Commodity Futures Trading Commission ("CFTC"), the German Federal Financial Supervisory Authority ("BaFin"), the Swiss Financial Market Supervisory Authority ("FINMA") and the United Kingdom's Financial Conduct Authority have scrutinized or investigated possible rigging of the precious metals markets by Defendants.  *Id.* ¶¶ 235-39, 242.[11]

In particular, Plaintiffs highlight FINMA's allegations of misconduct following its investigations into UBS's trading in the foreign exchange ("FX") and precious metals markets.  *Id.* ¶ 242.  On November 12, 2014, FINMA released a report (the "FINMA UBS Report")

---

[11]    During oral argument on Defendants' Motion to Dismiss, Defendants noted, however, that DOJ's Antitrust Division had closed its investigation into alleged manipulation of the precious metals benchmarks.  Transcript of Oral Argument dated April 18, 2016 ("Tr.") at 8:5-9:13.

finding that UBS precious metals traders had engaged in conduct against the interests of UBS,

including "'jamming' clients, triggering stop loss orders that forced clients to sell silver to the

Defendants at artificially lower prices; sharing non-public client order information with third-

parties; and front running client 'silver fix orders.'"  *Id.* ¶¶ 12, 156 (citing *Foreign Exchange*

*Trading at UBS AG: Investigation Conducted by FINMA*, FINMA (Nov. 12, 2014),

http://www.finma.ch/e/aktuell/Documents/ubs-fx-bericht-20141112-e.pdf).  According to a

Bloomberg News article, FINMA further claimed to have uncovered "clear attempts to

manipulate fixes in the precious metal market," but not specifically the silver market.  SAC ¶ 12

(quoting Elena Logutenkova & Nicholas Larkin, *UBS Precious Metals Misconduct Found By*

*Finma in FX Probe*, Bloomberg L.P. (Nov. 12, 2014),

http://www.bloomberg.com/news/articles/2014-11-12/finma-s-ubs-foreign-exchange-settlement-

includes-precious-metals).  As a result of FINMA's findings, UBS was ordered to pay

approximately $139 million to settle allegations of misconduct covering both the FX and

precious metals markets.  *Id.* ¶ 242.  Plaintiffs argue that because UBS (and also HSBC)[12] traded

precious metals during the Class Period from their FX desks, *id.* ¶ 13, they may have used the

same techniques found to have been used to manipulate the FX markets, as documented in their

respective settlements with the CFTC and FCA, in manipulating the silver market.  *Id.*[13]

---

[12]      HSBC was also sanctioned by the CFTC in connection with manipulation of the FX markets.  *Id.* ¶ 219 & n.45.  Among other things, the CFTC found that HSBC traders had shared the "size and direction of [HSBC]'s net orders" in private chatrooms with other traders.  *Id.*

[13]      Plaintiffs' theory appears to be that, because the same personnel may have been responsible for trading FX and precious metals, misconduct in the FX markets may have been duplicated in the silver market.  *Id.* ¶ 13.

**DISCUSSION**

### I.      Legal Standard

In evaluating a motion to dismiss, the Court must "'accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff.'"  *Meyer v. JinkoSolar Holdings Co.*, 761 F.3d 245, 249 (2d Cir. 2014) (quoting *N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 119 (2d Cir. 2013) (alterations omitted)).  Nonetheless, in order to survive a motion to dismiss, "a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "Plausibility" is not certainty.  *Iqbal* does not require the complaint to allege "facts which can have no conceivable other explanation, no matter how improbable that explanation may be."  *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 360 (2d Cir. 2013).  But "[f]actual allegations must be enough to raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 555, and "[courts] 'are not bound to accept as true a legal conclusion couched as a factual allegation,'" *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 225 (2d Cir. 2014) (quoting *Twombly*, 550 U.S. at 555 (other internal quotations marks and citations omitted)).

### II.      Plaintiffs Have Constitutional Standing

Plaintiffs must establish both constitutional standing and, with respect to their antitrust claims, antitrust standing.  *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 770 (2d Cir. 2016) (citing *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters* (*AGC*), 459 U.S. 519, 535 n.31 (1983) (other citations omitted)).  To have constitutional standing, Plaintiffs must demonstrate that they have suffered an injury-in-fact that is "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court," and that is likely to be redressed by a favorable decision.

*Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 55 (2d Cir. 2016) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (alterations in the original)).  With respect to the injury-in-fact element, Plaintiffs must have suffered "the invasion of a 'legally protected interest' in a manner that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d 581, 595 (S.D.N.Y. 2015) (quoting *Bhatia v. Piedrahita*, 756 F.3d 211, 218 (2d Cir. 2014) (other citations omitted)).  In evaluating constitutional standing, courts "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party."  *Warth v. Seldin*, 422 U.S. 490, 501 (1975).

The Fixing Members argue that, because Plaintiffs were likely both buyers and sellers who traded at various times throughout the trading day, "there is no way to conclude that Plaintiffs sustained any loss as a result of Defendants' conduct," suggesting that Plaintiffs have not asserted an injury-in-fact.  Defs.' Mem. at 32-33.[14]  Plaintiffs have, however, alleged that they sold silver investments on days when Defendants allegedly manipulated the Fix Price downward, *see* SAC App. D, and they further allege that Defendants' downward price manipulation had a lingering effect on silver prices, such that Plaintiffs were forced to sell silver at artificially depressed prices for some to-be-determined period of time after the Silver Fixing.  SAC ¶¶ 173-76, 230-33 & Figs. 33-34.  While certain Plaintiffs may have actually benefitted from Defendants' alleged price manipulation (*e.g*., they may have purchased silver at artificially suppressed prices and sold when the price suppression had abated), that is not an issue that is ripe for resolution at the pleading stage.  *See, e.g.*, *In re Foreign Exch. Benchmark Rates Antitrust*

---

[14]     While the Fixing Members do not address constitutional standing separately from antitrust standing, their arguments regarding Plaintiffs' alleged injuries are relevant to both inquiries.  The Court must consider both in evaluating subject matter jurisdiction at the pleading stage.  *Lance v. Coffman*, 549 U.S. 437, 439 (2007) ("Federal courts must determine that they have jurisdiction before proceeding to the merits.").

*Litig.*, 74 F. Supp. 3d at 595 (finding an injury-in-fact where plaintiffs' alleged injuries stemmed from "having to pay supra-competitive prices as a result of [d]efendants' manipulation of the [f]ix," and dismissing defendants' demand for specifics as to the timing of certain transactions as inappropriate at the pleading stage); *see also Ross v. Bank of Am. N.A. (USA)*, 524 F.3d 217, 222 (2d Cir. 2008) ("[T]he fact that an injury may be outweighed by other benefits, while often sufficient to defeat a claim for damages, does not negate standing.").  Because Plaintiffs have alleged a concrete injury as a result of Defendants' manipulation (*i.e.*, losses or artificially reduced gains on their silver investments), they have constitutional standing.  *See Gelboim*, 823 F.3d at 770 (noting that the injury component of constitutional standing was "easily satisfied" by plaintiffs' allegation "that they were harmed by receiving lower returns on LIBOR-denominated instruments as a result of defendants' manipulation).

### III.     Plaintiffs Have Antitrust Standing

Section 4 of the Clayton Act establishes a private right of action to enforce Section 1 of the Sherman Act.  15 U.S.C. § 15.[15]  Applying the Supreme Court's decision in *AGC*, the Second Circuit has held that "a private antitrust plaintiff [must] plausibly [ ] allege (a) that it suffered a special kind of antitrust injury, and (b) that it is a suitable plaintiff to pursue the alleged antitrust violations and thus is an 'efficient enforcer' of the antitrust laws."  *Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 76 (2d Cir. 2013) (citations and internal quotations omitted).

---

[15]     Section 4 of the Clayton provides:

> [A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue . . . in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

15 U.S.C. § 15(a).

"[A]ntitrust standing is a threshold, pleading-stage inquiry . . . ."  *Id.* at 75-76 (quoting *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 450 (6th Cir. 2007) (en banc)).

### A.  Plaintiffs Have Adequately Alleged an Antitrust Injury

"'Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation,'" *AGC*, 459 U.S. at 534 (quoting *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 263 n.14 (1972)), but only for those injuries reflecting an "anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation," *Gelboim*, 823 F.3d at 772 (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489 (1977)).  "Competitors and consumers in the market where trade is allegedly restrained are presumptively the proper plaintiffs to allege antitrust injury."  *In re Aluminum Warehousing Antitrust Litig.*, No. 14-3574, 2016 WL 4191132, at *4 (2d Cir. Aug. 9, 2016) (quoting *Serpa Corp. v. McWane, Inc.*, 199 F.3d 6, 10 (1st Cir. 1999)).

In *Gelboim*, the Second Circuit held that the manipulation of LIBOR rates by banks that participated in the LIBOR benchmarking process gave rise to an antitrust injury on the part of the plaintiffs who transacted in LIBOR-dependent financial instruments.  823 F.3d at 772-75.  Even though defendants did not "control the market," and even though plaintiffs were free to negotiate the interest rates attached to certain financial instruments, the Second Circuit found that plaintiffs had adequately alleged that they were in a "worse position" as a consequence of the defendant banks' horizontal price-fixing and, therefore, had plausibly alleged an antitrust injury.  *Id.* at 773-75 ("Even though the members of the price-fixing group were in no position to control the market, to the extent that they raised, lowered, or stabilized prices they would be directly interfering with the free play of market forces." (quoting *United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 221 (1940) (other citation omitted)); *id.* at 776 ([E]ven if "LIBOR did not necessarily correspond to the interest rate charged for any actual interbank loan[,] . . . [t]his is a

disputed factual issue that must be reserved for the proof stage." (internal citations and quotations omitted)).

Here, Plaintiffs allege that they were harmed by being forced to sell silver and silver derivatives at artificially suppressed prices as a result of Defendants' manipulation of the Silver Fixing.  Because Plaintiffs have alleged that their "loss[es] stem[] from a competition-*reducing* aspect or effect of the [D]efendant['s] behavior," *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 329 (1990) (emphasis in original), their alleged "injury is of the type the antitrust laws were intended to prevent and that flows from that which makes [or might make] [d]efendants' acts unlawful."  *Gatt*, 711 F.3d at 76 (citations and internal quotation marks omitted); *see also In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d at 596 (finding antitrust injury where defendants engaged in price-fixing as horizontal competitors, which caused plaintiffs to pay supra-competitive prices).[16]

In another recent decision, the Second Circuit clarified that, although as a general rule only participants in the defendant's market can claim an antitrust injury, plaintiffs in an affected secondary market may have antitrust standing if their alleged injuries are "'inextricably intertwined' with the injury the defendants ultimately sought to inflict" and if their injuries are "the essential means by which defendants' illegal conduct brings about its ultimate injury to the marketplace."  *In re Aluminum Warehousing Antitrust Litig.*, 2016 WL 4191132, at *7 (quoting IIA Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 339, at 145 (4th ed. 2014)); *see*

---

[16]    In their Motion to Dismiss, the Fixing Members originally argued that Plaintiffs failed to assert an antitrust injury because, even if accepted as true, Plaintiffs' alleged injuries would have resulted merely from Defendants' purported "misrepresentation[s]" rather than an "anticompetitive aspect" of Defendants' conduct.  Defs.' Mem. at 33 (quoting *In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*LIBOR I*"), 935 F. Supp. 2d 666, 688 (S.D.N.Y. 2013), *vacated and remanded sub nom. Gelboim*, 823 F.3d 759).  That argument was squarely rejected by the Second Circuit, which held that the manipulation of LIBOR rates by the benchmarking banks constituted an anticompetitive practice that tended to "warp[] . . . market factors affecting the prices for LIBOR-based financial instruments."  *Gelboim*, 823 F.3d at 776.  The Fixing Members have since withdrawn this argument based on *LIBOR I.  See* Letter from Michael Lacovara to the Court dated May 25, 2016, Dkt. 128 at 3.

*also Sanner v. Board of Trade of City of Chicago*, 62 F.3d 918, 929 (7th Cir. 1995)

("[P]articipants in the cash market can be injured by anticompetitive acts committed in the

futures market. . . . The futures market and the cash market for soybeans are thus 'so closely

related' that the distinction between them is of no consequence to antitrust standing analysis.").

*But see Atucha* v. *Commodity Exch.*, *Inc.*, 608 F. Supp. 510, 516 (S.D.N.Y. 1985) (plaintiffs

alleging that defendants' conspiracy to manipulate the price of COMEX silver futures caused the

silver contracts plaintiff purchased on the London Metal Exchange to be inflated artificially

lacked standing despite plaintiff's allegations of an "inextricabl[e] connect[ion]" between futures

markets in the United States and United Kingdom).

While the Fixing Members did not raise this theory in their Motion to Dismiss, in light of

the Second Circuit's *In re Aluminum Warehousing* opinion, they now argue that Plaintiffs cannot

assert an antitrust injury because they did not directly participate in the Silver Fixing, which the

Fixing Members define as the only "directly impacted" market. *See* Letter from Joel S. Sanders

to the Court, dated August 16, 2016, Dkt. 144 at 3 ("Even if the London Silver Fixing was the

means of an anticompetitive conspiracy, only plaintiffs who participated in the Fixing could have

standing.").

Even assuming that the Fixing Members' argument was properly asserted, the Fixing

Members fail to explain why the Fixing itself (which all parties acknowledge to be an

artificially-constructed private "auction" that was instituted for the sole purpose of allowing the

Fixing Members to set a market-wide benchmark) should be considered the affected "market"

for antitrust purposes. While the guiding precedent leaves room for debate regarding how the

"market" should be defined under the circumstances of this case, the suggestion that the alleged

conspirators are the only entities with standing to bring antitrust claims relating to the Silver

Fixing seems absurd.

Here, Plaintiffs allege that Defendants artificially depressed the price of silver for some period of time around the Fixing in order to profit from silver and silver futures trading at prices that were advantageous to them vis à vis Plaintiffs and other less-informed market participants. These allegations are sufficient to demonstrate that Plaintiffs' injuries are "inextricably intertwined" with the Defendants' alleged manipulation of the Fix Price for antitrust standing purposes to the extent that Defendants relied on Plaintiffs' and other market participants' trading on a manipulated Fix Price in order to carry out their alleged scheme.  The Court therefore finds that Plaintiffs have adequately stated an antitrust injury.

### B.  Some Plaintiffs Have Established That They Are Efficient Enforcers

The Second Circuit has identified four factors to be considered in determining whether a particular plaintiff has standing as an "efficient enforcer" to seek damages under the antitrust laws:

> (1) whether the violation was a direct or remote cause of the injury; (2) whether there is an identifiable class of other persons whose self-interest would normally lead them to sue for the violation; (3) whether the injury was speculative; and (4) whether there is a risk that other plaintiffs would be entitled to recover duplicative damages or that damages would be difficult to apportion among possible victims of the antitrust injury. . . . Built into the analysis is an assessment of the "chain of causation" between the violation and the injury.

*Gelboim*, 823 F.3d at 772 (citations omitted).  In other contexts the Supreme Court has noted that the first factor, requiring proximate causation, "must be met in every case."  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, __ U.S. __, 134 S. Ct. 1377, 1392 (2014).  In contrast, the third and fourth factors are "problematic" and the "'potential difficulty in ascertaining and apportioning damages is not . . . an *independent* basis for denying standing where it is adequately alleged that a defendant's conduct has proximately injured an interest of the plaintiff's that the statute protects' and other relief might be available."  *DNAML PTY, Ltd. v. Apple Inc.*, 25 F.

Supp. 3d 422, 430 (S.D.N.Y. 2014) (quoting *Lexmark*, 134 S. Ct. at 1392 (emphasis in the original)).

### 1. Plaintiffs Have Demonstrated a Sufficiently Direct Injury

Evaluating the directness of an injury is essentially a proximate cause analysis that hinges upon "whether the harm alleged has a sufficiently close connection to the conduct the statute prohibits." *Lexmark*, 134 S. Ct. at 1390; *see also AGC*, 459 U.S. at 540-41 (evaluating directness in light of the "chain of causation" between the asserted injury and the alleged restraint of trade); *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 412 (2d Cir. 2014) (considering, *inter alia*, whether the alleged injury was in the scope of the risk that defendant's wrongful act created; was a natural or probable consequence of defendant's conduct; was the result of a superseding or intervening cause; or "was anything more than an antecedent event without which the harm would not have occurred" (quoting *CSX Transp., Inc. v. McBride*, 564 U.S. 685, 717 (2011) (Roberts, C.J., dissenting)). "Where the chain of causation between the asserted injury and the alleged restraint in the market 'contains several somewhat vaguely defined links,' the claim is insufficient to provide antitrust standing." *Laydon v. Mizuho Bank, Ltd.*, No. 12-cv-3419, at *9 (S.D.N.Y. Mar. 28, 2014) (citing *AGC*, 459 U.S. at 540).

As an appendix to the SAC, Plaintiffs have provided a list of the dates, quantities, and types of silver investments that Plaintiffs sold on days when Defendants are alleged to have manipulated the Silver Fixing. SAC App. D at 13-26. Plaintiffs do not state the actual prices or times at which they sold their silver investments but instead allege that they sold their silver investments at prices that were "directly and artificially impacted by the Silver Fix[ing]." SAC ¶ 230. Plaintiffs elsewhere allege that the silver investments they sold were "priced, benchmarked, and/or settled to the Fix Price." *Id.* ¶ 3.

With respect to physical sellers, the SAC alleges that Plaintiffs' OTC trades for physical silver were priced "by reference to the Fix [P]rice," *id.* ¶ 103, and it appears that Plaintiffs who sold silver bars or coins on the American Precious Metals Exchange may have transacted at a price representing the Fix Price plus a premium, *id.* ¶ 104 n.29. Plaintiffs do not, however, clearly define the relationship between the Fix Price (which is only set once daily), spot pricing ("which is always changing (just like a normal stock changing minute-by-minute throughout the day")), and the exact prices at which Plaintiffs sold silver during the Class Period. *See First Time Buyers FAQs*, APMEX, http://www.apmex.com/first-time-buyer (cited in SAC ¶ 104 n.29); *see also* SAC App. D. With respect to sellers of silver futures and options, Plaintiffs claim that "the value of these contracts is directly tied to the price of physical silver," *id.* ¶ 109,[17] and "directly impacted by the Fix [P]rice," *id.* ¶ 112, highlighting, for example that "99.85% of the variation in the price of COMEX silver futures contracts between January 1, 2004 and December 31, 2013 is explained by the results of the Silver Fix." SAC ¶ 114.

The Fixing Members rely on several lines of cases to argue that, regardless of whether Plaintiffs sold physical silver or silver derivatives, their claims are too indirect and remote to confer antitrust standing. First, the Fixing Members argue that Plaintiffs lack standing because "only direct purchasers of [the] monopolized product[]" have antitrust standing, and Plaintiffs did not transact directly (or indirectly) with the Defendants. Defs.' Mem. at 29 (quoting *In re Pub. Offering Antitrust Litig.*, No. 98-7890 (LMM), 2004 WL 350696, at *5 (S.D.N.Y. Feb. 25, 2004)). In making this argument, the Fixing Members rely heavily on *Illinois Brick Co. v.*

---

[17]    In the FAC, Plaintiffs alleged that "commercial silver traders use the prices of COMEX silver futures contracts to calculate the spot market price of silver," FAC ¶ 122, which appears to be the inverse of the relationship that Plaintiffs now plead. Nonetheless, because Plaintiff have consistently alleged that variations in closing prices for COMEX futures are 99.85% attributable to the Fix Price, FAC ¶ 121, SAC ¶ 114, and that spot prices also closely track the Fix Price, this inconsistency in Plaintiff's pleadings may be not as significant as the Fixing Members urge. Defs.' Mem. at 10.

*Illinois*, in which the Supreme Court held that indirect purchasers lacked standing to recover damages for overcharges resulting from antitrust violations that were passed on through a distribution chain.  431 U.S. 720, 729 (1977).  The Court's reasoning in *Illinois Brick* was predicated on its concern that permitting indirect purchasers to sue for antitrust violations "would create a serious risk of multiple liability for defendants," *id.* at 730, and the notion that the antitrust laws would be more "effectively enforced by concentrating the full recovery for the overcharge in the direct purchasers," *id.* at 735.  As a result, downstream purchasers in a distribution chain typically lack antitrust standing.  *See, e.g.*, *Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199 (1990) (public utilities but not residential customers to whom they sell gas have standing to sue natural gas companies for antitrust injuries); *In re Beef Indus. Antitrust Litig.*, 710 F.2d 216 (5th Cir. 1983) (packers who sell to retail grocers have standing to sue grocers alleged to have conspired to set wholesale beef prices at artificially depressed levels, but feeders who sell to packers may not).

      This argument, however, mischaracterizes Plaintiffs' claims.  Plaintiffs do not allege that Defendants suppressed the price of a particular bar of silver that was later sold through a distribution chain to Plaintiffs but rather that Defendants suppressed the Fix Price, which had a direct (and negative) impact on the value of their silver investments.  SAC ¶¶ 102-118.  In addition, the Fixing Members overreach when they suggest that *Illinois Brick* has been interpreted to deny standing to every plaintiff who is not in direct privity with the defendant. Defs.' Mem. at 29.  Indeed, since *Illinois Brick* was decided, courts have found that differently-situated plaintiffs may have standing to assert antitrust injuries, provided that each plaintiff suffered a unique and sufficiently direct injury as a result of defendants' anticompetitive conduct. *See, e.g.*, *Blue Shield of Va. v. McCready*, 457 U.S. 465 (1982) (employee who received health coverage under a group plan purchased by her employer had antitrust standing even though she

was not a competitor of, or in direct privity with, defendants because her injury was "inextricably intertwined with the injury the conspirators sought to inflict"); *In re Aluminum Warehousing Antitrust Litig.*, 2016 WL 4191132, at *7 (an antitrust defendant may "corrupt a separate market in order to achieve its illegal ends, in which case the injury suffered can be said to be 'inextricably intertwined' with the injury of the ultimate target"); *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 481 (7th Cir. 2002) (certain copper purchasers had antitrust standing to bring claims against defendants who conspired to manipulate the price of copper futures, even though plaintiffs never dealt directly with the defendants because "different injuries in distinct markets may be inflicted by a single antitrust conspiracy").

Next, the Fixing Members argue that Plaintiffs' alleged injuries are raised under a so-called "umbrella theory" of liability, which has not been well-received by at least some courts in this Circuit.  Defs.' Mem. at 29-30 (citing cases).  "Umbrella standing concerns are most often evident when a cartel controls only part of a market, but a consumer who dealt with a non-cartel member alleges that he sustained injury by virtue of the cartel's raising of prices in the market as a whole."  *Gelboim*, 823 F.3d at 778.  As noted in *Gelboim*, the viability of the concept of umbrella liability has not been resolved in this circuit.  *Id.* at 778-79.  Due to the uncertainty surrounding the viability of the theory of umbrella liability, and the unique facts of this case, analyzing Plaintiffs' claims under an umbrella theory of liability leads to no dispositive conclusions.

In the typical umbrella liability case, plaintiffs' injuries arise from a transaction with a non-conspiring retailer who is able, but not required, to charge supra-competitive prices as the result of defendants' conspiracy to create a pricing "umbrella."  *See, e.g.*, *Pollock v. Citrus Assocs. of N.Y. Cotton Exch., Inc.*, 512 F. Supp. 711, 719 n.9 (S.D.N.Y. 1981); *Gross v. New Balance Athletic Shoe, Inc.*, 955 F. Supp. 242, 245-47 (S.D.N.Y. 1977) (rejecting umbrella

theory of liability and noting that "the causal connection between the alleged injury and the conspiracy is attenuated by significant intervening causative factors," most notably, the "independent pricing decisions of non-conspiring retailers").  Here, in contrast, Plaintiffs allege that the "Fix Price determines the price of the entire silver market" such that, at least for some subset of Plaintiffs, there is little room for any interfering price impact due to the actions of non-culpable entities or exogenous market forces. Pls.' Opp. at 29.  In other words, Defendants are not merely alleged to have conspired to alter prices within a particular segment or region of the market but rather are alleged to have manipulated the benchmark price, upon which all market participants (buyers and sellers alike) relied in trading silver investments across a variety of markets.

As the Second Circuit made clear in *Gelboim*, under such circumstances, there appears to be little, if any, difference between the injuries suffered by market participants who sold silver to one of the Defendants (the alleged cartel members) and those who sold to non-conspiring third-parties. *Gelboim*, 823 F.3d at 779.  Accepting as true Plaintiffs' allegations that Defendants' suppression of the Fix Price had a direct impact on market participants who sold silver on days when the Fix was manipulated (regardless of the counterparty), the Court finds that at least some subset of Plaintiffs have sufficiently alleged proximate causation for purposes of antitrust standing.  That said, there appear to be substantial challenges to Plaintiffs' causation theory: the Court is extremely skeptical that *all* market participants who sold silver or silver instruments on alleged manipulation days will ultimately be able to move forward with their claims.  *See id.* ("Requiring the Banks to pay treble damages to every plaintiff who ended up on the wrong side of a[] [relevant transaction] would, if appellants' allegations were proved at trial, not only bankrupt [some] of the world's most important financial institutions, but also vastly extend the potential scope of antitrust liability in myriad markets where derivative instruments have

proliferated.").  Although causation and standing are threshold issues to be decided at the pleading stage, because the record is not (and could not reasonably be) sufficiently developed with respect to Plaintiffs' claim that the effect of Defendants' alleged manipulation persisted throughout the trading day and into future trading days (SAC ¶¶ 173-76, Figs. 33-34), the Court finds that these questions must be deferred to the class certification stage.

### 2. Some Plaintiffs Are Sufficiently Direct and Interested Victims for Purposes of Enforcing the Antitrust Laws

As alluded to, *supra*, the Court is convinced that at least some subset of Plaintiffs has suffered a sufficiently direct injury and therefore is sufficiently interested to litigate the antitrust claims at issue.  The most direct victims of Defendants' alleged manipulation would presumably be sellers who transacted at the Fix Price or at a price that incorporated the Fix Price as a component and sellers who transacted within a circumscribed time period around the Silver Fixing (before the impact of Defendants' alleged manipulation had been diluted by extraneous market factors).[18]  While it is unclear how many market participants transacted "at" the Fix Price on "manipulation days" versus how many Plaintiffs transacted in close temporal proximity to the Fixing window, the potential existence of more direct plaintiffs does not necessarily defeat Plaintiffs' standing to the extent that Plaintiffs suffered separate, and sufficiently direct, injuries. *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 689 (2d Cir. 2009) ("Inferiority to other potential plaintiffs can be relevant, but it is not dispositive." (internal quotations and

---

[18]     Plaintiffs' failure to allege that the Fix Price was the price (or an established component of the price) at which they transacted distinguishes this case from many of Plaintiffs' cited authorities.  *See Loeb*, 306 F.3d at 476, 494-95 (finding antitrust standing for certain copper purchasers alleging conspiracy to inflate copper futures prices when plaintiffs transacted at prices based on "rigid formulas" related to copper futures); *In re Aluminum Warehousing Antitrust Litig.*, 95 F. Supp. 3d 419, 429-30, 444 (S.D.N.Y. 2015), *motion to certify appeal denied*, No. 13-md-2481(KBF), 2015 WL 4646822 (S.D.N.Y. May 14, 2015) (finding antitrust standing for plaintiffs who alleged that defendants conspired to raise the "Midwest Premium" price, which was a component of plaintiffs' aluminum contracts); *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d at 587 (antitrust standing found for plaintiffs who were forced to pay supracompetitive prices when they purchased FX instruments from defendants "priced at or by the Fix [price]").

citation omitted)); *Ice Cream Liquidation, Inc. v. Land O'Lakes, Inc.*, 253 F. Supp. 2d 262, 274

(D. Conn. 2003) ("[T]he antitrust laws do not limit standing to only that class of purchasers with

the most direct injury."); *cf. DNAML*, 25 F. Supp. 3d at 431 ("A retailer's lost profits are wholly

distinct from consumer overcharges, and to "[d]eny[ ] the plaintiff[ ] a remedy in favor of a suit

by [consumers] would thus be likely to leave a significant antitrust violation . . . unremedied."

(alterations in the original) (citations omitted)).  This is particularly true where, as here, a rigid

rule requiring Plaintiffs to have transacted "at" the Fix Price would effectively eliminate private

enforcement with respect to all claims brought by futures sellers, who dominate the market and

who transact via an exchange rather than OTC or through contracts tied to the Fix Price.  The

Court therefore finds that at least some group of Plaintiffs are sufficiently interested so as to be

appropriate antitrust enforcers.

### 3.  Standing Is Not Defeated By the Risks of Speculative Injuries, Duplicative Damages and Difficulties in Apportioning Damages

Standing may be lacking where courts would otherwise be required to engage in

"hopeless speculation concerning the relative effect of an alleged conspiracy in the [relevant

markets] . . . , where countless other market variables could have intervened to affect [] pricing

decisions."  *Reading Indus., Inc. v. Kennecott Copper Corp.*, 631 F.2d 10, 13-14 (2d Cir. 1980).

For the reasons stated, *supra*, the Court is concerned that at least some Plaintiffs' alleged injuries

are highly speculative.  Although Plaintiffs argue that the Silver Fixing is the "only" factor that

goes into determining the price of Plaintiffs' silver investments, Pls.' Opp. at 22 (citing SAC ¶¶

103-112), this allegation is, at a minimum, hyperbolic: the Silver Fixing occurs only once a day,

at 12:00 P.M. London time, while silver instruments can be sold OTC twenty-four hours a day

and via exchanges that have varying hours of operation all around the world.

Plaintiffs do not deny that other market variables may have affected silver prices before and after the Silver Fixing.  (Indeed, were it otherwise, pricing across silver markets would essentially be flat, varying only once a day at the 12:00 P.M. Silver Fixing.)  And, while Plaintiffs allege that Defendants' price suppression lingered long after the end of the Fixing call, a significant evidentiary record will need to be developed before the Court can determine what role any such lingering suppression played in the losses suffered by Plaintiffs at various points throughout the trading day in the different markets in which they traded.

Nonetheless, because exogenous factors affect price movements in most antitrust cases and the existence of such factors does not alone defeat standing, the Court finds that issues regarding the speculative nature of Plaintiffs' injuries and damages can best be resolved at a later stage.  *See Grosser v. Commodity Exch., Inc.*, 639 F. Supp. 1293, 1319-20 (S.D.N.Y. 1986), *aff'd,* 859 F.2d 148 (2d Cir. 1988) (rejecting presence of extraneous factors affecting price movement as a reason to deny standing); *Strax v. Commodity Exch., Inc.*, 524 F. Supp. 936, 940 (S.D.N.Y. 1981) ("[W]hile—as is true with the vast majority of antitrust cases—proof of damages will most likely not be simple, this is not an action 'based on conjectural theories of injury and attenuated economic causality that would mire the courts in intricate efforts to recreate the possible permutations in the causes and effects of a price change.'" (quoting *Reading,* 631 F.2d at 14)).

Finally, with respect to damages, the Court finds that here, as in the *LIBOR* cases, "it is difficult to see how [Plaintiffs] would arrive at [a "just and reasonable estimate of damages"], even with the aid of expert testimony.  *Gelboim*, 823 F.3d at 779 (citation and internal quotation marks omitted).  Nonetheless, because "some degree of uncertainty stems from the nature of antitrust law," *id.*, and because the "potential difficulty in ascertaining and apportioning damages is not . . . an *independent* basis for denying standing where it is adequately alleged that a

28

defendant's conduct has proximately injured an interest of the plaintiff's that the statute

protects," *Lexmark*, 134 S. Ct. at 1392 (emphasis in original), the Court finds that standing has

been adequately pled.  In addition, given that, here, Plaintiffs have alleged separate injuries

(rather than derivative or duplicative injuries) and inasmuch as DOJ's Antitrust Division has

closed its investigation and no governmental entities have imposed penalties or fines against the

Fixing Members relating to this alleged conspiracy, any concerns regarding duplication and

apportionment appear to be hypothetical or minimal.  The Court therefore finds that, although it

harbors grave doubts regarding the scope of Plaintiffs' proposed class, Plaintiffs have plausibly

alleged that they are efficient enforcers for purposes of antitrust standing.

###   IV.   Plaintiffs Adequately Allege an Unlawful Agreement to Fix Prices and Restrain Trade from January 1, 2007 through December 31, 2013

Plaintiffs bring claims for price fixing, bid rigging, and conspiracy in restraint of trade

under Section 1 of the Sherman Act.  "Horizontal price fixing—that is, price fixing by

competitors in the same market—is per se illegal."  *In re Aluminum Warehousing Antitrust*

*Litig.*, 95 F. Supp. 3d at 447 (citing *Socony-Vacuum*, 310 U.S. at 223-24).  Claims for bid

rigging, on the other hand, typically involve competitors conspiring to raise prices for

purchasers—often, but not always, governmental entities—who acquire products or services by

soliciting competing bids.  *See, e.g.*, *Gatt*, 711 F.3d at 72-74; *State of N.Y. v. Hendrickson Bros.*,

840 F.2d 1065 (2d Cir. 1988).  With regard to unlawful restraints of trade, "[b]ecause [Section] 1

of the Sherman Act does not prohibit [all] unreasonable restraints of trade . . . but only restraints

effected by a contract, combination, or conspiracy, . . . [t]he crucial question is whether the

challenged anticompetitive conduct stem[s] from independent decision or from an agreement,

tacit or express."  *Twombly*, 550 U.S. at 553 (alterations in the original) (internal quotations and

citations omitted).  Regardless of whether Plaintiffs' allegations are evaluated in terms of price

fixing, bid rigging or an unlawful restraint of trade, an unlawful agreement must be pleaded with respect to each antitrust claim brought under Section 1.  *See, e.g.*, *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) ("To survive a motion to dismiss . . . a complaint must contain enough factual matter . . . to suggest that an agreement . . . was made.") (internal citations and quotations omitted)).

To allege an unlawful agreement, Plaintiffs must assert either direct evidence (such as a recorded phone call or email in which competitors agreed to fix prices) or "circumstantial facts supporting the *inference* that a conspiracy existed."  *Mayor & City Council of Baltimore* (*City of Baltimore*) *v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013) (emphasis in original).  Because conspiracies "nearly always must be proven through inferences that may fairly be drawn from the behavior of the alleged conspirators," the Court cannot take Plaintiffs' failure to present direct evidence as a sign that no conspiracy existed.  *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d at 591 (quoting *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 183 (2d Cir. 2012)).  At the pleading stage, Plaintiffs "need not show that [their] allegations suggesting an agreement are more likely than not true or that they rule out the possibility of independent action . . . ."  *Gelboim*, 823 F.3d at 781 (quoting *Anderson News*, 680 F.3d at 184).  Instead, "'a well-pleaded complaint may proceed even if . . . actual proof of those facts is improbable, and . . . a recovery is very remote and unlikely' as long as the complaint presents *a* plausible interpretation of wrongdoing."  *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d at 591 (quoting *Twombly*, 550 U.S. at 556) (emphasis in original)); *see also Gelboim*, 823 F.3d at 781 ("At the pleading stage, a complaint claiming conspiracy, to be plausible, must plead 'enough factual matter (taken as true) to suggest that an agreement was made . . . .'" (quoting *Anderson News*, 680 F.3d at 184)).

Here, Plaintiffs clear the plausibility standard, albeit barely, with respect to their price-fixing and unlawful restraint of trade claims under Section 1 based on allegations that the Fixing Members conspired opportunistically to depress the Fix Price between January 1, 2007 and December 31, 2013.[19]

### A.  Plaintiffs' Allegations of Parallel Conduct

Plaintiffs allege that Defendants engaged in parallel conduct by opportunistically causing "reversions" in spot pricing in advance of the Silver Fixing.  In particular, Plaintiffs claim to have identified 1900 days during the Class Period on which Defendants' below-market spot quotes leading up to the Fixing allegedly caused downward "reversions" in the spot market, leading to the artificial suppression of the Fix Price.  *Id.* ¶¶ 155-66, Figs. 21-28, App. D.  The SAC describes in detail six such days in which two or more Defendants appear to offer spot quotes that correlate with a downward trend in silver prices leadings up to the Silver Fixing.  *Id.* ¶¶ 155-66 & Figs. 21-28.

The Fixing Members correctly argue that this pattern of conduct is, without more, of limited persuasive value.  While Plaintiffs make a modest showing that different pairs or groupings of Defendants routinely lowered their quotes in advance of the Fixing, Plaintiffs acknowledge that other non-Defendant market participants (including BNP Paribas and others) quoted similar prices, without any evidence that Defendants were the ones causing, rather than merely responding to, these pricing declines.  Defs.' Mem. at 17 & n.14 (citing SAC ¶¶ 158-60).  Courts have long observed that a mere showing of parallel conduct or interdependence, which may be "consistent with conspiracy, but [is] just as much in line with a wide swath of rational

---

[19]     Because most of Plaintiffs' compelling facts, including those based on statistical analyses, are drawn from January 1, 2007 through December 31, 2013, Plaintiffs do not plausibly plead the existence of an antitrust conspiracy prior to 2007 or after 2013.  *See, e.g.*, SAC ¶¶ 179-80, 185-97 & Figs. 35-42.  Furthermore, the Court has absolutely no basis, apart from conjecture, to assume that Defendants' conduct continued beyond the conversion of the fixing call to an automated process involving other unidentified banking participants in August 2014.

and competitive business strategy unilaterally prompted by common perceptions of the market"

is insufficient to state a claim under Section 1. *Twombly*, 550 U.S. at 545; *see also In re*

*Elevator Antitrust Litig.*, 502 F.3d at 51 ("[s]imilar pricing can suggest competition at least as

plausibly as it can suggest anticompetitive conspiracy").

### B.  Plaintiffs' Allegations of Plus Factors

A conspiracy may, however, be "inferred on the basis of conscious parallelism, when such

interdependent conduct is accompanied by circumstantial evidence and plus factors." *City of*

*Baltimore*, 709 F.3d at 136 (citations omitted); *see also Twombly*, 550 U.S. at 557 (allegations of

parallel conduct "must be placed in a context that raises a suggestion of a preceding agreement").

Such "'plus factors' may include: a common motive to conspire, evidence that shows that the

parallel acts were against the apparent individual economic self-interest of the alleged

conspirators, and evidence of a high level of interfirm communications." *City of Baltimore*, 709

F.3d at 136 (quoting *Twombly v. Bell Atl. Corp.*, 425 F.3d 99, 114 (2d Cir. 2005), *rev'd on other*

*grounds, Twombly*, 550 U.S. at 570)).

Here, Plaintiffs argue that there are "at least seven" plus factors from which a conspiracy

to fix prices and restrain trade may plausibly be inferred. Pls.' Opp. at 17-20. Several of these

are clearly unavailing. For example, Plaintiffs' allegations that the structure of the Silver Fixing,

itself, including the fact that the auction occurred via private telephone call, cannot be counted as

a "plus factor." Pls.' Opp. at 18-19. In so finding, the Court notes that this case is different from

many (and maybe most) antitrust conspiracy cases in which the defendants' misconduct and

supporting communications occur in secret, outside the public eye. Here, in contrast,

Defendants' alleged misconduct occurred primarily through a daily Fixing call, which, although

private, had been acknowledged and accepted by market participants as a legitimate and

beneficial pricing exercise for nearly one hundred years. The structure of the Fixing is not

irrelevant —it provided a forum and opportunity for the Fixing Members to conspire— but the

"opportunity to collude does not translate into collusion."  *Ross v. Am. Exp. Co.*, 35 F. Supp. 3d

407, 452 (S.D.N.Y. 2014) (citation omitted); *see also Venture Tech., Inc. v. Nat'l Fuel Gas Co.*,

685 F.2d 41, 47 (2d Cir. 1982) (noting an antitrust plaintiff must show "more than the existence

of a climate in which such a conspiracy may have been formed").  The Court therefore finds that,

even at the pleading stage, the structure of the Silver Fixing does not constitute a "plus factor" in

support of Plaintiffs' claims.  *Cf. In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 65 (2d Cir.

2012) ("private phone calls and meetings—for which no social or personal purpose has been

persuasively identified" suggested conspiratorial communications).

  The Court further disagrees with Plaintiffs' assertion that the ongoing government

investigations into possible manipulation of the precious metals markets and the investigations

into FX and LIBOR constitute a "plus factor."  Pls.' Opp. at 19.  Even if the Court accepts these

allegations (which Defendants argue should be stricken as irrelevant), Defs.' Mem. at 26-27,

UBS Mem. at 5-8, evidence of Defendants' wrongdoing with respect to LIBOR and FX and the

mere existence of regulatory investigations into the precious metals markets do not substantiate

Plaintiffs' antitrust claims with respect to the Silver Fixing.  While not irrelevant, the mere fact

that Defendants UBS and HSBC traded precious metals during the Class Period from their FX

desks, SAC ¶ 13, and were fined for misconduct associated with their FX trading, does not

constitute evidence that UBS and HSBC (let alone the Fixing Members as a group) used the

same techniques in trading silver.  Moreover, Plaintiffs' efforts to infer wrongdoing from

Defendants' misconduct in the FX context is significantly hampered by the fact that the private

plaintiffs in those cases cited to direct evidence of manipulation and government findings of

collusion, whereas no similar allegations are present here.  This is so notwithstanding the fact

that government investigations into the Silver Fixing have been ongoing for well over two years

and that Plaintiffs have alleged that Defendants were colluding in chat rooms and via other forms of electronic communication throughout the trading day, communications that the Government has presumably obtained and reviewed.

The FINMA UBS Report found that UBS precious metals traders had shared client names and order information with unidentified "third-parties," intentionally triggered client stop-loss orders, and engaged in front-running, *id.* ¶¶ 79, 220, 224 (citing FINMA UBS Report at 10, 12), but UBS was not a Fixing Member, and Plaintiffs have alleged no facts  suggesting that UBS was specifically sharing information or conspiring with any of the Fixing Members with respect to silver trades.  Indeed the FINMA UBS Report noted that a "substantial element" of the misconduct in the precious metals desk was confined to the repeated front running of a single client's Fix orders, which does not suggest any conspiratorial participation on the part of the Fixing Members.  UBS Mem. at 6 n.5 (citing FINMA UBS Report at 12).  Significantly, none of the regulatory investigations cited by Plaintiffs has advanced to the point of charging any of the Defendants with colluding to manipulate the price of silver, and DOJ's Antitrust Division has closed its investigation without charging anyone.  Tr. at 8:5-9:13.  Thus, while the Court finds it relevant that banks found ways to profit from manipulating other benchmarks in ways that were not initially apparent to outsiders, the mere fact that regulatory entities are investigating the possibility of similar misconduct with respect to silver is not a "plus factor."

Nevertheless, Plaintiffs adequately allege other circumstantial evidence and "plus factors" that, taken together, advance their claims from the realm of the possible to the realm of the plausible.  In particular, Plaintiffs provide economic analyses showing not only the existence of unusual or "dysfunctional" pricing behavior around the Silver Fixing but also demonstrating that the Fixing Members had a "common motive" collectively to manipulate the Fix Price.  *City of Baltimore*, 709 F.3d at 136.  For example, Plaintiffs present data from 2007 through 2013

showing a volume spike in COMEX silver futures contracts beginning at the start of the Silver

Fixing call and peaking two minutes into the Fixing call, when, on the vast majority of days, the

call was still in progress.  SAC ¶ 141 & Fig. 14.  Plaintiffs further point to a similar pattern in the

spot market, in which, from 2007 through 2013, price volatility increased at the beginning of the

Fixing call and peaked while the Fixing call was still ongoing.  *Id.* ¶¶ 145-46 & Fig. 15.  These

analyses, showing market reaction *before* the publication of the Fix Price, constitute

circumstantial evidence of trading by the Fixing Members, the only entities who could have had

advance knowledge of the Fix Price.  The fact that the Silver Fixing occurred at noon, London

time, before the opening of the COMEX silver pit, a time when the U.S. markets were not fully

open, *id.* at 153-54 & Figs19-20, undermines the Fixing Members' contention that these unusual

pricing and trading patterns were merely the natural consequence of competition at a highly

liquid period of the trading day.  Defs.' Mem. at 39.

Plaintiffs' theory is further corroborated by analyses showing that, from 2007 through

2013, trades of COMEX silver futures placed *during* the Silver Fixing window were more than

twice as accurate in predicting the direction of the Fix Price than those placed *before* the Fixing

call.  *Id.* ¶¶ 149-52 & Fig. 18.  Those analyses provide further circumstantial evidence that the

Fixing Members, as opposed to less informed market participants, were behind the increased

volume in futures trading during the Fixing call.  *Id.*  The fact that the predictive accuracy of

futures trading during the Fixing increased to over 90% when particularly large returns were

available lends further plausibility to the theory that the Fixing Members were motivated to, and

did, trade on advance knowledge of the Fix Price while the Fixing calls were ongoing.  *Id.* ¶ 152

& Fig. 18.

Finally, Plaintiffs' allegations that Defendants' bid-ask spreads did not respond to the Fix

Price, remaining artificially wide so that Defendants were able to buy low and sell high, is

another factor, however slight, tending to show that the outcome of the Fixing auction was not news to the Defendants. *Id.* ¶¶ 198-207 & Figs. 43-47. Whether or not Plaintiffs' theory—that the Defendants' were able to offer supracompetitive bid-ask spreads based on their foreknowledge of the Fix Price—ultimately holds water is a question for a later time. At the pleading stage, however, Defendants' disproportionately wide bid-ask spreads constitute another piece of circumstantial evidence suggesting that the Defendants may have conspired to manipulate the Fix Price.[20]

Additionally, implicit in Plaintiffs' allegations is the notion that the Fixing Members at times acted against their own interests by quoting below-market prices leading up to the Fixing. The Fixing Members agree that their client orders and proprietary trading positions could not have all moved in parallel over the course of the Class Period. Defs.' Mem. at 36-37 (quoting *In re LIBOR-Based Fin. Instruments Antitrust Litig.* (*In re LIBOR III*), 27 F. Supp. 3d 447, 469 (S.D.N.Y. 2014) ("[I]t is implausible that all defendants would maintain parallel trading positions . . . across the Class Period.")). As a result, the pattern of highly-correlated and below-market quotes presented by Plaintiffs' SAC ¶¶ 155-66 & Figs. 21-28, suggests that at least on some days one or more of the Fixing Members quoted prices that were contrary to their interest on that day: for example, by agreeing to reduce the Fix Price, notwithstanding the fact that a given bank would have profited more from an increase, rather than a decrease, in the Fix Price. *See Alaska Elec. Pension Fund*, 2016 WL 1241533, at *5 (S.D.N.Y. Mar. 28, 2016) (banks that

---

[20]     On the other hand, the Court is not persuaded by Plaintiffs' argument that Defendants stood to benefit from the alleged conspiracy because they held "large, unhedged positions in the precious metals markets." SAC ¶¶ 208-212 & Figs. 49-51. Based on Plaintiffs' proffered data, the only bank with a "large unhedged trading position" throughout the Class Period appears to be HSBC, but the supporting data includes all of HSBC's foreign exchange and precious metals trading, which gives little insight into its position specifically in the silver market. SAC ¶ 208 & Fig. 48. The Bank of Nova Scotia did not take on a large hedging position until 2011, and again, that position reflects its total derivatives positions, telling the Court nothing about its position specifically in the silver market. *Id.* ¶ 209 & Fig. 49. Plaintiffs present no comparative data for UBS, *id.* ¶ 210 & Fig. 50, or Deutsche Bank, *id.* ¶ 211 & Fig. 51.

allegedly conspired to manipulated ISDA benchmark rates against their economic self-interest by *inter alia* trading against their positions on certain days).  Taken together, Plaintiffs' allegations are, therefore, sufficiently plausible to allege an unlawful agreement to fix prices and restrain trade.

The Fixing Members' arguments to the contrary are unpersuasive.  Characterizing Plaintiffs' theory as one merely alleging "persistent suppression" of silver prices, they argue that Plaintiffs' allegations as to motive are implausible because Plaintiffs do not claim that Defendants held "net short" futures positions throughout the Class Period, "a prerequisite if Defendants were to gain from persistent, long-term price suppression."  Defs.' Mem. at 17-18.  But rather than alleging that Defendants constantly suppressed the Fix Price on a daily basis, Plaintiffs instead allege that Defendants opportunistically (albeit frequently) suppressed the Fix Price in order to create, and then capitalize on, arbitrage conditions, particularly in the market for silver futures.  *See* SAC ¶¶ 149-54, 177-97.[21]  To support this theory, Plaintiffs need not allege that Defendants were "consistently short," Defs.' Reply at 8 n.13, although the fact that the SAC alleges that price suppression persisted suggests that being consistently short would have been a logical trading strategy, but only that Defendants opportunistically engaged in short-term trading based on their advance knowledge of the Fix Price.  *See* SAC ¶¶ 149-54.  For the same reason, Plaintiffs need not allege that the Fix Price was manipulated downward in every year during the Class Period.  *See* Defs.' Mem. at 23-24.

---

[21]     Notably, the Fixing Members acknowledge this point, when it suits their interest, in arguing that Plaintiffs lack CEA standing because Plaintiffs allege a pattern of "isolated (though repeated) manipulative activity" while failing to allege that they transacted at a time during which prices were artificially suppressed.  Defs.' Mem. at 44-45.

Finally, the Fixing Members argue that Plaintiffs' economic analyses cannot be relied upon because they are based on the work of "paid experts"[22] who are improperly proffering expert opinions at the pleading stage.  Defs.' Mem. at 21-22 (citing cases).  The Court is not, however relying on Plaintiffs' *opinions* (expert or otherwise) but rather on Plaintiffs' factual assertions regarding pricing and other economic data, which courts generally accept at the pleading stage.  *See Carpenters Pension Trust Fund of St. Louis v. Barclays PLC.*, 750 F.3d 227, 234 n.8 (2d Cir. 2014) (relying on, among other things, plaintiff's expert economic analysis to show loss causation); *LIBOR I*, 935 F. Supp. 2d at 679-80, 716-17, *rev'd on other grounds, Gelboim*, 823 F.3d 759 (accepting plaintiffs' proffered analyses showing that banks' rates were grouped and comparing LIBOR to other data); *Dover v. British Airways, PLC (UK)*, No. 12-cv-5567, 2014 WL 317845, at *2 (E.D.N.Y. Jan. 24, 2014) (noting that plaintiff's statistical analysis of prices "is a factual allegation that the Court must credit"); *Fed. Hous. Fin. Agency v. UBS Americas, Inc.*, 858 F. Supp. 2d 306, 332 (S.D.N.Y. 2012), *aff'd*, 712 F.3d 136 (2d Cir. 2013) (discussing plaintiffs' internal review of a sampled subset of loan files).  While courts may have discretion to reject such statistical analyses, Defendants have not cited a single case from this District in which a court has done so at the pleading stage.[23]  Moreover, disregarding all such analyses here would effectively foreclose Plaintiffs' ability to state an antitrust claim for manipulation of the Silver Fixing unless they had direct evidence, which is generally not

---

[22]      Plaintiffs counter that at least some of the expert analyses relied upon were published prior to Plaintiffs' filing of the initial complaint and therefore were presumably performed independently of any compensated work for Plaintiffs.  Pls.' Opp. at 3.  Whether Plaintiffs brought their complaint because of such reports or procured expert analyses after deciding to bring their complaint is immaterial because the Court cannot evaluate the reliability of Plaintiffs' experts at the pleading stage.

[23]      The Fixing Members cite to *Reed Const. Data Inc. v. McGraw-Hill Cos., Inc.*, 49 F. Supp. 3d 385, 399 (S.D.N.Y. 2014) and *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 145-46 (1997), but those decisions were based on pretrial and summary judgment motions to exclude expert testimony, not motions to dismiss.

required at the pleading stage.  *See Anderson News*, 680 F.3d at 183-84.  While the Court evaluates Plaintiffs' analysis-based allegations with as much scrutiny as any other, such allegations cannot be wholly disregarded.[24]

In short, the Court finds that Plaintiffs have plausibly alleged an antitrust conspiracy and price fixing from 2007 through 2013 with respect to the Fixing Members.  Plaintiffs adequately allege that the Fixing Members, horizontal competitors in the relevant markets for physical silver and silver derivatives, conspired artificially to suppress the Fix Price in order to gain an unfair trading advantage over other market participants, causing Plaintiffs to suffer losses on their silver investments.  Because Plaintiffs have sufficiently pleaded a *per se* violation, they "need not separately plead harm to competition."  *In re Foreign Exch. Benchmarking Rates Antitrust Litig.*, 74 F. Supp. 3d at 594 (citing *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007)).  The Fixing Members' Motion to Dismiss Plaintiffs' price fixing and conspiracy in restraint of trade claims is therefore denied with respect to Plaintiffs' claims from 2007 through 2013 and otherwise granted with respect to the balance of the Class Period.

## V.    Plaintiffs Fail to State a Claim of Bid Rigging

In contrast to Plaintiffs' price fixing and unlawful restraint of trade claims, Plaintiffs have not alleged any facts supportive of a claim for bid rigging.  Claims for bid rigging typically apply where bidding parties conspire to increase the price ultimately paid by the purchaser by artificially altering their bids or agreeing to abstain from bidding entirely.  *See, e.g.*, *Shaw v. United States*, 371 F. Supp. 2d 265, 272 (E.D.N.Y. 2005) (citing *United States v. W.F. Brinkley*

---

[24]    The Fixing Members' argument that Plaintiffs' experts endorse "obvious alternative explanations" to Plaintiffs' theory is based on a misreading of Plaintiffs' expert's report.  Defs.' Mem. at 24-25 (citing Ex. 1 (Caminschi) at 51-52).  The report actually concluded that, although fixing results *could be* "driven by the price changes observed in the public markets," the "more plausible" theory is that "short-term prices of public traded instruments are driven by the London silver fixing," *i.e.*, by the Fixing Members.  Pls.' Opp. at 6 (citing Ex. 1 (Caminschi) at 51-52).

*& Son Constr. Co.*, 783 F.2d 1157, 1161 (4th Cir. 1986) (illegal bid rigging occurs "where two or more persons agree that one will submit a bid for a project higher or lower than the others or that one will not submit a bid at all")); *Philip Morris Inc. v. Heinrich*, No. 95 CIV. 0328 (LMM), 1996 WL 363156, at *9 (S.D.N.Y. June 28, 1996) (citing *United States v. Portsmouth Paving Corp.* 694 F.2d 312, 325 (4th Cir. 1982) ("Any agreement between competitors pursuant to which contract offers are submitted to or withheld from a third party constitutes bid rigging *per se.*")).

Plaintiffs allege that Defendants engaged in bid rigging by "rig[ing] the supposedly 'Walrasian' auction of the Silver Fix," SAC ¶ 280, but Plaintiffs ignore the fact that the auction process was a benchmarking mechanism, not a bidding process for any particular contract, project or transaction.  Because there was no purchaser on the other side of the Fixing auction, and because Plaintiffs allege no additional facts in support of their bid rigging claim, the Fixing Members' Motion to Dismiss Plaintiffs' bid rigging claim is granted.

### VI.    Plaintiffs Have Standing to Assert CEA Claims

Under section 22(a) of the CEA, a plaintiff has standing to bring a commodities manipulation action only if he or she suffered "actual damages" as a result of a defendant's manipulation.  7 U.S.C. § 25(a)(1).  To establish "actual damages" a plaintiff must show an "actual injury caused by the violation," *In re LIBOR-Based Fin. Instruments Antitrust Litig.* (*LIBOR II*), 962 F. Supp. 2d 606, 620 (S.D.N.Y. 2013) (quoting *Ping He (Hai Nam) Co. v. NonFerrous Metals (U.S.A.) Inc.*, 22 F. Supp. 2d 94, 107 (S.D.N.Y. 1998), *vacated on other grounds*, 187 F.R.D. 121 (S.D.N.Y. 1999)).  Where, as here, CEA claims are based on discrete, episodic instances of manipulation, plaintiffs must allege that they "engaged in a transaction at a time during which prices were artificial as a result of defendants' alleged . . . manipulative conduct, and that the artificiality was adverse to their position." *Id.* at 622.

The Fixing Members argue that Plaintiffs lack CEA standing because Plaintiffs fail to allege that they transacted in the "moments immediately before and after the Silver Fix." Defs.' Mem. at 45. But Plaintiffs allege that the effects of Defendants' manipulation persisted beyond the Fixing window. SAC ¶¶ 173-76 & Figs. 33-34. While the Fixing Members correctly point out that Plaintiffs' allegations of "persistence" are in tension with their allegations that the Fixing marked a uniquely dysfunctional period of the trading day, Defs.' Mem. at 45, they are not necessarily incompatible. Viewing the allegations in the light most favorable to the Plaintiffs, the Court could find that the Plaintiffs have adequately alleged that, on days that Defendants engaged in manipulation, the Fixing marked an abrupt downward aberration in pricing, which abated gradually, but perhaps not completely, over time.

Under such circumstances, allegations that Plaintiffs sold a particular quantity of silver futures on specifically identified dates when Defendants are alleged to have artificially suppressed the Fix Price are sufficient for CEA standing purposes. *Compare In re Amaranth Nat. Gas Commodities Litig.*, 269 F.R.D. 366, 379-80 (S.D.N.Y. 2010) (in the context of CEA class certification, "case law suggests that because plaintiffs transacted at artificial prices, injury may be presumed") *with LIBOR II*, 962 F. Supp. 2d at 620-21 (no standing where Plaintiffs failed plausibly to allege that they transacted on days on which prices were artificial or that the alleged artificiality was adverse to their positions).

**VII.    Plaintiffs Adequately Allege Price Manipulation**

Plaintiffs assert claims under CEA Section 9(a)(2), 7 U.S.C. § 13(a)(2), which makes it unlawful for "any person to manipulate or attempt to manipulate the price of any commodity in interstate commerce." Although manipulation claims that sound in fraud may be evaluated under the more stringent pleading requirements of Fed. R. Civ. P. 9(b), *In re Amaranth Nat Gas Commodities Litig.*, 730 F.3d 170, 180-81 (2d Cir. 2013) (reserving question of whether Rule

9(b) applies to market manipulation claims based on fraud), courts in this District have generally found that "fraud is not a necessary element of a market manipulation claim." *CFTC v. Wilson*, 27 F. Supp. 3d 517, 532 (S.D.N.Y. 2014) (citing *CFTC v. Parnon Energy Inc.*, 875 F. Supp. 2d 233, 244 (S.D.N.Y. 2012)).  In determining whether a particular manipulation claim raises allegations of fraud in the commodities context, courts typically employ a "case-by-case" approach.  *See In re Amaranth Nat. Gas Commodities Litig.*, 730 F.3d at 181 (citing *Parnon*, 875 F. Supp. 2d at 244; *CFTC v. Amaranth Advisors, L.L.C.*, 554 F. Supp. 2d 523, 530-31 (S.D.N.Y. 2008)).

Although Plaintiffs characterize their claims as merely asserting an "abuse of market power," the SAC actually alleges that Defendants submitted false and misleading auction bids and otherwise colluded to manipulate the Fix Price in order to gain an unfair short-term trading advantage over other market participants; those allegations likely "sound in fraud."  *See, e.g.*, *In re Crude Oil Commodity Litig.*, No. 06-cv-6677 (NRB), 2007 WL 1946553, at *5 (S.D.N.Y. June 28, 2007) (applying Rule 9(b) where "the crux of plaintiffs' allegations is that defendants misled the market with regard to supply and demand . . . resulting in artificial prices"); *see also LIBOR I*, 935 F. Supp. 2d at 713-14 (allegations that defendants "misled the market" by submitting artificial LIBOR quotes sound in fraud).  Although Plaintiffs also allege price manipulation based on deceptive trading behavior and abuse of market power, which allegations may be subject to the more liberal Rule 8(a) standard, the Court need not determine which standard applies, because Plaintiffs have met their burden even under the more rigorous Rule 9(b) standard.  *See Ploss v. Kraft Foods Group, Inc.*, 15-cv-2937, slip op. at 23-28 (N.D. Ill. June 27, 2016) (manipulation claims based on explicit misrepresentations sound in fraud and are subject to Rule 9(b), while those based solely on deceptive market activity may be subject to the more liberal Rule 8(a) standard).

In alleging fraud or mistake under Rule 9(b), "a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  This standard is generally relaxed in the context of manipulation-based claims, *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 102 (2d Cir. 2007), where the complaint must simply specify "what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue."  *In re Nat. Gas Commodity Litig.* (*Amaranth I*), 358 F. Supp. 2d 336, 343 (S.D.N.Y. 2005) (citation and internal quotations omitted); *see also In re Amaranth Nat. Gas Commodities Litig.*, 587 F. Supp. 2d 513, 535 (S.D.N.Y. 2008).  While scienter "may be alleged generally," Fed. R. Civ. P. 9(b), Plaintiffs must allege facts that "give rise to a *strong inference* of scienter."  *In re Amaranth Nat. Gas Commodities Litig.* (*Amaranth II*), 612 F. Supp. 2d 376, 384 (S.D.N.Y. 2009) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007) (emphasis in *Amaranth II*)).

To establish a claim for price manipulation under the CEA, Plaintiffs must allege that: "(1) Defendants possessed an ability to influence market prices; (2) an artificial price existed; (3) Defendants caused the artificial prices; and (4) Defendants specifically intended to cause the artificial price."  *In re Amaranth Nat. Gas Commodities Litig.*, 730 F.3d at 173 (quoting *Hershey v. Energy Transfer Partners, L.P.*, 610 F.3d 239, 247 (5th Cir. 2010)).  Because Plaintiffs' allegations relative to intent, artificiality, and causation are interrelated, a separate discussion of each element is something of an artificial exercise.  *See, e.g.*, *Wilson*, 27 F. Supp. 3d at 535 (noting how the elements of CEA manipulation claims occasionally overlap, such that they may be factually and legally interdependent (citations omitted)).  In the interest of clarity, however, the Court will address each element in turn.

With respect to the first element, Defendants do not dispute that Plaintiffs have adequately pleaded that each of the Fixing Members possessed the ability to manipulate the silver futures market by virtue of its role as a market maker and participant in the Fixing auction.

With regard to artificiality, viewing the allegations in the light most favorable to Plaintiffs, the Court finds that Plaintiffs have adequately pleaded the existence of artificial prices around the Silver Fixing.  "An artificial price is a price that 'does not reflect basic forces of supply and demand.'"  *Parnon*, 875 F. Supp. 2d at 246 (quoting *In re Soybean Futures Litig.*, 892 F. Supp. 1025, 1044 (N.D. Ill. 1995)).  "When determining if artificial prices exist, a court may consider the underlying commodity's normal market forces, historical prices, supply and demand factors, price spreads, and also the cash market for the commodity at issue."  *In re Commodity Exch., Inc., Silver Futures & Options Trading Litig.* (*Silver I*), No. 11–md-2213 (RPP), 2012 WL 6700236, at *12 (S.D.N.Y. Dec. 21, 2012) (citing *In re Sumitomo Copper Litig.*, 182 F.R.D. 85, 90 n.6 (S.D.N.Y. 1998)).

Plaintiffs allege that a dysfunction in silver pricing dynamics is reflected in a 7-year pattern of sharp downward price swings accompanied by a spike in highly predictive futures trading and price volatility occurring frequently (and uniquely) around the Silver Fixing.  SAC ¶¶ 120-24 & Figs. 1-3, 140-54 & Figs. 14-20[25]  The Fixing Members counter that this pattern is consistent with "the forces of supply and demand in the market," Defs.' Mem. at 39 (quoting *Silver I*, 2012 WL 6700236, at *12), but they offer no plausible market-based explanation for this phenomenon.  While it is conceivable that silver sellers might have been incentivized to trade around the "highly liquid" Fixing, basic principles of supply and demand dictate that lower prices would have immediately attracted buying interest, such that high liquidity around the

---

[25]    For the reasons stated in footnote 19, *supra*, Plaintiffs have not plausibly alleged a pattern of price manipulation prior to 2007 or after 2013.

44

Fixing window should have been a price neutralizing factor.  The Fixing Members also offer no

market-based explanation for the spike in futures trading volume *during* the Fixing window,

which allegedly predicted the outcome of the Fixing to a high degree of accuracy.  Finally, the

Fixing Members' argument that these allegedly "dysfunctional" pricing dynamics must have

been the result of natural market forces because they occurred simultaneously in the spot market,

Defs.' Mem. at 39, is circular.  Because Plaintiffs allege that variations in the Fix Price had a

simultaneous impact on prices in the spot and futures markets, the co-occurrence of anomalous

pricing behavior in the spot market around the Fixing does not render benign similar activity in

the futures markets.

    With regard to scienter, specific intent to manipulate prices can be pleaded by "alleging

facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2)

constituting strong circumstantial evidence of conscious misbehavior or recklessness."

*Amaranth I*, 587 F. Supp. 2d at 530 (quoting *ATSI*, 493 F.3d at 99 (other citations omitted)).

Plaintiffs' allegations meet both standards.  First, as described more fully, *supra*, Plaintiffs allege

that the Fixing Members were motivated to manipulate the Fix Price because doing so allowed

them to create an arbitrage condition in the futures market on which they were able to profitably

trade during the Fixing window.[26]  *See Amaranth I*, 587 F. Supp. 2d at 530 ("Sufficient motive

allegations entail concrete benefits that could be realized by one or more of the false statements

and wrongful nondisclosures alleged." (quoting *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir.

2001)).  The Fixing Members also had the opportunity to manipulate the Fix Price by virtue of

---

[26]    The Fixing Members' arguments to the contrary are not so much inaccurate as they are off point.  Defs.'
Mem. at 36-37.  As described *supra* the Court agrees that Plaintiffs' allegations regarding the Defendants' "large,
unhedged positions in the precious metals markets" are not well-pleaded, and even if they were, they would be
insufficient to establish a motive for price manipulation under the CEA.  *See In re Crude Oil Commodity Litig.*,
2007 WL 1946553, at *8 (a "generalized [profit] motive" is "insufficient to show intent" because it "could be
imputed to any corporation with a large market presence in any commodity market") (citations omitted).

their role as major market makers and Fixing participants, which Defendants do not appear to contest. *See Laydon*, 2014 WL 1280464, at *5 (S.D.N.Y. Mar. 28, 2014) (defendants' roles as, *inter alia*, Euroyen TIBOR and/or Yen–LIBOR "Contributor Banks" was sufficient to plead opportunity).

Plaintiffs further allege that each of the Fixing Members acted recklessly in creating artificial price dynamics in the silver markets around the Fixing. As the sole contributors to the Fixing auction, the Fixing Members were no doubt aware of their ability to influence the Fix Price (both individually and collectively), which, in turn, affected the silver markets. Therefore, they could not have acted accidentally or unknowingly in opportunistically submitting artificially low Fixing bids over a 7-year period. *See LIBOR III*, 27 F. Supp. 3d at 470 (satisfying intent element under a conscious misbehavior or recklessness theory based on evidence that defendants had submitted artificial LIBOR quotes and the "danger" of submitting artificial quotes "was either known to the defendant banks or so obvious that they must have been aware of it"). The Fixing Members' suggestion that reckless intent cannot be alleged without direct evidence is incorrect. Defs.' Mem. at 37-38. *See Lerner v. Fleet Bank, N.A.*, 459 F.3d 275, 290-91 (2d Cir. 2006) ("strong" circumstantial evidence sufficient to show recklessness). "Because proof of intent will most often be circumstantial in nature, manipulative intent must normally be shown inferentially from the conduct of the accused." *Parnon*, 875 F. Supp. 2d at 249 (quoting *In re Ind. Farm Bureau Coop. Ass'n.*, No. 75–14, 1982 WL 30249, at *7 (CFTC Dec. 17, 1982)). Plaintiffs' allegations are therefore sufficient to plead scienter.

Finally, Plaintiffs have sufficiently pleaded that the Fixing Members' alleged misconduct was the "proximate cause of the price artificiality." *Silver I*, 2012 WL 6700236, at *16 (citations omitted). In particular, while the parties debate the role of external market forces, Plaintiffs adequately allege that changes in the Fix Price had an immediate effect on pricing in the silver

markets.  Plaintiffs have identified a significant number of days on which abnormal or

dysfunctional downward pricing swings occurred uniquely around the Silver Fixing along with a

concurrent pattern of price volatility and highly predictive futures trading during the Fixing

window.  Plaintiffs have also identified "hundreds" of days in the Class Period on which

Defendants' trading in the minutes immediately preceding the Fixing window was highly

correlated with (if not definitively the cause of) a downward reversion of silver prices, and

Plaintiffs have alleged that, unlike other market participants, Defendants' bid-ask spreads did not

react to the publication of the Fix Price.  Taken individually, none of these allegations would be

sufficient but together (and combined with Plaintiffs' allegations regarding artificiality and

intent) they plausibly allege that the Fixing Members' conduct was at least one cause of the

alleged artificial pricing around the Silver Fixing.  *See Parnon*, 875 F. Supp. 2d at 248 ("'[I]t is

enough, for purposes of a finding of manipulation . . . that respondents' action contributed to the

price [movement].'"  (quoting *In re Kosuga*, 19 Agric. Dec. at 603, 624 (1960)); *cf. In re Cox*,

1987 WL 106879, at *12 ("If the multiple causes [of an artificial price] cannot be supported . . . ,

or if the respondents are not one of the proximate causes, then the charge of manipulation cannot

be sustained.").  At the pleading stage, the Court may not pick and choose among plausible

explanations and must assume that Plaintiffs' well-pleaded allegations are true, regardless of

whether they are probable.  *Anderson News*, 680 F.3d at 185 (2d Cir. 2012) (internal quotations

omitted)).  The Fixing Members' motion to dismiss Plaintiffs' price manipulation claims is,

therefore, denied.

### VIII.   Plaintiffs Adequately Allege Manipulative Device Claims After August 15, 2011

Plaintiffs bring claims under CEA Section 6(c)(1), 7 U.S.C. § 9(1), and CFTC Rule

180.1, which make it unlawful for any person to "use or employ . . . in connection with any

swap, or a contract of sale of any commodity . . . any manipulative or deceptive device or

contrivance, in contravention of [CFTC rules and regulations]," 7 U.S.C. § 9(1), or to: "[m]ake, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading," 17 CFR 180.1(a)(2); "[e]ngage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person," *id.* at (a)(3); or "[d]eliver or cause to be delivered . . . a false or misleading or inaccurate report concerning . . . market information or conditions that affect or tend to affect the price of any commodity in interstate commerce . . . ," *id.* at (a)(4).  While the phrase "manipulative or deceptive device or contrivance" is not defined by statute or regulation, CFTC precedent notes that: "the operative phrase 'manipulative or deceptive device or contrivance,' is virtually identical to the terms used in section 10(b) of the Securities Exchange Act of 1934."  *In re Total Gas & Power N.Am.*, CFTC No. 16-03, 2015 WL 8296610, at *8 (Dec. 7, 2015) (quoting Prohibition on the Employment, or Attempted Employment, of Manipulative and Deceptive Devices and Prohibition on Price Manipulation, 76 Fed. Reg. 41398-01, at 41, 399 (July 14, 2011)) (to be codified at 17 CFR pt. 180)) (the "Prohibition on Manipulative and Deceptive Devices").  Because of "the differences between the securities markets and the derivatives markets," however, the CFTC has stated that it is "guided, but not controlled, by the substantial body of judicial precedent applying the comparable language of SEC Rule 10b-5."  *Id.*

The Fixing Members argue that because Rule 180.1 did not become effective until August 15, 2011, Plaintiffs' manipulative device claim based on pre-August 15, 2011 conduct must be dismissed.  Defs.' Mem. at 42.  The Court agrees.  *See In re Amaranth Nat. Gas Commodities Litig.*, 730 F.3d at 173 n.1 (noting that Rule 180.1 "does not impact the present appeal, however, given the regulation's effective date of August 15, 2011 (citations omitted)); *see also In re Barclays PLC, Barclays Bank PLC, and Barclays Capital Inc.*, CFTC No. 15-25,

48

2015 WL 2445060, at *14 (CFTC May 20, 2015) (differentiating between conduct occurring pre- and post-August 15, 2011 for purposes of Rule 180.1).  What remains are Plaintiffs' manipulative device claims with respect to three futures sales that occurred on dates allegedly affected by Defendants' alleged misconduct after August 15, 2011.  *See* SAC App. D.

With respect to these three transactions, the Fixing Members argue that Plaintiffs' manipulative device claims fail because Plaintiffs have not alleged: (1) a manipulative act, (2) performed in connection with a swap, or contract of sale of a commodity, (3) scienter, (4) reliance, (5) economic loss, and (6) loss causation.  Defs.' Mem. at 42 (citing securities cases). For the reasons articulated *supra*, Plaintiffs have satisfied their burden to allege that the Fixing Members engaged in manipulative acts in connection with the sale of commodities, scienter,[27] and economic loss.  With respect to the remaining elements of reliance and loss causation, Plaintiffs argue that their CEA claims are merely guided but not controlled by securities law, and the only courts in this District to have addressed the applicability of 10(b) to commodities manipulation claims have not required reliance and loss causation to be alleged separately.  Pls.' Opp. at 44-45.

While the case law is scarce on this point, the Court finds that, under the circumstances of these consolidated actions, Plaintiffs have satisfied their pleading burden.  In *Ploss*, the court assumed that misrepresentation-based claims require reliance and loss causation to be alleged separately and with particularity, 15-cv-2937, slip op. at 25-26, while manipulation-based claims merely require that "the market relies on the transactions to signal true, rather than manipulative,

---

[27]     The Court notes that, in contrast to Plaintiffs' price manipulation claims, Plaintiffs' manipulative device claims under Section 6(c)(1) and 17 C.F.R. 180.1 require scienter to be proven by intentional or reckless conduct. *See* 17 C.F.R. § 180.1(a); Prohibition on Manipulative and Deceptive Devices, 76 Fed. Reg. at 41,404; *CFTC v. Kraft Foods Grp., Inc.*, 153 F. Supp. 3d 996, 1014-15 (N.D. Ill. 2015), *motion to certify appeal denied*, No. 15 C 2881, 2016 WL 3907027 (N.D. Ill. July 19, 2016).  Because the Court has already found that Plaintiffs alleged strong circumstantial evidence of conscious misbehavior or recklessness, this element has been adequately alleged.

demand," *id.* at 30 n.11, and that the alleged manipulation had a sufficient impact on the relevant

market, *id.* at 25-26.  In *In re Crude Oil Commodity Futures Litigation*, the court held that, at

least in the context of manipulation-based claims, as to which the effects of the alleged

manipulation presumably dissipate over time, loss causation is not required.  913 F. Supp. 2d 41,

60-61 (S.D.N.Y. 2012); *see also In re Platinum and Palladium Commodities Litig.*, 828 F. Supp.

2d 588, 600-01 (S.D.N.Y. 2011) (loss causation principles were not applicable to a CEA claim

involving a manipulative "bang the close" trading strategy).  Here, Plaintiffs have alleged both

misrepresentations (*i.e.*, the Fixing Members' misstatements regarding their supply and demand

for silver in the context of the Fixing) and manipulation (*i.e.*, the Fixing Members' quoting and

trading practices leading up to the Fixing and opportunistic futures trading before and during the

Fixing call) as part of a single scheme.  Accordingly, at the pleading stage, and specifically in the

context of this benchmark manipulation case, the Court finds that Plaintiffs have satisfied their

burden by alleging with particularity "the nature, purpose, and effect of the fraudulent conduct

and the roles of the defendants."  *ATSI*, 493 F.3d at 101; *cf. Laydon*, 2014 WL 1280464, at *5-*6

(denying defendants' motion to dismiss plaintiff's CEA claims based on alleged Euroyen TIBOR

and Yen–LIBOR manipulation without separately addressing reliance and loss causation).  The

Fixing Members' motion to dismiss Plaintiffs' manipulative device claims is therefore denied.[28]

---

[28]     Finally, the Fixing Members argue that Plaintiffs' manipulative device claim should be dismissed because
it is predicated on an "insider trading" theory but fails to allege that Defendants owed Plaintiffs a fiduciary duty.
Defs.' Mem. at 43 (citing *Chiarella v. United States*, 445 U.S. 222, 228 (1980)).  In support of this theory, the
Fixing Members argue that: "[U]nlike securities markets, derivatives markets have long operated in a way that
allows for market participants to trade on the basis of lawfully obtained material nonpublic information."  Defs.'
Mem. at 44 (quoting Prohibition on Manipulative and Deceptive Devices, 76 Fed. Reg. at 41,403).  Be that as it
may, as described *supra*, Plaintiffs' manipulation allegations are not necessarily akin to a claim of "insider trading,"
and even if they were, the Fixing Members have not argued that the facts, viewed in the light most favorable to the
Plaintiffs, demonstrate that the Fixing Members were trading on information that was "lawfully obtained."

**IX.     Plaintiffs Adequately Allege Aiding and Abetting and Principal-Agent Liability**

Section 22 of the Commodity Exchange Act creates liability for any person "who willfully aids, abets, counsels, induces, or procures the commission of a violation" of the CEA. 7 U.S.C. § 25(a)(1).  A claim for aiding and abetting liability under the CEA requires that the defendant "associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed."  *In re Amaranth Nat. Gas Commodities Litig*., 730 F.3d at 182 (quoting *United States v. Peoni,* 100 F.2d 401, 402 (2d Cir. 1938)).

As previously described, Plaintiffs adequately allege that, as participants in the Fixing, the Fixing Members unlawfully conspired to manipulate silver prices and restrain trade. *See* Section IV, *supra.*  Plaintiffs' conspiracy allegations, particularly with respect to Defendants' reversionary price quotes leading up to the Fixing, non-reactive bid-ask spreads, and patterns of downward price swings coinciding with volume spikes in silver futures trading are sufficient to state an aiding and abetting claim.  *See Laydon*, 2014 WL 1280464, at *6 (denying motion to dismiss aiding and abetting claim based on "numerous allegations giving rise to an inference that Defendants knew of the other Defendants' unlawful and manipulative conduct and assisted each other in the furtherance of the violation").  The Fixing Members' motion to dismiss Plaintiffs' aiding and abetting claim is, therefore, denied.

Plaintiffs' claim for principal-agent liability is also well-pled.  The liability of a principal for the acts of its agents is governed by Section 2(a)(1)(B) of the CEA.  7 U.S.C. § 2(a)(1)(B). Under that provision, a claim for principal-agent liability requires that the agent was acting in the capacity of an agent when he or she committed the unlawful acts and that the agent's actions were within the scope of his or her employment.  *Guttman v. CFTC*, 197 F.3d 33, 39 (2d Cir. 1999); *see also In re Nat. Gas. Commodity Litig.* 337 F. Supp. 2d 498, 515 (S.D.N.Y. 2004)

(Section 2(a)(1)(B) codifies a "variant" of common law respondeat superior) (quoting *Rosenthal & Co. v. CFTC*, 802 F.2d 963, 966 (7th Cir. 1986)).  The SAC's allegations of information sharing and manipulation of the Fix Price necessarily imply the involvement of as-yet unnamed traders and other Fixing Member employees.  *See* SAC ¶¶ 81-82 (naming "Jane Doe" defendants and alleging that all actions taking by the Defendants were "by or through its [agents] . . . while they were actually engaged in the management, direction, control or transaction of business or affairs of the [Defendants]").  There is no indication, at this stage, that these employees acted on a lark or in any way outside the scope of their employment.  *See In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13-cv-7789 (LGS), Slip Op. at 49-50 (S.D.N.Y. Sept. 20, 2016) (denying motion to dismiss principal-agent claims where there was no suggestion that "any trader was operating outside the scope of his employment when engaging in the alleged conduct").  In fact, the SAC alleges that these bad acts were highly profitable for the principals, the Fixing Members, *see* Part III.B-D, *supra*.  These allegations are adequate at this stage to allege plausibly principal-agent liability. [29]  The Fixing Members' motion to dismiss Plaintiffs' principal-agent claim is, therefore, denied.

## X.     Statute of Limitations and Tolling

### A.  Plaintiffs' Antitrust Claims

Plaintiffs' antitrust claims are subject to a four-year statute of limitations.  *See* 15 U.S.C. § 15b.  Plaintiffs argue that the four-year limitations period does not apply because they have pleaded an ongoing conspiracy since 1999, and each incident of price suppression constituted a

---

[29]     The SAC's relatively thin principal-agent allegations reflect in part the posture of this case.  None of the Jane Doe defendants, presumably employees of the Fixing Members, has been identified, and there has been no document discovery.  Assuming this case reaches the summary judgment stage, Plaintiffs will be required to adduce significantly more evidence establishing that agents of the Fixing Members violated the CEA and did so acting within the scope of their employment.

"continuing violation."  Pls.' Opp. at 47-48.  Even when the continuing violation exception

applies, however, it is well-established that "the commission of a 'separate and new overt act'

will not permit the plaintiff to recover for the injury caused by the old overt acts that do not fall

within the limitations period."  *In re Nine West Shoes Antitrust Litig.*, 80 F. Supp. 2d 181, 192

(S.D.N.Y. 2000) (quoting *Klehr v. A.O. Smith Corp.,* 521 U.S. 179, 189 (1997)); *see also Rite*

*Aid Corp. v. Am. Exp. Travel Related Servs. Co.*, 708 F. Supp. 2d 257, 268 (E.D.N.Y. 2010)

("The continuing violation exception only allows a plaintiff to recover damages caused by overt

acts committed inside the limitations period."  (citing *Klehr*, 521 U.S. at 189)).  Because

Plaintiffs do not deny that each instance of Fix Price manipulation was an "overt act" (*i.e.*, an

independent act causing new injury), *Rite Aid*, 708 F. Supp. 2d at 268, Plaintiffs may only

recover for injury caused by acts that occurred prior to July 25, 2010 if they can demonstrate that

the statute of limitations should be tolled.[30]  *Hinds Cty., Miss. v. Wachovia Bank N.A.*, 700 F.

Supp. 2d 378, 398-99 (S.D.N.Y. 2010).

### B.  Tolling

Plaintiffs have sufficiently alleged that the applicable statutes of limitations may be

subject to tolling based on fraudulent concealment.  To show fraudulent concealment, "an

antitrust plaintiff must prove (1) that the defendant concealed the existence of the antitrust

violation[;] (2) that plaintiff remained in ignorance of the violation until sometime within the . . .

statute of limitations; and (3) that his continuing ignorance was not the result of lack of

diligence."  *Nine West Shoes*, 80 F. Supp. 2d at 192 (citations omitted).  "A claim of fraudulent

concealment must be pleaded with particularity, in accordance with the heightened pleading

standards of Rule 9(b)."  *Hinds Cty.*, 700 F. Supp. 2d at 399.  At the same time, because

---

[30]     The first Interim Lead Plaintiffs filed a complaint in this action on July 25, 2014.  *See* Complaint,
*Nicholson v. Bank of Nova Scotia*, No. 14-cv-5682 (VEC) (S.D.N.Y. July 25, 2014) (Dkt. 1).

resolution of a claim of fraudulent concealment is "intimately bound up with the facts of the case," it often cannot be decided at the motion to dismiss stage. *Id.* (quoting *In re Mercedes–Benz Anti–Trust Litig.*, 157 F. Supp. 2d 355, 374 (D.N.J. 2001)).

As to the first factor, a plaintiff may prove concealment by showing "either that the defendant took affirmative steps to prevent the plaintiff's discovery of his claim or injury or that the wrong itself was of such a nature as to be self-concealing." *Hendrickson Bros.*, 840 F.2d at 1083-84.  Here, the Fixing Members' alleged manipulation and misrepresentation of the Fix Price was, by its nature, self-concealing.  *See id.* ("The passing off of a sham article as one that is genuine is an inherently self-concealing fraud, whether what is passed off is a fake vase sold as a real antique . . . or a collusive bid purporting to reflect genuine competition.") (internal citations omitted); *see also Nine West Shoes*, 80 F. Supp. 2d at 193 ("[B]y alleging a price-fixing scheme, the plaintiff sufficiently has alleged the first prong of fraudulent concealment . . . .").  Thus, Plaintiffs have satisfied the first element.

As for the second element, as described *supra*, Plaintiffs have adequately alleged that they remained ignorant of the alleged manipulative scheme until a point of time within the statute of limitations.[31]  *Cf. In re Sumitomo Copper Litig.*, 120 F. Supp. 2d at 346-47 (noting that dismissal at the pleading stage, and even summary judgment, is often inappropriate on issues of constructive knowledge that typically "depend on inferences drawn from the facts of each particular case") (citations omitted)).

With respect to the third element, a "plaintiff will prove reasonable diligence either by showing that: (a) the circumstances were such that a reasonable person would not have thought

---

[31]     Defendants argue that Plaintiffs cannot claim ignorance of the alleged manipulation because four of the named Plaintiffs filed class action lawsuits in 2010 and 2011 against HSBC and others for suppressing silver prices. Defs.' Mem. at 49 n.34.  As with the 2008 CFTC investigation, however, those complaints involved substantially different misconduct, which apart from alleging price suppression, had nothing to do with the manipulation of the Silver Fixing alleged here.

to investigate, or (b) the plaintiff's attempted investigation was thwarted." *See In re Publ'n Paper Antitrust Litig.*, No. 304-md-1631 (SRU), 2005 WL 2175139, at *5 (D. Conn. Sept. 7, 2005). Here, Plaintiffs' assertion that they "could not have discovered [the alleged manipulation] by the exercise of due diligence," SAC ¶ 255, prior to January 2014 is threadbare, but sufficient to withstand the Fixing Members' motion to dismiss under circumstances where Plaintiffs appear to have been diligent in researching, investigating, and litigating their claims. The Court therefore finds that Plaintiffs have adequately alleged tolling; at the pleading stage, the Court need not determine the precise contours of the applicable tolling period.

### C. Plaintiffs' CEA Claims

CEA claims must be brought "not later than two years after the date the cause of action arises." 7 U.S.C. § 25(c). Because the CEA does not define when a cause of action accrues, "courts apply a 'discovery accrual rule' wherein 'discovery of the injury, not discovery of the other elements of a claim, is what starts the clock.'" *LIBOR I*, 935 F. Supp. 2d at 697 (quoting *Koch v. Christie's Int'l PLC,* 699 F.3d 141, 148-49 (2d Cir. 2012) (other citations omitted)). "'Inquiry notice'—often called 'storm warnings' in the securities context—gives rise to a duty of inquiry 'when the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded.'" *Koch*, 699 F.3d at 151 (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 168 (2d Cir. 2005)).

The Fixing Members argue that Plaintiffs were on inquiry notice as of September 2008, when, as the SAC acknowledges, the "CFTC announced that it was investigating complaints of misconduct in the silver market. " Defs.' Mem. at 47 (quoting SAC ¶ 243 n.74). That investigation, however, involved the alleged manipulation of COMEX silver futures relative to retail silver prices rather than manipulation of the Silver Fixing. Pls.' Opp. at 49 n.48 (citing SAC ¶ 243). As such, the 2008 CFTC investigation would not have put Plaintiffs on inquiry

notice of their claims here.  Based on the SAC, it appears that Plaintiffs would not have been on inquiry notice of the alleged manipulation prior to January 2014,[32] when Deutsche Bank announced its resignation from the Fixing, or at the earliest February 2013, when a CFTC Commissioner issued a statement suggesting possible manipulation of various commodity benchmarks.  SAC ¶¶ 236, 255.  Either way, because Plaintiffs' CEA claims were filed within two years of the discovery date, the Fixing Members' motion to dismiss based on the statute of limitations is denied.

## XI.    Plaintiffs' Unjust Enrichment Claim Fails

Under New York law, a claim for unjust enrichment requires that "'(1) [the]defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover.'"  *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 55 (2d Cir. 2011) (citations omitted).  The "essence" of such a claim "is that one party has received money or a benefit at the expense of another." *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000) (quoting *City of Syracuse v. R.A.C. Holding, Inc.,* 685 N.Y.S.2d 381 (4th Dep't 1999)).  As a result, courts require proof that the defendant received a "specific and direct benefit" from the property sought to be recovered, rather than an "indirect benefit."  *Id.*  While the plaintiff "need not be in privity with the defendant to state a claim for unjust enrichment," neither can the relationship between the parties be "too attenuated to support such a claim."  *Sperry v. Crompton Corp.*, 8 N.Y.3d 204, 215-16 (2007); *see also Reading Int'l, Inc. v. Oaktree Capital Mgmt.*, 317 F. Supp. 2d 301, 334 (S.D.N.Y. 2003) (an unjust enrichment claim "'requires some type of direct dealing or actual,

---

[32]    Defendants' argument that the Plaintiffs were on inquiry notice due to obvious "red flags" regarding the lack of accountability and oversight over the Silver Fixing is misplaced.  Defs.' Mem. at 48.  Just as these structural factors were not sufficient to constitute "plus factors" in support of Plaintiffs' conspiracy claims, neither are they sufficient to put Plaintiffs on inquiry notice.

substantive relationship with a defendant'" (quoting *Redtail Leasing, Inc. v. Bellezza*, No. 95-5191 (JFK) 1997 WL 6034965, at * 8 (S.D.N.Y. Sept. 30, 1997)).

The Fixing Members argue that Plaintiffs' unjust enrichment claim fails because Plaintiffs have not alleged that they had any "relevant relationship" with the Defendants or that Defendants received any benefit to which they were not entitled at Plaintiffs' expense.  Defs.' Mem. at 50.  The Court agrees.  Because Plaintiffs have failed to allege that they had any relevant relationship with the Defendants or that Defendants were enriched at Plaintiffs' expense, the SAC fails to state a claim for unjust enrichment.  *See, e.g.*, *Bazak Int'l Corp. v. Tarrant Apparel Grp.*, 347 F. Supp. 2d 1, 4 (S.D.N.Y. 2004) ("'A complaint does not state a cause of action in unjust enrichment if it fails to allege that defendant received something of value which belongs to the plaintiff.'" (quoting 22A N.Y. Jur.2d. Contracts § 515));  *Laydon*, 2014 WL 1280464, at *13-14 (conclusory assertions that defendants "financially benefited from the unlawful manipulation" and that "[t]hese unlawful acts caused [p]laintiff . . . to suffer injury," were insufficient); *LIBOR I*, 935 F. Supp. 2d at 737-38 (same); *see also Amaranth I,* 587 F. Supp. 2d at 547 (dismissing unjust enrichment claim based on alleged market manipulation that had an impact on the price of natural gas futures contracts because Plaintiffs did not "allege[] any direct relationship, trading or otherwise, between themselves and any [Defendant]"); *Ga. Malone & Co. v. Rieder*, 19 N.Y.3d 511, 516-19 (2012) (where Plaintiff and Defendant "simply had no dealings with each other," their relationship is "too attenuated" to support an unjust enrichment claim).  Because the connection between the named Plaintiffs and Defendants is "too attenuated," the Fixing Members' motion to dismiss is granted with respect to Plaintiffs' claim for unjust enrichment, and Plaintiffs' unjust enrichment claim is dismissed.

### XII.    Plaintiffs Fail to State a Claim Against UBS

Each of Plaintiffs' claims is based upon their premise that the Fixing Members improperly used their private daily Fixing call to conspire to suppress silver prices.  Because UBS was not a Fixing Member and never participated in the Silver Fixing, and because Plaintiffs fail to allege that UBS caused Plaintiffs' injuries, whether acting separately or in concert with the Fixing Members, Plaintiffs fail to state a claim against UBS.

With respect to Plaintiffs' antitrust claims, Plaintiffs fail to allege parallel conduct, circumstantial evidence, or plus factors suggesting that UBS had an agreement with the Fixing Members to manipulate the Fixing.  UBS was not a party to the private Fixing calls, and Plaintiffs fail to identify a single communication between UBS and the Fixing Members suggestive of manipulative conduct.  The fact that UBS is a market maker and a large bullion bank does not constitute circumstantial evidence of misconduct; such allegations could apply to any number of large banks, none of which is (or could be) named as defendants on that basis.  Finally, while FINMA fined UBS for misconduct in the FX and precious metals markets, nothing in the FINMA UBS Report plausibly supports Plaintiffs' conspiracy allegations here.  In particular, FINMA's findings that UBS shared order information with "third parties" and engaged in "conduct against the interests of [UBS's] own clients," FINMA UBS Report at 12, including the repeated front running of one client's silver fix orders, does not support Plaintiffs allegation that UBS conspired with the Fixing Members (or others) to manipulate the Silver Fixing, SAC ¶¶ 220, 224.

At best, Plaintiffs allege that UBS engaged in parallel conduct by offering (along with the Fixing Members) below-market quotes around the Fixing that coincided with downward reversions in the price of silver.  SAC ¶¶ 155-66 & Figs. 21-28.  But allegations of parallel conduct "must be placed in a context that raises a suggestion of a preceding agreement, not

merely parallel conduct that could just as well be independent action." *Twombly*, 550 U.S. at 557; *see also In re Elevator Antitrust Litig.*, 502 F.3d at 51 ("[S]imilar pricing can suggest competition at least as plausibly as it can suggest anticompetitive conspiracy."). In the absence of any other circumstantial evidence or plus factors, Plaintiffs' allegations that UBS quoted prices that were lower than market averages around the Fixing call are simply inadequate to create a plausible inference of unlawful activity.

Plaintiffs' CEA claims against UBS fail for similar reasons. Both Plaintiffs' price manipulation and manipulative device claims require allegations that UBS caused (and intended to cause) the artificial price in question. *In re Amaranth Nat. Gas Commodities Litig.*, 730 F.3d at 173. Because Plaintiffs have failed to allege plausibly that UBS played any part in the Fixing Members' conspiracy to suppress silver prices, Plaintiffs cannot establish that UBS caused (and intended to cause) the downward price manipulation at issue.[33] Likewise, because Plaintiffs have not alleged any (non-conclusory) facts suggesting that UBS intentionally associated itself with and participated in the Fixing Members' scheme, their aiding and abetting and principal-agent claims fail as well. *See id.* at 182 (proof of unlawful intent required for aiding and abetting liability under the CEA). Plaintiffs' claim against UBS for unjust enrichment is likewise dismissed for the reasons stated above with respect to the Fixing Members.

### XIII.   Leave to Amend

Under Rule 15(a) of the Federal Rules of Civil Procedure, "[t]he court should freely give leave" to a party to amend its complaint "when justice so requires." Fed. R. Civ. P. 15(a)(2). "Leave may be denied 'for good reason, including futility, bad faith, undue delay, or undue

---

[33]    Notably, Plaintiffs do not claim to be clients of UBS who suffered losses as a result of UBS front-running their orders or triggering their stop loss orders. *See* UBS FINMA Report at 12. Rather Plaintiffs allege that they "suffered harm in the sales they conducted on days where the price of silver was artificially lower because of Defendants' manipulative conduct" in artificially suppressing the price of silver "by using the Silver Fix and conducting manipulative trading." SAC ¶¶ 231-32.

prejudice to the opposing party.'" *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007) (additional citation omitted)).  Ultimately, "the grant or denial of an opportunity to amend is within the discretion of the District Court." *Foman v. Davis,* 371 U.S. 178, 182 (1962).  Given the fact that Plaintiffs have already amended their complaint twice and based on the parties' briefs and the arguments presented during oral argument, it appears that leave to amend may be futile.  Nevertheless, Plaintiffs shall have 14 days from the filing of this Opinion to show good cause why leave to file a Third Amended Complaint should be granted.

## CONCLUSION

For the foregoing reasons, UBS's Motion to DISMISS is GRANTED in its entirety.  The Fixing Members' Motion to Dismiss is GRANTED IN PART and DENIED IN PART.  The Fixing Members' Motion to Dismiss is GRANTED with respect to Plaintiffs' antitrust claims for price fixing and unlawful restraint of trade from the beginning of the Class Period through December 31, 2006, and from January 1, 2014 through the end of the Class Period.  The Fixing Members' Motion to Dismiss is further GRANTED with respect to Plaintiffs' manipulative device claims from the beginning of the Class Period through August 15, 2011, and with respect to Plaintiffs' claims for bid-rigging, and unjust enrichment.

The Fixing Members' Motion to Dismiss is DENIED with respect to Plaintiffs' antitrust claims for price fixing and unlawful restraint of trade from January 1, 2007 through December 13, 2013.  The Fixing Members' Motion to Dismiss is further DENIED with respect to Plaintiffs' price manipulation claims, Plaintiffs' manipulative device claims after August 15, 2011 and Plaintiffs' aiding and abetting and principal-agent claims.  The Clerk of Court is respectfully directed to close the open motions at docket numbers 73 and 75.  Plaintiffs' deadline to show good cause why leave to replead should be granted is **October 17, 2016**.

The parties must appear for a pretrial conference on **October 28, 2016 at 3:00 p.m.** in courtroom

443 of the Thurgood Marshall Courthouse, 40 Foley Square, New York, NY 10007.  The parties,

together with the parties in *In re Commodity Exch., Inc., Gold Futures & Options Trading Litig.*,

No. 14-md-2548 (VEC), must meet and confer regarding a proposed schedule for discovery and

class certification.  The parties are required to submit a joint proposal (if possible) or separate

proposals (if a joint proposal is not possible) by October 21, 2016.  Within that submission the

parties must address whether discovery in this case should be consolidated with discovery in *In*

*re Commodity Exch., Inc., Gold Futures & Options Trading Litig.*, No. 14-md-2548 (VEC), and

should include any other items they would like to discuss at the October 28, 2016 conference.

**SO ORDERED.**


**Date:   October 3, 2016**
**New York, New York**                      **VALERIE CAPRONI**
                                            **United States District Judge**