UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- X

IN RE:                                               :

                                                     :          14-MD-2573 (VEC)

LONDON SILVER FIXING, LTD.,                          :          14-MC-2573 (VEC)

ANTITRUST LITIGATION                                 :

                                                     :          OPINION AND ORDER

*This Document Relates to All Actions*               :

-------------------------------------------------------------- X

VALERIE CAPRONI, United States District Judge:

    This case began as a benchmark-fixing case.  Until 2013, the price of silver bullion was

set in part through a daily private auction among a small group of silver dealers ("the Silver

Fixing").  Based on a sophisticated econometric analysis of thousands of price quotes from the

silver markets, Plaintiffs alleged that this daily private auction was a cover for a conspiracy

among the participating banks, Deutsche Bank, HSBC, and Bank of Nova Scotia (together, the

"Fixing Banks"), to suppress the price for physical silver and silver-denominated financial

products.

    In September 2016, the Court held that Plaintiffs had stated claims against HSBC and

Bank of Nova Scotia.  Plaintiffs settled with Deutsche Bank for $38 million dollars and what

Plaintiffs hoped would be a treasure trove of preserved electronic chat messages among precious

metals traders employed by Deutsche Bank and traders at Bank of America, Barclays, Standard

Chartered, BNP Paribas, and UBS (the "Non-Fixing Banks").  The chat messages, many of

which are quoted in the Third Amended Complaint (the "TAC") (Dkt. 258), appear to document

sharing of proprietary information and episodic attempts to coordinate trading, apparently in the

hopes of profiting from resulting movement in the prices of silver and silver-denominated

financial instruments.  After acquiring these chat messages, Plaintiffs amended their complaint to

allege that the Non-Fixing Banks conspired with the Fixing Banks and among themselves to manipulate the Silver Fixing and the silver markets more generally.

But what Plaintiffs represented to be a mother lode of evidence of a vast conspiracy turns out to be less than overwhelming. The Non-Fixing Banks have moved to dismiss on the grounds that the chat messages do not connect them to a conspiracy with the Fixing Banks and do not document any actionable manipulation of the silver markets (among other things). For the reasons that follow, the Court agrees in part. Plaintiffs' allegations of an overarching conspiracy involving the Fixing Banks and Non-Fixing Banks are implausible. The chat messages provide a basis to infer the existence of a more limited conspiracy to episodically manipulate the silver markets, but Plaintiffs lack antitrust standing to bring a claim based on that theory. Plaintiffs also fail to allege market manipulation by any of the Non-Fixing Banks. Thus, the Non-Fixing Banks' motion to dismiss is GRANTED.

## BACKGROUND

From 1897 to 2014, the price of silver bullion was set through the Silver Fixing. *See In re London Silver Fixing, Ltd., Antitrust Litig.*, 213 F. Supp. 3d 530, 542 (S.D.N.Y. 2016) ("*Silver I*"). During the relevant period, 2007 to 2013, the Silver Fixing was conducted during a private conference call among the Fixing Banks at noon London time. *Id.* at 542, 544. The daily fixing operated through a "Walrasian" auction. *Id.* at 542. Each Fixing Bank would announce how much silver they wished to buy or sell at a given price—based on client orders and proprietary demand—and the price would be adjusted until an equilibrium of supply and demand was reached. *Id.* The market-clearing price, or the "Fix Price," was then published to the market. *Id.*

The Second Amended Class Action Complaint (the "SAC") (Dkt. 63) alleged that the Silver Fixing was a cover for a long-running conspiracy to suppress artificially the price of

physical silver and silver-denominated financial instruments. 213 F. Supp. 3d at 543–44. Relying on an econometric analysis of the spot market for physical silver and the market for Commodity Exchange, Inc. ("COMEX") silver futures, Plaintiffs alleged that silver prices "moved downward around the Silver Fixing much more frequently than [they] moved upward" and more frequently than would be expected in an efficient market. *See id.* at 544. Plaintiffs also alleged that the declines began shortly before the Silver Fixing call started. *Id.* On days when the Fix Price moved downward from the prevailing price before the call, there was, on average, a 15 basis point drop in COMEX silver futures and spot silver prices at the start of the Silver Fixing. *Id.*

Plaintiffs tied the Fixing Banks to this anomalous behavior by analyzing publicly-available trading data. According to Plaintiffs, on approximately 1900 days the Fixing Banks and defendant UBS quoted below-market prices for silver-denominated assets in the minutes leading up to and during the Silver Fixing. *Id.* at 545. Trading volume also increased significantly in the run up to the Silver Fixing. *Id.* For example, between 2007 and 2013, trading volume in COMEX silver futures began to increase just before the Silver Fixing and peaked during the Fixing call at more than three-times pre-Fixing volume. *Id.* During the same period, trades in COMEX silver futures successfully anticipated the direction of the Fix Price with 83.6% accuracy. *Id.* at 546; *see also id.* (describing in detail statistical analysis showing volume spikes prior to and during the Silver Fixing). According to Plaintiffs, these trends are circumstantial evidence of trading by the Fixing Banks to take advantage of their advance knowledge of the Fix Price. *Id.* at 545.

In *Silver I,* the Court denied the Fixing Banks' motion to dismiss and granted UBS's motion to dismiss. The Court concluded that the trading patterns identified by the Plaintiffs were

evidence of parallel conduct consistent with a conspiracy. *Id.* at 559. Plaintiffs also alleged "plus factors"—facts that tend to show that parallel conduct was the result of an unlawful conspiracy rather than individual economically-rational decisions. *Id.* The structure of the Silver Fixing presented an opportunity for collusion: the trading volume spikes identified by Plaintiffs appeared to anticipate the Fix Price, whereas an efficient market would respond to the Fix Price after it was announced; and, given the strikingly consistent below-market prices quoted by the Defendants, it appears likely that on at least some occasions, individual Fixing Banks acted against their own self-interest. *Id.* at 561-62. The Court found that the same allegations stated a claim for manipulation under the Commodities Exchange Act (the "CEA"), 7 U.S.C. § 1 *et seq. See id.* at 565.

The Court also concluded that Plaintiffs had adequately alleged that they had "antitrust standing." *Id.* at 552. Plaintiffs allege that they were injured by the Fixing Banks' conspiracy because they sold silver-denominated assets at artificially low prices caused by the Fixing Banks' alleged manipulation of the Silver Fixing. *Id.* at 551. Although the Silver Fixing itself can be distinguished from the markets for physical silver and silver-denominated assets, the Silver Fixing and the silver markets are "inextricably intertwined." Moreover, the Court concluded that Plaintiffs were "efficient enforcers" because they sold silver investments on days the Fixing Banks allegedly manipulated the Silver Fixing. *Id.* at 555. Even if Plaintiffs did not deal directly with the Fixing Banks, the nature of the Defendants' alleged manipulation was market-wide and therefore had a sufficiently direct impact (at the motion to dismiss stage) on Plaintiffs' trades to provide standing. *Id.* By contrast, Plaintiffs made only limited allegations against UBS, which was not a part of the Silver Fixing and therefore did not have access to the same information. *Id.* at 575.

On June 8, 2017, the Court granted leave to amend and file the Third Amended Complaint. *See* Dkt. 253 ("*Silver II*"). The TAC alleges a much broader conspiracy to manipulate the markets for physical silver and silver-denominated assets. According to Plaintiffs, Defendants' "comprehensive strategy" has three elements.[1] The first element is the Silver Fixing scheme described above and addressed at length in *Silver I*. Relying on chat messages between traders at Deutsche Bank and the other defendants (the "Deutsche Bank Cooperation Materials"), the TAC also alleges a scheme to manipulate the "bid-ask" spread in the market for physical silver and a scheme to manipulate the silver markets through coordinated trading and information sharing.[2] The TAC also added as defendants a handful of banks that were not involved in the Silver Fixing: Barclays Bank PLC ("Barclays"), BNP Paribas Fortis S.A./N.V. ("BNP Paribas"), Standard Chartered Bank ("Standard Chartered"), and Bank of America Corporation and its subsidiary unit Merrill Lynch, Pierce, Fenner & Smith Inc. (together, "BAML") (collectively, the "New Defendants").

One of the means allegedly used by the Non-Fixing Banks to profit from their manipulation of the silver markets was manipulation of bid-ask spreads in the market for physical silver. Plaintiffs allege occasions on which traders at Deutsche Bank and UBS discussed how "wide" they would quote prices for 500,000 ounces of silver, settling on a spread of 10 cents. TAC ¶ 230; *see also* TAC ¶¶ 231 (comparing spreads for different quantities of silver), 240 ("if they call me in 1 lac [100,000 ounces of silver] I will quote 7-8 cents"). Traders

---

[1]    Plaintiffs describe the "comprehensive strategy" in five parts. *See* Opp'n (Dkt. 336 at 4-11). The difference between three elements and five parts is not substantive.

[2]    The SAC also alleged improper trading and manipulation of bid-ask spreads. But the SAC alleged that the Fixing Banks and UBS used manipulative trading tactics to profit from their foreknowledge of the Silver Fixing and as means to conceal their manipulation of the Fix Price. The TAC alleges manipulative trading in the silver markets more generally.

at Barclays, BNP Paribas, HSBC, and BAML are alleged to have engaged in similar discussions with traders at Deutsche Bank. *See* TAC ¶¶ 232-43. For example, on July 4, 2008, in a conversation with a trader at Barclays, a London-based Deutsche Bank trader said, "just be wide." TAC ¶ 239; *see also* TAC ¶ 240 (UBS trader told trader at Deutsche Bank "just quote wider"). Many of the chats involve a single trader at Deutsche Bank, who communicated with individual traders at each of the Non-Fixing Banks and was aware that the information he shared was proprietary and could be used to gain an advantage over other market participants. *See* TAC ¶ 238 ("[UBS]: 10 cents is ridiculous." "[Deutsche Bank]: u shudnt have told me hahahaa[sic]hahahaha :D [smiley face]."). As the TAC explains, "wider spreads generated increased profits from Defendants' illegitimate market making activities at the expense of Plaintiffs and the Class by removing price competition and requiring that market participants pay an artificial price set by the cartel." TAC ¶ 243.

The TAC also alleges collusion in the silver markets by traders at each of the Non-Fixing Banks. Numerous chats between a trader at UBS and a trader at Deutsche Bank describe efforts to coordinate positions, TAC ¶¶ 253, 279; to time coordinated trades for maximum market impact, TAC ¶ 252 ("if we are correct and do it together, we screw other people harder"); and to employ manipulative techniques artificially to push the price of silver-denominated assets up or down, TAC ¶¶ 256-57, 259 (the "blade" and the "muscle"), 264 ("sniping"). Several of the chats between traders at UBS and Deutsche Bank refer to collusion with traders at other banks. For example, on March 31, 2011, a UBS trader shared a stop-loss position with Deutsche Bank and said "in one hour im gonna call reinforcement," i.e., another trader to help move the market price and trigger the stop-loss order. TAC ¶ 251. On June 8, 2011, the same UBS trader told the same Deutsche Bank trader that "we need to grow our mafia a lil get a third position involved," to

which the Deutsche Bank trader responded, "ok calling barx." TAC ¶ 250. On another occasion,

the same Deutsche Bank trader added the UBS trader to a chat with traders at HSBC and

Barclays, to which the UBS trader responded, "wow this is going to be the mother of all chats."

TAC ¶ 274; *see also* TAC ¶ 280 (describing information possibly learned from discussions with

Bank of Nova Scotia).

Traders at Barclays also shared information with Deutsche Bank. In addition to sharing

information regarding bid-ask spreads, *see* TAC ¶ 233, a Barclays trader discussed another

bank's attempt to "spoof" the silver markets on July 4, 2008. TAC ¶ 263; *see also* TAC ¶ 264

(Deutsche Bank and Barclays discussed "sniping"). On other occasions, traders at Barclays and

Deutsche Bank compared positions and coordinated purchases. TAC ¶¶ 291-96. In one chat, a

Barclays trader, referring to himself and a trader at Deutsche Bank, said "we are one team one

dream." TAC ¶ 295. Chats between Deutsche Bank and UBS also reference collusion with

traders at Barclays. *See* TAC ¶¶ 250, 274.

The Deutsche Bank Cooperation Materials also include messages between a trader at

Deutsche Bank and traders at BNP Paribas. Several chats describe real-time sharing of market

positions and conditions including bid-ask spreads quoted by BNP Paribas and Deutsche Bank's

position heading into the Silver Fixing. TAC ¶¶ 236, 298-99, 306-07. Two of the chats between

Deutsche Bank and BNP Paribas reference collusive trading techniques. *See* TAC ¶¶ 300 (BNP

Paribas trader described taking the "bulldozer" out on a prior occasion – potentially a reference

to triggering stop-loss orders), 310 (BNP Paribas trader suggested to Deutsche Bank trader that

they go "smash" the Silver Fixing).

A trader at Standard Chartered (and formerly of HSBC) also shared proprietary

information with a trader at Deutsche Bank. The TAC includes only three chat messages

involving Standard Chartered, but those chats include sharing of current trading positions, TAC

¶¶ 286-88, 290, and Deutsche Bank's position in the Silver Fixing, TAC ¶ 289.

Finally, the TAC alleges six conversations between Deutsche Bank and BAML. One of

the chats includes an exchange of information regarding bid-ask spreads. TAC ¶ 301. Deutsche

Bank and BAML also shared information about the price level of stop-loss orders in the market,

TAC ¶¶ 301-02, and their current positions in silver-denominated derivatives, TAC ¶ 303.[3]

The Commodity Futures Trading Commission (the "CFTC") and Department of Justice

have recently undertaken enforcement actions directly relevant to Plaintiffs' claims against the

Non-Fixing Banks. On January 29, 2018, the CFTC announced a settlement with UBS to resolve

allegations that UBS traders "spoofed" the markets for precious metals and collaborated with

traders at another financial institution to trigger stop-loss orders. *See* Dkt. 344 Ex. 1 ("UBS

CFTC Order"). The CFTC consent order references specific instances of manipulation in the

silver markets, including the COMEX futures market. *See* UBS CFTC Order at 3-5. UBS

agreed to pay a $15 million monetary penalty to the CFTC. UBS CFTC Order at 11. Deutsche

Bank settled similar claims with the CFTC on the same day for $30 million. *See* Dkt. 344 Ex.2

at 3-7, 13. The CFTC has also initiated civil proceedings against three individual traders at

Deutsche Bank and UBS for alleged spoofing in the COMEX futures markets between 2008 and

2013.[4] Dkts. 344 Exs.4, 5. Meanwhile, the Department of Justice has charged two BAML

traders with commodities fraud (among other things) in connection with alleged spoofing in the

---

[3]     The chat messages do not make clear which silver-denominated financial instruments were the subject of the Non-Fixing Banks' manipulation. Some of the messages clearly discuss physical silver. Others likely refer to silver-denominated derivatives, but it is not obvious which derivatives or on what market they were traded.

[4]     The United States Department of Justice initiated criminal proceedings against the same traders in the District of Connecticut and the Northern District of Illinois. The trader charged in Connecticut has since been acquitted. *See United States v. Andre Flotron*, No. 17-Cr-220 (JAM) (D. Conn.).

precious metals futures markets, including the COMEX silver futures market. *See* Dkt. 344 Ex.6 (the "BAML Complaint").

Plaintiffs are individuals and entities that transacted in physical silver and silver-denominated financial instruments during the class period. There are many silver-based derivatives, but Plaintiffs allege they traded in physical silver or silver bullion; Chicago Board of Trade ("CBOT") silver futures; COMEX silver futures; COMEX "miNY" silver futures; New York Stock Exchange LIFFE mini silver futures; and CBOT "mini" silver futures. Appendix D to the TAC includes a list of days on which the price of silver was allegedly affected by Defendants' manipulative conduct on which Plaintiffs traded. The list in Appendix D does not specify whether Plaintiffs' alleged injury was the result of manipulation of the Silver Fixing, manipulation of bid-ask spreads for physical silver, or manipulative trading. The TAC also does not identify the counterparties to Plaintiffs' transactions. It is unclear whether any of the Plaintiffs dealt directly with any of the Defendants—much less dealt with a Defendant in an allegedly manipulated transaction or in the immediate wake of a manipulated transaction.

The Non-Fixing Banks have moved to dismiss the TAC. They argue that the TAC's allegations of a "comprehensive" conspiracy among the Fixing Banks and Non-Fixing Banks are not plausible. The connection between an agreement to depress the Fix Price and information-sharing and collusion in the silver markets is not clear. Because of the Fixing Banks' complete control over the Silver Fixing, other conspirators and collusive trading were unnecessary to profit from foreknowledge of the Silver Fixing. Joint Mem. (Dkt. 303) at 9-10. None of the chat messages reference an agreement with the Non-Fixing Banks to fix the Silver Fixing. Joint Mem. at 11-12. As the Non-Fixing Banks point out, they are conspicuously absent from the TAC's allegations of parallel and below-market trading: "Of the roughly 850 trading days on

which Plaintiffs allege the occurrence of spot price manipulation, Plaintiffs assert that two of the Non-Fixing Banks collectively submitted lower quotes around the Silver Fixing on just six purportedly illustrative days (representing less than 1% of the sample). Joint Mem. at 14.

The Non-Fixing Banks also argue that Plaintiffs lack antitrust standing as to the Non-Fixing Banks. Because the Non-Fixing Banks' involvement in the conspiracy differs in important respects from the Fixing Banks, the Non-Fixing Banks contend that they are differently situated. They argue that because no Plaintiff alleges that he traded with the Non-Fixing Banks, there is only an indirect connection between Plaintiffs' trades and the market manipulation identified in the Deutsche Bank Cooperation Materials. Joint Mem. at 25. For the same reason, they assert that Plaintiffs' injuries are attenuated from the alleged collusion and are highly speculative. Joint Mem. at 26-27.

With respect to Plaintiffs' claims pursuant to the CEA, the Non-Fixing Banks argue that Plaintiffs' claims are untimely because Plaintiffs were on notice of possible manipulation of the silver markets more than two years before they sought leave to amend in November 2017. Assuming Plaintiffs' claims are not time-barred, the Non-Fixing Banks contend in the alternative that Plaintiffs' allegations are insufficient because they do not adequately allege that the Non-Fixing Banks intended to manipulate the silver futures markets or that they were successful in doing so. The Non-Fixing Banks also contend that Plaintiffs' CEA claims are impermissibly extraterritorial because there is no alleged impact on a *domestic* market from the Non-Fixing Banks' manipulation.

Failing these defenses, certain of the Non-Fixing Banks contend the Court lacks personal jurisdiction over them. UBS, Standard Chartered, BNP Paribas, and Barclays argue that Plaintiffs do not allege their involvement in any in-forum, suit-related misconduct.

**DISCUSSION**

In evaluating a motion to dismiss, the Court must "'accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff.'" *Meyer v. JinkoSolar Holdings Co.*, 761 F.3d 245, 249 (2d Cir. 2014) (quoting *N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC,* 709 F.3d 109, 119 (2d Cir. 2013)) (alterations omitted). Nonetheless, in order to survive a motion to dismiss, "a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Plausibility" is not certainty. *Iqbal* does not require the complaint to allege "facts which can have no conceivable other explanation, no matter how improbable that explanation may be." *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 360 (2d Cir. 2013). But "[f]actual allegations must be enough to raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 555, and "[courts] 'are not bound to accept as true a legal conclusion couched as a factual allegation,'" *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 225 (2d Cir. 2014) (quoting *Twombly*, 550 U.S. at 555) (other internal quotations marks and citations omitted).

**I.      Sherman Act Claims**[5]

Plaintiffs bring claims for price fixing, bid rigging, and conspiracy to restrain trade under Section 1 of the Sherman Act. Horizontal price fixing is, of course, per se illegal. *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223-24 (1940). Claims for bid rigging, on the other

---

[5]      Under the circumstances, the Court exercises its discretion to address the Non-Fixing Banks' motion to dismiss for failure to state a claim before addressing personal jurisdiction. *See Sullivan v. Barclays PLC*, No. 13-CV-2811 (PKC), 2017 WL 685570, at *11 (S.D.N.Y. Feb. 21, 2017) ("In cases such as this one with multiple defendants—over some of whom the court indisputably has personal jurisdiction—in which all defendants collectively challenge the legal sufficiency of the plaintiff's cause of action, we may address first the facial challenge to the underlying cause of action and, if we dismiss the claim in its entirety, decline to address the personal jurisdictional claims made by some defendants." (quoting *Chevron Corp. v. Naranjo*, 667 F.3d 232, 247 n.17 (2d Cir. 2012))). Because Plaintiffs' claims fail on their merits, the Court need not address personal jurisdiction.

hand, typically involve competitors conspiring to raise prices for purchasers—often, but not always, governmental entities—who acquire products or services by soliciting competing bids. *See, e.g.*, *Gatt Commcn's, Inc. v. PMC Assocs., LLC*, 711 F.3d 68, 72-74 (2d Cir. 2013); *State of N.Y. v. Hendrickson Bros.*, 840 F.2d 1065 (2d Cir. 1988). With regard to unlawful restraints of trade, "[b]ecause [Section] 1 of the Sherman Act does not prohibit [all] unreasonable restraints of trade . . . but only restraints effected by a contract, combination, or conspiracy, . . . [t]he crucial question is whether the challenged anticompetitive conduct stem[s] from independent decision or from an agreement, tacit or express." *Twombly*, 550 U.S. at 553 (alterations in the original) (internal quotations and citations omitted). Regardless of whether Plaintiffs' allegations are evaluated in terms of price fixing, bid rigging or an unlawful restraint of trade, an unlawful agreement must be pleaded with respect to each antitrust claim brought under Section 1. *See, e.g.*, *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) ("To survive a motion to dismiss . . . a complaint must contain enough factual matter . . . to suggest that an agreement . . . was made.")) (internal citations and quotations omitted).

### A. Allegations of an Overarching Agreement Involving the Silver Fixing

To allege an unlawful agreement, Plaintiffs must plead either direct evidence (such as a recorded phone call or email in which competitors agreed to fix prices) or "circumstantial facts supporting the *inference* that a conspiracy existed." *Mayor & City Council of Baltimore v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013) (emphasis in original). Because conspiracies "nearly always must be proven through inferences that may fairly be drawn from the behavior of the alleged conspirators," the fact that Plaintiffs have no direct evidence does not mean there was no conspiracy. *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d 581, 591 (S.D.N.Y. 2015) ("*FOREX I*") (quoting *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d

162, 183 (2d Cir. 2012)).  At the pleading stage, Plaintiffs "need not show that [their] allegations

suggesting an agreement are more likely than not true or that they rule out the possibility of

independent action . . . ."  *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 781 (2d Cir. 2016)

(quoting *Anderson News*, 680 F.3d at 184).  Instead, "'a well-pleaded complaint may proceed

even if . . . actual proof of those facts is improbable, and . . . a recovery is very remote and

unlikely' as long as the complaint presents *a* plausible interpretation of wrongdoing."  *FOREX I*,

74 F. Supp. 3d at 591 (quoting *Twombly*, 550 U.S. at 556) (emphasis in original); *see also*

*Gelboim*, 823 F.3d at 781 ("At the pleading stage, a complaint claiming conspiracy, to be

plausible, must plead 'enough factual matter (taken as true) to suggest that an agreement was

made . . . .'" (quoting *Anderson News*, 680 F.3d at 184)).

      For the reasons discussed more fully below, the Court does not find Plaintiffs' allegations

of a "comprehensive" conspiracy to be plausible.  What Plaintiffs present as components of a

single agreement appear to be unrelated, internally inconsistent efforts to manipulate the silver

markets episodically.  *See Sonterra Capital Master Fund Ltd. v. Credit Suisse Grp. AG*, 277 F.

Supp. 3d 521, 546 n.11 (S.D.N.Y. 2017) ("*CHF LIBOR*") (rejecting inference of an overarching

conspiracy to manipulate markets in Swiss-denominated LIBOR because "a group of defendants

could have agreed to fix bid-ask spreads regardless of the CHF LIBOR rate, and vice versa, and

there is no indication that the two conspiracies were part of one interwoven plot, as opposed to

two separate sets of misconduct allegedly committed by the same entities."); *In re Zinc Antitrust*

*Litig.*, 155 F. Supp. 3d 337, 372-73 (S.D.N.Y. 2016) (rejecting inference of an overarching

conspiracy where there was not a clear connection between various forms of manipulation).

Even though the TAC plausibly alleges that the Fixing Banks conspired to depress the Fix Price,

it does not explain why the Non-Fixing Banks, which are competitors and counterparties, would

be in on the agreement. The coordinated trading alleged in the TAC lacks a connection to suppression of the Fix Price and, in fact, could have made it more difficult to profit from foreknowledge of the Fix Price.

The TAC does not include any direct evidence of an agreement between the Non-Fixing Banks and the Fixing Banks involving the Silver Fix. The chat messages that reference the Silver Fixing do not reference or suggest an overarching scheme to depress the Silver Fix and many are inconsistent with Plaintiffs' theory that the Non-Fixing Banks had foreknowledge of the Fix Price. For example, chats between Deutsche Bank and BNP Paribas appear to involve sharing by Deutsche Bank of its anticipated position heading into the Silver Fixing. TAC ¶¶ 297-98, 310. The information in these messages could have been used by BNP Paribas to predict the direction of the Silver Fixing, but the messages do not suggest that BNP Paribas was part of an agreement to manipulate the Fix Price, and the fact that this information was worth sharing suggests that the result of the Silver Fixing was otherwise uncertain to BNP Paribas. Other chats reference apparently unilateral or bilateral attempts to manipulate the Silver Fixing. *See* TAC ¶¶ 307 ([Deutsche Bank]: "HE SPOOFED IT TO BUY IT AND I THINK HE JUST SOLD IT TO BUY IT . . . JUST LIKE THEM TO BID IT UP BEFORE THE FIX THEN GO IN AS A SELLER . . . ."), 308 ([UBS]: "oh ok did I tell u I saw a 300k loss on the fixing before too . . . started pushing too early lol"), 310 ([Deutsche Bank]: "I got the fix in 3 minutes" [BNP Paribas]: "I'm bearish . . . . Let's go and smash it together"), 311 ([Deutsche Bank]: "well you told me too but i told no one u just said you sold on fix" [UBS]: "we smashed it good"), 322. A few of the chats describe the results of the Silver Fixing, essentially after-action reports, and suggest that the chat participants did not have foreknowledge of the Fix Price. *See* TAC ¶ 289 ([Standard Chartered]: "what was that all aboyt" [Deutsche Bank]: "silver fix?" [Standard Chartered]:

"yeah" [Deutsche Bank]: "I had 2 m to sell no one wanted it."). The fact that the Non-Fixing Banks agreed, on occasion, to "smash" or "push" the Silver Fixing is inconsistent with being members of a broader conspiracy to depress the Fix Price.

It is also hard to understand why the Fixing Banks, major market-makers with their own trading operations and collective control over the Silver Fixing, would involve numerous other market makers in their scheme. *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d at 372 (finding that the fact that defendant and affiliated entities controlled a significant market share made it less likely they would involve non-affiliated entities in an anticompetitive scheme). This is particularly true because in the zero-sum world of commodities trading, the other banks were potentially counterparties at whose expense the Fixing Banks would have sought to profit.

The manipulative techniques described in the Deutsche Bank Cooperation Materials also lack a connection to Plaintiffs' theory that the Fixing Banks conspired to depress the Fix Price. Coordinated trading could further the Fixing Banks' alleged conspiracy by masking otherwise suspicious changes in the price of silver-denominated assets. But the chats are not direct or circumstantial evidence of this theory. Because Plaintiffs did not include the time of the messages on which the TAC relies, it is impossible to tell from the TAC whether the manipulative trades being discussed were timed to conceal a reversion in the Fix Price.[6] The

---

[6] Exhibits to the Defendants' motions include time stamps for the chats included in the TAC and the locations of the traders involved. The time stamps reveal that many of the chat messages occurred when the London markets were closed, which suggests that they were not a part of an effort to manipulate the Silver Fixing. Notwithstanding Plaintiffs' obvious and annoying attempt to hide the ball by omitting this information, the Court may consider the time stamps (and the locations of the traders involved in the chats) because the chat messages are incorporated into the TAC.

By cross-referencing this information to Appendix D to the TAC it is possible to determine that the Plaintiffs traded on certain of the days on which the chat messages were sent. But this information is of limited value because Plaintiffs do not connect the chat messages to specific incidents of market manipulation in the silver markets (much less to the markets on which Plaintiffs traded), and they do not explain how that hypothetical market manipulation would have had an impact on Plaintiffs' trades.

chats describe tactics that could move prices up or down and therefore are not necessarily consistent with a conspiracy, the goal of which was to suppress prices. *See, e.g.*, TAC ¶¶ 257-59 (discussing the "muscle" and "blade" strategies, which could provide "artificial support for silver prices" and recommending that a trader hold-off on manipulation because "its gonna go fast like rollercoaster going up"). "Spoofing,"—placing and then canceling orders to give an appearance of demand at a given price—can create artificial price pressure in either direction. *See* TAC ¶ 261 (spoofing causes artificial prices "either above or below where the market was trading"). "Pushing," "smashing," and "hammering" silver prices cause prices to fall (or to increase, TAC ¶¶ 307, 312), but are profitable because a trader "pushing" the market can trade at an artificial price, knowing that prices will revert to normal post-manipulation. *See* TAC ¶¶ 307-09, 320-21 (Deutsche Bank and UBS conspired to "push silver prices down through stop-loss orders to generate illegitimate profits by trading in advance of the 'wave' created when prices shot back up."). The profitability of those tactics is dependent on a reversion in prices, which is inconsistent with a conspiracy persistently to depress silver prices.

Where direct evidence is lacking, an antitrust conspiracy may be plausibly alleged through circumstantial evidence. Circumstantial evidence includes parallel behavior and so-called "plus factors." *See Mayor & City Council of Balt.*, 709 F.3d at 136. "[P]lus factors include: (1) a common motive to conspire; (2) evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators; and (3) evidence of a high level of interfirm communications." *Gelboim*, 823 F.3d at 781 (quoting *Mayor & City Council of Balt.*, 709 F.3d at 136) (internal quotation marks and additional citations omitted). In *Silver I*, the Court concluded that Plaintiffs' econometric analysis of the silver markets around the time of the Silver Fixing, along with evidence of motive and a

readymade forum for collusion, plausibly alleged a conspiracy among the Fixing Banks to depress the Fix Price. 213 F. Supp. 3d at 561-62. The Court finds that the TAC does not include similar facts as to the New Defendants.

Plaintiffs do not present an econometric analysis of quotes from the New Defendants to tie them to the alleged conspiracy to suppress the Fix Price. Plaintiffs identified approximately 850 days on which they allege there was manipulation of the spot price of silver around the time of the Silver Fixing. *See* TAC App'x D. Reversions in the price of silver shortly before and during the Silver Fixing are circumstantial evidence of a conspiracy to depress the Fix Price because they indicate either foreknowledge of the direction of the Fix Price or an attempt to conceal the effect of manipulation of the Fix Price. *See Silver I*, 213 F. Supp. 3d at 561-62. The TAC does not link the New Defendants to this pattern of below market quotes. On six days—out of 850 identified in the TAC—one or more of the Non-Fixing Banks submitted below-market quotes leading up to the Silver Fixing. One does not need to conduct sophisticated statistical analyses to conclude that such evidence is too slim a reed from which the Court could infer foreknowledge of the Fix Price. The New Defendants are not included in Plaintiffs' analysis of bid-ask spreads before and during the Silver Fixing. *See* TAC ¶¶ 223-229. As the New Defendants point out, the thesis of this analysis is that "[i]n stark contrast to the rest of the market the Fixing [Banks] and UBS never *narrow[ed]* their spread in response to the new information provided by the Silver Fix[ing]." Joint Mem. at 16 (quoting TAC ¶ 228) (emphasis in original). Implicitly, Plaintiffs concede that the New Defendants are a part of "the rest of the market", and that their bid-ask spreads moved with the market in response to the Fix Price.

Plaintiffs' allegations of unilateral and bilateral manipulative trading are evidence of collusion in the silver markets but are of limited value in suggesting a conspiracy to manipulate

the Silver Fixing. Arguing to the contrary, Plaintiffs rely on *In re High-Tech Employee Antitrust Litigation*, 856 F. Supp. 2d 1103 (N.D. Cal. 2012). In that case, plaintiffs alleged an overarching agreement not to compete for employees based on allegations that suggested the existence of six bilateral, but "virtually identical," agreements. *Id.* at 1119-20. In a boycott or refusal-to-deal case, like *High-Tech Employee*, bilateral agreements can be persuasive evidence of an overarching conspiracy because each agreement is economically rational only if other market participants are also involved. In other words, each bilateral agreement or unilateral action would be against the defendants' self-interest unless all of the participants were acting in concert. *See, e.g.*, *Grasso Enters., LLC v. Express Scripts, Inc.*, 2017 WL 3654434, at *5 (E.D. Mo. 2017) (individual refusal to deal only economically rational if a part of a broader conspiracy). In contrast, bilateral coordinated trading such as "smashing" and "pushing" the markets for silver-denominated assets would be profitable to the traders involved regardless of whether the conduct was connected to a broader agreement to manipulate the Fix Price. *See Sullivan*, 2017 WL 685570, at *25 (recognizing that "horizontal activity to fix the price of Euribor-based derivatives on a transaction-by-transaction basis" does not "overlap with the fixing of the Euribor" benchmark rate).

Because manipulative trading could cause an increase in price—as Plaintiffs acknowledge—it is also possible that the manipulative trading alleged in the TAC would work at cross-purposes with a conspiracy to suppress the Fix Price. *Cf. CHF LIBOR*, 277 F. Supp. 3d at 555 ("[I]t is harder to infer a conspiracy from individual acts of trader-based manipulation because large financial institutions are both buyers and sellers of derivative products, and thus any changes may well offset each other."). The chat messages show that the Non-Fixing Banks used similar methods to manipulate the silver markets—potentially evidence of a broader

agreement, *see In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 472-74 (S.D.N.Y. 2017)—but those methods bear little resemblance to Plaintiffs' theory that the Fixing Banks used the daily fixing call to agree on an artificially low Fix Price.[7]

Plaintiffs also rely heavily on *In re Foreign Exchange Benchmark Rates Antitrust Litigation*, 2016 WL 5108131 (S.D.N.Y. 2016) ("*FOREX III*"). *FOREX III* also involved allegations of a broader conspiracy based on evidence of bilateral and group chat messages among traders, but it differs in critical respects. In *FOREX I*, the conspirators were alleged to have manipulated benchmark rates such as the WM/Reuters Closing Spot Rates through information sharing and coordinated trading in the foreign exchange markets in advance of the benchmark measurement. *See FOREX III*, 2016 WL 5108131, at *3. Because the conspirators in *FOREX I* were not a part of the benchmark-fixing process, they depended on coordinated trading and information sharing to accomplish their goal of manipulating the benchmark. *Id.* Given the means available to the conspirators, chat messages showing information sharing and coordinated trading among the defendants were highly relevant to plaintiffs' benchmark manipulation theory. There is no similar, close connection between manipulative trading, as evidenced in the Deutsche Bank Cooperation Materials included in the TAC, and the Silver

---

[7]    To the extent Plaintiffs intend to argue that they have plausibly alleged parallel conduct and plus factors as to UBS, the Court disagrees. The Court granted UBS's motion to dismiss the SAC because Plaintiffs did not allege that UBS had any role in the Silver Fixing. *See Silver I*, 213 F. Supp. 3d at 575-76. The TAC includes chat messages between traders at UBS and Deutsche Bank suggesting that UBS and Deutsche Bank coordinated attempts to manipulate the markets for unspecified silver-denominated assets. The chats are some evidence of a conspiracy to manipulate prices because they evidence a high degree of intrafirm communication and a willingness to collude and use manipulative trading techniques in the subject market or a related market. Nonetheless, they are not so probative as to make UBS's involvement in a conspiracy to manipulate the Fix Price plausible. To the extent they reference the Silver Fixing, the chats describe unilateral manipulation. *See* TAC ¶¶ 308, 311. Unilateral attempts to manipulate the Silver Fixing are inconsistent with an overarching conspiracy among the Fixing Banks and UBS to depress the Fix Price. The other chats involving UBS describe manipulation of the markets for silver-denominated assets more generally. But, as the Non-Fixing Banks have noted, these chats involve a UBS trader stationed in Singapore and did not take place during London trading hours, making it highly unlikely they related to the Silver Fix.

Fixing process. The Silver Fixing (and the similar gold fixings) is *sui generis* insofar as a limited number of market participants exercised control over the fixing process through a daily, unrecorded conference call. Accordingly, while the Court finds *FOREX III* relevant to determining whether a conspiracy existed among the Non-Fixing Banks, it does not suggest that Plaintiffs have plausibly alleged a comprehensive scheme among the Fixing Banks and Non-Fixing Banks to manipulate the Fix Price.

### B. Allegations of an Agreement among the Non-Fixing Banks

While the TAC does not allege an "overarching" conspiracy among the Fixing Banks and Non-Fixing Banks, the Court finds that the chat messages contained in the TAC plausibly allege a conspiracy among the Non-Fixing Banks (and Deutsche Bank) to manipulate the markets for silver and silver-denominated financial assets opportunistically and to fix bid-ask spreads in the market for physical silver. *Cf. In re Zinc Antitrust Litig.,* 155 F. Supp. 3d at 368 (recognizing that allegations in antitrust complaint may allege multiple different, but overlapping conspiracies).

The chat messages included in the TAC are direct evidence of an anticompetitive agreement to manipulate the silver markets.[8] *See FOREX I*, 74 F. Supp. 3d at 591 (chat rooms and instant messages used to share pricing information and trading positions are direct evidence of an anticompetitive agreement). The Court is not persuaded by the Non-Fixing Banks'

---

[8] The chat messages, as reproduced in the TAC, do not specify which silver-denominated instruments were to be manipulated. Many of the chats use terminology that is specific to the physical silver markets. *See, e.g.*, TAC ¶¶ 7, 230-233. Others appear to reference silver futures but do not specify whether they involve COMEX silver futures, CBOT silver futures, or NYSE silver futures. Nonetheless, it is plausible that the manipulation involved the silver futures markets in which Plaintiffs traded: the CFTC's settlements with Deutsche Bank and UBS describe manipulation of COMEX futures, *see* Dkt 344 Ex. 1 at 3, Ex. 2 at 3; the CFTC's complaints against individual traders at Deutsche Bank and UBS also refer to manipulation of COMEX futures contracts, Dkt. 344 Exs. 4, 5; and the Department of Justice's complaint against two traders at BAML also describes manipulation of COMEX futures. *See* Dkt. 344 Ex. 6.

argument that these chat messages involve mere *ex post* information sharing or "inapposite" bilateral communications. Joint Reply Mem. (Dkt. 338) at 2. The chat messages cited in the TAC involve exchanges of current pricing information by horizontal competitors, *see* TAC ¶¶ 230-31, 236, 287-88, 301, 303, 306; sharing of real-time order flow information, *see* TAC ¶¶ 286, 289, 291-96, 298-99, 307; and coordinated use of manipulative trading strategies such as the "blade" and "muscle" and trading intended to trigger stop loss orders, *see* TAC ¶¶ 256-59, 264, 310. These are paradigmatic examples of communications relevant to a horizontal price-fixing scheme.[9] *See FOREX I*, 74 F. Supp. 3d at 591; *Sullivan*, 2017 WL 685570, at *23–24 (identifying bilateral chat messages, primarily involving a trader at Deutsche Bank, as evidence of a broader conspiracy to manipulate the Euribor benchmark); *CHF LIBOR*, 277 F. Supp. 3d at 553, 556 (concluding that chat messages were adequate to state conspiracy claim against the bank quoted in the chat messages); *In re Libor-Based Fin. Instruments Antitrust Litig.*, 2015 WL 4634541, at *44 (S.D.N.Y. Aug. 4, 2015) ("*LIBOR IV*") (sustaining complaint where Plaintiff identified "sporadic" examples of rate manipulation); *cf. Todd v. Exxon Corp.*, 275 F.3d 191, 211-12 (2d Cir. 2001) (exchange of specific and current information related to prices is probative of anticompetitive behavior in a "data-exchange" case).

---

[9]     A comparison to the chat messages in *CHF LIBOR* is helpful. In that case, Plaintiffs' complaint relied primarily on chat messages included in government reports. There were "multiple[,] specific" messages involving one defendant, Royal Bank of Scotland ("RBS"), and an unidentified other bank, but only one chat involving the other defendants. *Id*. at 540-42; *id* at 553 ("the specific allegations of inter-defendant collusion consist of communications between RBS and an unidentified bank in 2008 and 2009 and a single request from BlueCrest to Deutsche Bank AG for a single tenor on a single day that may never have been responded to, let alone acted upon."). Judge Stein concluded that the complaint plausibly alleged a conspiracy against RBS, but not against any of the other defendants. By contrast, the TAC quotes chat messages involving each Non-Fixing Defendant, on multiple occasions, explicitly discussing market manipulation or sharing current pricing and order flow information. The evidence produced by Plaintiffs is at least as strong as the evidence produced against RBS in *CHF LIBOR* and more similar to the sustained complaint in *FOREX I*.

Several of the chat messages refer to other Defendants, suggesting that market-manipulation was not limited to sporadic bilateral agreements. For example, a UBS trader told a Deutsche Bank trader that they needed to "grow our mafia a lil" by getting a "third position involved." TAC ¶ 250. The Deutsche Bank trader responded by saying "ok calling barx [Barclays]" and reported that the Barclays trader had agreed to participate in the manipulation. TAC ¶ 250. The same traders participated in what one characterized as "the mother of all chats" involving traders at HSBC and Barclays. TAC ¶ 274. Other chats plausibly support an inference of a multilateral conspiracy. *See* TAC ¶ 251 (UBS trader told Deutsche Bank trader that "in one hour im gonna call reinforcement"). A single London-based Deutsche Bank trader appears to have played a clearinghouse role in the alleged conspiracy. This particular trader shared proprietary information, discussed manipulative trading, and agreed to fix prices with traders at each of the Non-Fixing Banks. *See* TAC ¶¶ 235-36, 238-39, 263, 288, 290, 297-306, 310. At this stage, Plaintiffs "need not show that 'the defendant knew the identities of all the other conspirators,'" *In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d at 482 (quoting *United States v. Huezo*, 546 F.3d 174, 180 (2d Cir. 2008)), and it is plausible that the conspiracy operated through one or more well-connected traders without the knowledge of the other participants.

The CFTC's settlements with UBS and Deutsche Bank, and the Department of Justice's prosecution of traders at Deutsche Bank and BAML are also evidence of a conspiracy. *See FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*, No. 16-CV-5263 (AKH), 2017 WL 3600425, at *10 (S.D.N.Y. Aug. 18, 2017) (considering regulator's findings of inappropriate behavior directed at improperly-influenced benchmark rates as evidence of a conspiracy); *see*

*also FOREX I*, 74 F. Supp. 3d at 592 (relying in part on regulatory enforcement actions to find plausible allegations of a conspiracy to fix benchmark rates).

The chat messages are especially strong direct evidence of an anticompetitive agreement to quote artificially wide bid-ask spreads in the market for physical silver.[10]  Traders at Barclays, HSBC, BNP Paribas, BAML, and UBS discussed bid-ask spreads with traders at Deutsche Bank. *See* TAC ¶¶ 231-43.  Several of these chats include explicit agreements—such as when traders at Deutsche Bank and UBS agreed to quote a bid-ask spread of 10 cents on an order of 500,000 ounces of silver.  *See* TAC ¶ 230.  One Deutsche Bank trader repeatedly urged traders at the other defendant banks to quote "wider," i.e., more profitable spreads.  *See* TAC ¶¶ 239-40.  As this trader forthrightly explained to a trader at UBS, "the price of liquidity is growing [and] u have to pass it on to the custys [customers]."  TAC ¶ 238.  Although these chats do not reference an agreement among the defendants, quoting artificially wide bid-ask spreads would not be economically rational without a broader agreement involving a critical mass of market participants.  In this respect, the conspiracy alleged in the TAC is a traditional price-fixing conspiracy:  it is easier to increase prices to customers if a critical mass of market participants is involved.

Defendants' remaining arguments urge the Court to pick-and-choose between plausible inferences.  Relying on the dearth of multi-bank chat messages in the TAC, Defendants argue that the Court should presume that any market-manipulation was bilateral and that there was no overarching agreement.  Joint Reply Mem. at 4-5.  The cases cited by Defendants for this point are summary judgment cases.  *See Dahl v. Bain Capital Partners, LLC*, 937 F. Supp. 2d 119, 135

---

[10]     Plaintiffs have adduced no evidence of a conspiracy to fix bid-ask spreads in any other silver-related market.  To the extent they claim bid-ask spread manipulation in the markets for silver-denominated derivatives, their claims are based purely on speculation, *see CHF LIBOR*, 277 F. Supp. 3d at 545, and are not plausible.

(D. Mass. 2013); *In re K-Dur Antitrust Litig.*, No. 01-CV-1652 (SRC), 2016 WL 755623, at *21-22 (D.N.J. Feb. 25, 2016). As discussed above, some of the chats reference other conspirators, and it is plausible that the conspiracy worked through a hub of one or more central wrong-doers. The involvement of other conspirators, providing additional "ammo," was also economically rational.[11] The Court also rejects Defendants' argument that because the chats do not demonstrate "systemic inter-firm communications by high-level executives," they are not indicative of an antitrust conspiracy. Joint Reply Mem. at 6. In a market manipulation case such as this, the traders at each bank are key. Whether these communications are sufficient to prove a single, unified conspiracy is a question for summary judgment or trial. As Judge Schofield explained in *FOREX III*, it is possible that bilateral or group chats were merely opportunistic attempts at collusion—rather than a part of an overarching conspiracy—but it is also plausible that the communications are evidence of a broader agreement. "Questions as to each Defendant's participation in the conspiracy and the conspiracy's scope may be raised later in litigation, but do not merit dismissal at this phase." *FOREX III*, 2016 WL 5108131 at *4. Finally, Defendants contend the chat messages show sharing of price and order information but not market manipulation. The Court disagrees because many of the chat messages clearly discuss market manipulation, *see, e.g.*, TAC ¶¶ 257-259, 263-266, or involve information sharing between horizontal competitors with no apparent purpose other than to coordinate positions, *see, e.g.*, TAC ¶¶ 230-237, 252-53. In any event, it is plausible to infer an anticompetitive agreement

---

[11]     It is possible, even likely, that some of the Defendants may have been on the other side of the market manipulation discussed in the TAC. An agreement among two of the Defendants to "push" silver prices higher could injure other Defendants betting that silver prices would fall. If true, the fact that some of the allegedly anticompetitive conduct injured other Defendants may be a basis to argue that there was no overarching conspiracy. *See CHF LIBOR*, 277 F. Supp. 3d at 556 ("With no consistent preference between a higher and lower CHF LIBOR rate, plaintiffs fail to explain why it is plausible to think that defendants would consistently share a preference at any given time, particularly over the course of a decade, and why one defendant's interests might not be adverse to another's."). It is also a reminder that there is no honor among thieves.

from apparently regular sharing of current price and order information between horizontal competitors. *See Gelboim*, 823 F.3d at 781 ("'The choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion'"; an antitrust plaintiff "need not show that its allegations suggesting an agreement are more likely than not true or that they rule out the possibility of independent action.") (quoting *Anderson News*, 680 F.3d at 184-85). To state the obvious, it is not rational for horizontal competitors to share current pricing information absent the existence of an anticompetitive agreement. *See FOREX III*, 2016 WL 5108131, at *4 (sharing of information "is against each bank's economic self-interest as a competitor absent collusion").

In sum, the Court does not find Plaintiffs' allegations of a single conspiracy among the Fixing Banks and Non-Fixing Banks to manipulate the Silver Fixing to be plausible. That said, the TAC plausibly alleges two conspiracies: Plaintiffs have plausibly alleged a conspiracy involving the Fixing Banks to suppress the Fix Price through the daily fixing call. Plaintiffs have also plausibly alleged a conspiracy among the Non-Fixing banks to collude in the silver markets through market manipulation and information-sharing. Whether Plaintiffs would be able to prove that the market manipulation alleged in the TAC was anything other than episodic and bilateral collusion among traders is unknown, but they have plausibly alleged the existence of a conspiracy.

Because Plaintiffs' Sherman Act claim against the Non-Fixing Banks is plausible, the Court must consider whether Plaintiffs have "antitrust standing" to assert such a claim.

### C. Antitrust Standing

Section 4 of the Clayton Act establishes a private right of action to enforce Section 1 of the Sherman Act. 15 U.S.C. § 15.[12] Applying the Supreme Court's decision in *Associated General Contractors v. California State Council of Carpenters*, 459 U.S. 519 (1983) ("*AGC*"), the Second Circuit has held that "a private antitrust plaintiff [must] plausibly [ ] allege (a) that it suffered a special kind of antitrust injury, and (b) that it is a suitable plaintiff to pursue the alleged antitrust violations and thus is an 'efficient enforcer' of the antitrust laws." *Gatt Commcn's*, 711 F.3d at 76 (citations and internal quotations omitted). "'Antitrust standing is a threshold, pleading-stage inquiry . . . .'" *Id.* at 75 (quoting *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 450 (6th Cir. 2007) (en banc)). Regardless of whether Plaintiffs have suffered an "antitrust injury," Plaintiffs lack antitrust standing as to the Non-Fixing Banks alleged conspiracy because they are not "efficient enforcers."

### Efficient Enforcers

The Second Circuit has identified four factors to consider when determining whether a particular plaintiff has standing as an "efficient enforcer" to seek damages under the antitrust laws:

> (1) whether the violation was a direct or remote cause of the injury; (2) whether there is an identifiable class of other persons whose self-interest would normally lead them to sue for the violation; (3) whether the injury was speculative; and (4) whether there is a risk that other plaintiffs would be entitled to recover duplicative damages or that damages would be difficult to apportion among

---

[12]  Section 4 of the Clayton Act provides:

> [A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue . . . in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

15 U.S.C. § 15(a).

possible victims of the antitrust injury. . . . Built into the analysis is an assessment of the "chain of causation" between the violation and the injury.

*Gelboim*, 823 F.3d at 772 (citations omitted). "These factors are meant to guide a court in exploring the fundamental issue of 'whether the putative plaintiff is a proper party to perform the office of a private attorney general and thereby vindicate the public interest in antitrust enforcement.'" *In re Platinum & Palladium Antitrust Litig.*, No. 14-CV-9391 (GHW), 2017 WL 1169626, at *20 (S.D.N.Y. Mar. 28, 2017) (quoting *Gelboim*, 823 F.3d at 780).

Since the Second Circuit's decision in *Gelboim*, a critical mass of judges within this district have concluded that plaintiffs who are not direct purchasers are not efficient enforcers in a benchmark manipulation case.[13] *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11-MD-2262 (NRB), 2016 WL 7378980 at *16 (S.D.N.Y. Dec. 20, 2016) ("*LIBOR VI*"); *Sullivan*, 2017 WL 685570, at *15; *In re Platinum & Palladium Antitrust Litig.*, 2017 WL 1169626, at *22; *CHF LIBOR*, 277 F. Supp. 3d at 558. Plaintiffs who do not deal directly with the defendants are referred to as "umbrella purchasers" or "umbrella plaintiffs." *See In re Platinum & Palladium Antitrust Litig.*, 2017 WL 1169626, at *22. Umbrella purchasers are potentially injured by price-fixing because price-fixing enables non-conspiring market participants to charge supra-competitive prices. *See Silver I*, 213 F. Supp. 3d at 555 ("In the typical umbrella liability case, plaintiffs' injuries arise from a transaction with a non-conspiring retailer who is able, but not required, to charge supra-competitive prices as the result of defendants' conspiracy to create a pricing 'umbrella.'"). Umbrella purchasers present particular

---

[13]     *FOREX III* is an exception to this rule, but Judge Schofield's reasoning is consistent with the analysis applied by the other judges in this district. As discussed further below, the umbrella purchasers in *FOREX III* alleged a direct relationship between the price of the derivatives they purchased and the manipulated benchmark and that the defendants controlled over 90% of the relevant market. On those facts, Judge Schofield concluded that the umbrella plaintiffs suffered a direct injury for which damages could be proven and that the risk of disproportionate liability was limited. *FOREX III*, 2016 WL 5108131, at *11.

challenges to the efficient enforcer analysis: As to the first factor (whether the violation was a direct or remote cause of injury), umbrella purchasers typically suffer a remote injury, recovery for which may be disproportionate to the defendants' wrongdoing. *See Mid-West Paper Prods. Co. v. Cont'l Grp., Inc.*, 596 F.2d 573, 580-87 (3d Cir. 1979) (permitting umbrella plaintiffs to recover risks "overkill, due to an enlargement of the private weapon to a caliber far exceeding that contemplated by Congress" (quoting *Calderone Enters. Corp. v. United Artists Theatre Circuit, Inc.*, 454 F.2d 1292, 1295 (2d Cir. 1971))); *see also Gelboim*, 823 F.3d at 778-79. Because umbrella purchasers do not deal directly with the defendants, there is often a more directly injured victim available. *But see CHF LIBOR*, 277 F. Supp. 3d at 562 (recognizing that umbrella purchasers are similarly situated to direct purchasers in many benchmark-fixing cases); *see also Gelboim*, 823 F.3d at 779 (this factor has diminished weight in benchmark-fixing cases). The potential for intervening causative factors also makes it more likely that umbrella purchasers will present a risk of speculative damages. *See In re Platinum & Palladium Antitrust Litig.*, 2017 WL 1169626, at *24-25. And, although not always the case, umbrella purchasers may present a risk that both sides of a transaction will claim an injury, raising the specter of duplicative recoveries. *See id.* at *25; *Sullivan*, 2017 WL 685570, at *19.

These concerns are particularly acute in this case. Plaintiffs' claims against the Non-Fixing Banks do not depend on benchmark manipulation; rather, they allege a comprehensive scheme of market manipulation, involving rigged bid-ask spreads and coordinated trading in unspecified silver markets. *See* TAC ¶ 401 ("Defendants also caused artificial prices by injecting artificial supply and demand fundamentals into the market through their illegitimate coordinated trading activity including (a) maintain an artificial bid-ask spread; (b) quoting systematically lower silver prices in advance of the Silver Fix; and (c) coordinating trading

activity, e.g., to intentionally trigger client stop-loss orders.").  Plaintiffs' proposed class includes "[a]ll persons or entities that transacted in U.S.-Related Transactions in or on any over-the-counter ("OTC") market or exchange in physical silver or in a derivative instrument in which silver is the underlying reference asset . . . , at any time from January 1, 2007 through December 31, 2013," TAC ¶ 364, regardless of whether they traded a silver-denominated instrument that was manipulated by the Non-Fixing Banks and regardless of whether they ever dealt with a Non-Fixing Bank (or a Fixing Bank, for that matter).  Although there is often a statistically significant, or formula-based, connection between a financial benchmark and related derivatives, the impact of episodic coordinated trading in the silver markets is unclear.  The TAC does not identify which markets were manipulated—physical silver, COMEX futures, CBOT futures, or some other silver-denominated financial instrument—or identify specific manipulative transactions, even as examples.  The TAC also does not include any econometric analysis of the impact of the Non-Fixing Banks' alleged coordinated trading on the markets for physical silver or silver-denominated assets.  Plaintiffs' class definition presents an obvious risk of disproportionate damages, even relative to benchmark-fixing cases—which themselves often entail potential damages in the hundreds of millions, if not billions, of dollars.

For these reasons, discussed more fully below, the Court finds that Plaintiffs are not efficient enforcers.

### (a) Directness of Injury

Evaluating the directness of an injury is essentially a proximate cause analysis that hinges on "whether the harm alleged has a sufficiently close connection to the conduct the statute prohibits."  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1390 (2014); *see also AGC*, 459 U.S. at 540-41 (evaluating directness in light of the "chain of causation"

between the asserted injury and the alleged restraint of trade); *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 412 (2d Cir. 2014) (considering, *inter alia*, whether the alleged injury was within the scope of the risk that defendant's wrongful act created; was a natural or probable consequence of defendant's conduct; was the result of a superseding or intervening cause; or "was anything more than an antecedent event without which the harm would not have occurred" (quoting *CSX Transp., Inc. v. McBride*, 564 U.S. 685, 719 (2011) (Roberts, C.J., dissenting)). "Where the chain of causation between the asserted injury and the alleged restraint in the market 'contains several somewhat vaguely defined links,' the claim is insufficient to provide antitrust standing." *Laydon v. Mizuho Bank, Ltd.*, No. 12-CV-3419 (GBD), 2014 WL 1280464, at *9 (S.D.N.Y. Mar. 28, 2014) (citing *AGC*, 459 U.S. at 540).

The relationship between Plaintiffs' injuries and the Non-Fixing Banks' conduct is attenuated and inadequately alleged in the TAC. In a benchmark-fixing case the impact of the manipulated benchmark on the financial instruments traded by the plaintiff is relatively clear. For example, and as relevant here, the Fix Price is the price for physical silver, and the price of physical silver has a 99.85% correlation to the price of silver futures traded on COMEX. *See* TAC ¶ 137; *Silver I*, 213 F. Supp. 3d at 553; *see also FOREX III*, 2016 WL 5108131, at *9. Even in cases in which the benchmark is not the sole determinant of prices, there is frequently a mathematically-defined relationship between prices in the affected market and the benchmark. *See Sullivan*, 2017 WL 685570, at *9 (describing mathematical relationship between Euribor and CME-traded futures contracts). By contrast, the effect of the Defendants' coordinated trading and information sharing is undefined, both in the manipulated market (which, as noted previously, is not specified) and in related markets. *Cf.* TAC ¶ 263 ("[Deutsche Bank]: did u see the spoof . . . when he called . . . the futures went a buck wide."). Plaintiffs have made no effort

to explain, in concrete terms, the impact of spoofing, smashing, or pushing on the various markets for silver derivatives in which they traded; nor have they identified which silver markets were allegedly manipulated. The TAC's vague allegations of causation are particularly problematic because it appears to the Court that any impact on the market may be transient by design. For example, in order to spoof the market, a trader submits false trades, temporarily driving the market price up or down and enabling the trader to purchase or sell at an artificial price. The trader profits when the impact of the spoof on prices dissipates and he or she is able to repurchase or sell the position. *See* TAC ¶ 307 ("[Deutsche Bank]: HE SPOOFED IT TO BUY IT AND I THINK HE JUST SOLD IT TO BUY IT . . . JUST LIKE THEM TO BID IT UP BEFORE THE FIX THEN GO IN AS A SELLER . . . ."). Put differently, in a highly liquid, broad market, manipulative trading is highly unlikely to have a persistent impact on market prices. It is therefore unclear, and the TAC alleges nothing to make it clear, the extent to which class members were injured by Defendants' manipulation.

The fact that Plaintiffs are umbrella purchasers makes the causal connection between their injury and Defendants' manipulation even less clear. In *Gelboim*, the Second Circuit understood there to be little difference, if any, between plaintiffs who purchased directly from the defendants and umbrella plaintiffs. *See Gelboim*, 823 F.3d at 779 ("[a]t first glance . . . there appears to be no difference in the injury alleged by those who dealt in LIBOR-denominated instruments, whether their transactions were conducted directly or indirectly with the Banks"). Because the benchmark price has a defined relationship to the affected market, there is not a significant difference between class-members who transact with the defendants at the manipulated price and class-members who transact with other market-participants. *See id.*; *CHF LIBOR*, 277 F. Supp. 3d at 559. The same is not true in an episodic manipulation case. Class

members who traded directly with the Defendants during an episode of manipulation experienced the greatest distortion in prices.[14]  Whether class members who traded minutes or hours or days later were injured depends on the persistence of the impact of manipulation on the market.  The TAC includes no allegations relevant to that question and, as explained above, the economics of manipulative trading on a broad, highly liquid market suggest that the impact on prices is likely to be temporally-limited.

It is also likely that there are numerous intervening causative factors between Plaintiffs' trades and Defendants manipulative trading.  The likelihood of intervening causative factors is greater in this case than in other similar cases.  *See, e.g.*, *In re Platinum & Palladium Antitrust Litig.*, 2017 WL 1169626, at *22 (quoting *LIBOR VI*, 2016 WL 7378980, at *16) ("[P]laintiffs who did not purchase directly from defendants continue to face the same hurdle: they made their own decisions to incorporate LIBOR into their transactions, over which defendants had no control, in which defendants had no input, and from which defendants did not profit.").  The TAC does not include any allegations regarding the impact of Defendants' alleged manipulative trading on prices in any market for silver-denominated financial instruments.[15]  As discussed above, unlike in a benchmark-fixing case, the relationship between a manipulative quote and the market price is not clearly defined and, as a matter of logic, the persistence of any effect must depend on liquidity in the market and the variance between the quote and the market price (among other variables).  *See* TAC ¶¶ 257-58 (discussing use of different manipulative trading tactics depending on market liquidity), 260 (discussing "jobbing" a low-volume market).

---

[14]      A similarly close causal connection would exist for any class member who placed a stop-loss order that was triggered by Defendants' manipulative tactics.  No Plaintiff alleges, however, that he placed stop-loss orders, much less that those orders were triggered by Defendants' manipulative trading.

[15]      Likewise, the TAC includes no facts that even remotely suggest that Defendants' episodic, artificially-wide bid-ask spreads led to wider spreads in the market generally.

The breadth of Plaintiffs' proposed class definition also raises serious concerns of ruinous, potentially-disproportionate liability. "[T]o hold defendants trebly responsible for 'transactions, over which defendants had no control, in which defendants had no input, and from which defendants did not profit' would result in 'damages disproportionate to wrongdoing.'" *CHF LIBOR*, 277 F. Supp. 3d at 560-61 (quoting *LIBOR VI*, 2016 WL 7378980, at *16) (additional citations and alterations omitted). Plaintiffs' proposed class includes every participant in a silver or silver-denominated transaction on a U.S.-based exchange for approximately six years. According to the TAC, the silver markets trade approximately $30 billion dollars annually. TAC ¶ 125. Recognizing the potential for open-ended liability in cases involving umbrella purchasers of financial instruments, Judge Schofield focused on the defendants' relative control over the affected markets. *See FOREX III*, 2016 WL 5108131, at *9. Judge Schofield's "market control" test has gained traction in this district "as a proxy for the question of direct causation" for class-members who purchased financial instruments on an exchange such as COMEX or CBOT. *See LIBOR VI*, 2016 WL 7378980, at *16; *CHF LIBOR*, 277 F. Supp. 3d at 561. This Court agrees. Where the defendants substantially control the market—in *FOREX III*, the complaint alleged that the defendants controlled 90% of the market, *see FOREX III*, 2016 WL 5108131, at *9—there is little risk of disproportionate liability. In such a market, although in a technical sense the plaintiffs may not have traded directly with the defendants, the defendants are, de facto, "the market," and their potential liability is, therefore, in proportion to their economic control of the market.

The TAC does not allege market control by the Non-Fixing Defendants. According to the TAC, "UBS was the third most active market maker in the silver spot market" during the class period. TAC ¶ 76. "Barclays was the eleventh most active U.S. market maker in the silver

spot market." TAC ¶ 89. "Standard Chartered was the eighth most active U.S. market maker in the silver spot market." TAC ¶ 98. The TAC does not include similar allegations about the role of BNP Paribas or BAML in the physical silver markets. In all events, this information does not shed much light on the Non-Fixing Banks' role in the exchange-traded silver futures markets. At the risk of stating the obvious, the Non-Fixing Banks' role/influence on the spot market for physical silver has no necessary relationship to their role in the futures markets. Even as to physical silver, the TAC gives no indication of any of the Non-Fixing Banks' influence relative to other participants in the market. The physical silver market may be roughly equally divided among a dozen market makers or there may be a few giants and a much larger number of bit players; the TAC leaves the Court guessing. Any inference of market control is further undermined by the fact that nothing in the chat messages indicates which futures and options markets were being manipulated. *See e.g.*, TAC ¶¶ 301 (discussion of wide "vols" between BAML and Deutsche Bank traders without any indication of which silver-denominated instrument they were discussing), 303 ("Somejackass [sic], . . . sold me 1mm ozs of 1 week 35 silver call at 29 vol yesterday" but no indication on which futures or options market the complained-of trade occurred.).

In sum, the TAC provides no support for Plaintiffs' argument that they have suffered a direct injury from the Non-Fixing Banks' manipulation of the silver markets. Although this is an independently adequate basis to find that Plaintiffs are not efficient enforcers, the other efficient enforcer factors also weigh against Plaintiffs' claims.

### (b) Existence of More Direct Victims

Class-members who traded directly with the Non-Fixing Banks were more directly injured than Plaintiffs. As discussed above, in a benchmark-fixing case, there is little difference

between direct and umbrella purchasers because benchmark-manipulation affects all market participants equally. *See In re Platinum & Palladium Antitrust Litig.*, 2017 WL 1169626, at *23. That is not true with episodic manipulation of individual trades because the impact of the manipulation is not clear, and there is no allegation that the episodic manipulation had a persistent effect on price. Market participants who were counterparties to the Non-Fixing Banks in the physical silver market during a period of manipulation would presumably have experienced the maximum impact of the manipulation. With respect to manipulation of exchange-traded silver-denominated financial instruments, the most directly impacted class members would be class members who were counterparties or traded during or immediately after the Non-Fixing Banks' manipulation. The TAC includes no allegations from which the Court could infer that Plaintiffs were counterparties to the Non-Fixing Banks' manipulative trades in the silver derivatives markets or that Plaintiffs traded with the Non-Fixing Banks in the market for physical silver. Accordingly, this factor does not favor Plaintiffs.

### (c) Speculative Damages

This case would present difficult damages issues against the Non-Fixing Banks.[16] In order to determine damages, the parties would be required to reconstruct a hypothetical market in which the Non-Fixing Banks did not engage in episodic manipulation of the silver market. *See CHF LIBOR*, 277 F. Supp. 3d at 563; *In re Platinum & Palladium Antitrust Litig.*, 2017 WL 1169626, at *23-24; *Sullivan,* 2017 WL 685570 at *19. Leaving aside the unique concerns presented by Plaintiffs' umbrella claims, it is likely that constructing a hypothetical market

---

[16] That is not to suggest that the damages issues associated with Plaintiffs' claims against the Fixing Banks will be child's play.

without manipulation would be exceedingly difficult.  As Judge Stein explained in *CHF LIBOR*, which dealt with the comparatively less complex circumstance of a benchmark-fixing claim:

> Given that the Complaint offers only a handful of specific instances of manipulation and alleges that the manipulation was varied and episodic, even determining the days on which manipulation occurred at all may prove quite difficult.  Moreover, any damages would need to be netted out as to each plaintiff to offset any benefit from the defendants' manipulation in other transactions.

*CHF LIBOR*, 277 F. Supp. 3d at 563.  As discussed above, the macro impact of manipulative trading on prices is not at all clear, and the micro impact may not be persistent, depending on other variables, such as liquidity, volume, the size of the manipulated position, its variance from equilibrium prices, and other events that caused legitimate movement in prices.[17]  These concerns are especially pronounced for umbrella purchasers who may have traded hours or days after the Defendants' manipulation.

The Court finds that it would be extremely difficult, if not impossible, to isolate the impact of coordinated trading and episodic manipulation on an umbrella plaintiff's trades.  *See LIBOR VI*, 2016 WL 7378980, at *17; *see also In re Platinum & Palladium Antitrust Litig.*, 2017 WL 1169626, at *25 ("To find antitrust damages in this case would engage the court in hopeless speculation concerning the relative effect of an alleged conspiracy in a market where countless other market variables could have intervened to affect those pricing decisions."  (quoting *Reading Indus., Inc. v. Kennecott Copper Corp.*, 631 F.2d 10, 13-14 (2d Cir. 1980))) (alterations omitted); *CHF LIBOR*, 277 F. Supp. 3d at 564 ("Where 'the damages would be determined

---

[17]     Take for example a hypothetical plaintiff whose stop-loss order was allegedly triggered by manipulative "pushing."  If prices were moving downward already, it is possible, and maybe even likely, that the stop-loss order would have been triggered regardless.  Whether such a plaintiff was injured may depend on whether there is any injury from triggering the stop-loss order prematurely, by hours or even minutes.  Even that assumes the "pushing" was effective, which depends on market-liquidity and the size of the manipulative position.  The Court would also be required to address this hypothetical plaintiff's counter-party—also a putative class member—who may have profited from purchasing at a reduced market price.

based on transactions with non-parties, the calculation and apportionment of damages would be exceptionally complex and have aspects that can fairly be described as speculative.'" (quoting *Sullivan*, 2017 WL 685570, at *15)).  Although "potential difficulty in ascertaining and apportioning damages is not . . . an *independent* basis for denying standing where it is adequately alleged that a defendant's conduct has proximately injured an interest of the plaintiff's that the statute protects," *Lexmark*, 134 S. Ct. at 1392 (emphasis in original), this factor clearly weighs against Plaintiffs.

### (d) Duplicative Recovery and Apportionment of Damages

This factor also weighs against Plaintiffs' claims against the Non-Fixing Banks. Plaintiffs seek to recover on behalf of a market-wide class from five defendants who represent an unknown percentage of the market.[18]  *See In re Platinum & Palladium Antitrust Litig.*, 2017 WL 1169626, at *25 (damages apportionment would be complex where "[d]efendants represent a subset of fifty-two [market] members and a subset of the [] market-making members.  But the [complaint] asserts claims on behalf of all market participants, including persons who have not transacted with Defendants.") (internal citations omitted).  As Judge Castel explained in *Sullivan*, "[i]n certain of these transactions, it may not even be apparent which party profited and which party was injured by the [price] manipulation; given the nature of these transactions, there would surely be instances in which both sides would claim to have suffered injury."  2017 WL 685570, at *19.  Finally, it is relevant that the CFTC and Department of Justice have instituted

---

[18]      Including the Fixing Banks in the analysis does not significantly change the result.  The Fixing Banks are not alleged to have controlled the markets for physical silver and silver-denominated assets.  According to the TAC, Bank of Nova Scotia was the most active market maker in the physical silver market during the class period.  TAC ¶ 74.  Deutsche Bank was the fifteenth most active market maker in the physical silver market during the class period.  TAC ¶ 43.  HSBC was the sixth most active market maker.  TAC ¶ 59.  Because the TAC does not explain the distribution of the physical silver market, it is unclear whether these shares represent a large portion of the market, even aggregated with the Non-Fixing Banks.  Moreover, Plaintiffs do not include *any* allegations with respect to control of the markets for silver-denominated assets such as futures and options.

enforcement actions and criminal cases against several of the defendants and their traders for the manipulative trading alleged in the TAC. Enforcement actions are relevant because they "lessen the need for plaintiffs to function as private attorneys general and vindicators of the public interest." *Sullivan*, 2017 WL 685570, at *20 (citing *Gelboim*, 823 F.3d at 780); *see also CHF LIBOR*, 277 F. Supp. 3d at 565.[19]

In sum, Plaintiffs are not efficient enforcers. Their claims are based on an injury that is remote from the Non-Fixing Banks' alleged coordinated trading and market-manipulation and speculative at best. And, because Plaintiffs do not allege that they dealt with the Non-Fixing Banks and seek to recover on behalf of a class of all participants in the silver markets, there is a significant possibility of disproportionate liability. Accordingly, Plaintiffs' Sherman Act claims against the Non-Fixing Banks are DISMISSED.[20]

## II. Commodities Exchange Act Claims

Plaintiffs bring claims for violations of the CEA based on the same bad acts that underlie their Sherman Act claims. As relevant to this case, Section 9 of the CEA prohibits manipulation in the markets for commodities and commodities-based derivatives, *see* 7 U.S.C. § 13, and Rule

---

[19] The existence of parallel investigations is not necessarily relevant to whether plaintiffs' claims raise a risk of duplicative recovery. *See LIBOR VI*, 2016 WL 7378980, at *23. Unless regulators require defendants to pay restitution, class members will not be compensated through government enforcement actions. Nonetheless, enforcement actions are relevant to whether private enforcement of the Sherman Act is necessary to accomplish the goals of the antitrust laws and also whether there is a risk of disproportionate liability. *See Gelboim*, 823 F.3d at 778 (government enforcement actions are "background context" for whether private enforcement of the Sherman Act is necessary).

[20] Having determined that Plaintiffs are not efficient enforcers, the Court need not address whether they have suffered an antitrust injury. Nonetheless, as the Court discuses in more detail below with respect to CEA standing, the Second Circuit's recent decision in *Harry v. Total Gas & Power North America* suggests that Plaintiffs have not suffered an antitrust injury. 889 F.3d 104, 115-16 (2d Cir. 2018) (concluding that because plaintiffs did not allege actual damages for purposes of the CEA, they also could not allege an antitrust injury); *but see Gelboim*, 823 F.3d at 770 ("To avoid a quagmire, this Court (among others) assumes 'the existence of a violation in addressing the issue of [antitrust] standing.'" (quoting *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 437 (2d Cir. 2005))). The Court leaves the apparent tension between the analytical approach described in *Gelboim* and the reasoning in *Total Gas* for another day and another case.

180.1 prohibits the use of a "manipulative device" in connection with the sale of commodities, *see* 17 C.F.R. § 180.1. The Non-Fixing Banks have moved to dismiss Plaintiffs' CEA claims. They contend that Plaintiffs were on notice of possible manipulation in the silver futures markets by January 2014 at the latest. Because the CEA has a two-year limitations period, the Non-Fixing Banks contend that Plaintiffs' claims are time-barred. Alternatively, the Non-Fixing Banks contend Plaintiffs' claims fail because they seek to recover for foreign conduct that is not actionable under the CEA and do not sufficiently allege the elements of a claim for manipulation under the CEA.

### A. Timeliness

CEA claims must be brought "not later than two years after the date the cause of action arises." 7 U.S.C. § 25(c). Because the CEA does not define when a cause of action accrues, "courts apply a 'discovery accrual rule' wherein 'discovery of the injury, not discovery of the other elements of a claim, is what starts the clock.'" *In re LIBOR-based Fin. Instruments Antitrust Litig.*, 935 F. Supp. 2d 666, 697 (S.D.N.Y. 2013) ("*LIBOR I*") (quoting *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 148 (2d Cir. 2012)) (other citations omitted), *rev'd on other grounds by Gelboim*, 823 F.3d at 783. "Inquiry notice—often called 'storm warnings' in the securities context—gives rise to a duty of inquiry 'when the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded.'" *Koch*, 699 F.3d at 151 (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 168 (2d Cir. 2005)). "The date on which one imputes knowledge to a reasonable investor for purposes of [inquiry notice] varies, depending on what the investor does after being placed on constructive notice." *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 426 (2d Cir. 2008). Assuming the investor responds by making some inquiry, he or she is charged with the "knowledge of what an investor

in the exercise of reasonable diligence[] should have discovered concerning the fraud." *Id.* at 426 (quoting *LC Capital Partners, LP v. Frontier Ins. Grp., Inc.*, 318 F.3d 148, 154 (2d Cir. 2003)). An objective standard applies to inquiry notice, and the Court may determine whether plaintiffs were on notice as a matter of law. *See Dodds v. CIGNA Sec., Inc.*, 12 F.3d 346, 350 (2d Cir. 1993).

The Non-Fixing Banks contend that a collection of news articles and press releases cited in the TAC show that Plaintiffs were on notice that they may have been injured by manipulative trading in the silver markets as early as 2008 and, at the latest, by January 2014 (approximately two years and ten months before Plaintiffs sought leave to file the TAC). "[P]ress coverage, prior lawsuits, or regulatory filings" may put plaintiffs on inquiry notice of their injury. *See Staehr*, 547 F.3d at 425. For example, in *LIBOR I*, Judge Buchwald concluded that a series of high profile articles—"seven articles published in prominent national news sources"—describing pricing irregularities in the benchmark LIBOR rate put plaintiffs on notice that they may have suffered an injury in LIBOR-linked instruments. *See LIBOR I*, 935 F. Supp. 2d at 700-03. The articles in *LIBOR I* described detailed statistical analyses of pricing irregularities and ran under headlines like "*Special Topic: Is LIBOR Broken?*" *Id.* And because the articles concerned manipulation of the benchmark LIBOR rate, it was relatively straightforward for an investor to come to the conclusion that the manipulation would have a direct impact on the LIBOR-linked instruments traded by the plaintiffs.[21] *Id.*

---

[21]     Judge Buchwald explained the inquiry in *LIBOR I* as asking whether the plaintiffs would be on notice of their injury, as opposed to the elements of their claim. *See LIBOR I*, 935 F. Supp. 2d at 705 ("Unlike inquiry notice under the '34 Act, which requires plaintiffs to be able to plead a claim . . . inquiry notice under the CEA requires only that plaintiffs be on inquiry notice of their injury."). Judge Buchwald proceeded to analyze this issue as whether plaintiffs would have been aware of manipulation of LIBOR, from which they could conclude they had suffered an injury in LIBOR-linked trades. Judge Buchwald's focus on awareness of a probability of an injury is in tension with Judge Stein's recent decision in *CHF LIBOR*, in which he analyzed the question as whether plaintiffs would have been on notice of their claims against each defendant. *See CHF LIBOR*, 277 F. Supp. 3d at 575 ("However, the UBS non-prosecution agreement did not put plaintiffs on inquiry notice with respect to CEA claims

The articles and press releases cited in the TAC do not contain information that is as specific as the information contained in the articles in *LIBOR I*, and they do not describe alleged misconduct with a similarly-direct connection to the injury alleged by Plaintiffs. The Non-Fixing Banks rely on three statements by the CFTC in September 2008, February 2013, and September 2013, which, they contend, put Plaintiffs on inquiry notice of manipulation in the silver markets. The 2008 press release reads, in its entirety: "In September 2008 the CFTC confirmed that its Division of Enforcement has been investigating complaints of misconduct in the silver market." *See* TAC ¶ 345 & n.190. The press release includes no information about the financial products involved, the time period of the alleged misconduct, or the markets in which the misconduct allegedly occurred. In February 2013, CFTC commissioner Bart Chilton stated publicly that there was reason to believe that benchmarks like the Silver Fixing may have been manipulated. *See* TAC ¶ 335 (quoting Commissioner Chilton as saying "[g]iven what we have seen in LIBOR, we'd be foolish to assume that other benchmarks aren't venues that deserve review"). Chilton's discussion of the Silver Fixing might be a basis for the Court to find that Plaintiffs were on notice of manipulation of the Silver Fixing, but the statement has little relevance to Plaintiffs' CEA claims against the Non-Fixing Banks, which seek to recover for artificial prices caused by episodic market manipulation. The CFTC's September 2013 closure notice is more directly on point and includes more specificity than the 2008 announcement, but because the CFTC concluded that there "is not a viable basis to bring an enforcement action with respect to any firm or its employees," the Court cannot say that a reasonable investor would have been on notice that he had probably been injured. *See* TAC ¶ 345 & n.191.

---

against defendants other than UBS."); *see also FOREX III*, 2016 WL 5108131, at *27 (analyzing inquiry notice defendant by defendant). The Court need not resolve this issue because none of the notice materials cited in the TAC is a basis for the Court to find that, as a matter of law, Plaintiffs were on notice that they may have been the victims of episodic market manipulation.

The other articles cited by the Non-Fixing Banks also relate to manipulation of the Silver

Fixing or are too general to put Plaintiffs on inquiry notice. Deutsche Bank resigned its seat on

the Silver Fixing in January 2014 in response to scrutiny from the German securities regulator

BaFin.[22] *See* TAC ¶ 337. Plaintiffs' CEA claims do not depend on any connection to the Silver

Fixing.[23] The fact that BaFin was scrutinizing the benchmark Silver Fixing process, and that the

inquiry was serious enough for Deutsche Bank to respond by resigning its seat, may have led a

reasonable investor to suspect benchmark-manipulation, but the Court cannot say the same

information would put a reasonable investor on notice that he had been the victim of episodic

manipulative trading strategies.

The Non-Fixing Banks also point to UBS's November 2014 settlement with FINMA of

allegations of market manipulation by foreign exchange and precious metals traders. TAC ¶¶

339-40. But the relevant discussion in the FINMA report either references manipulation of the

Silver Fixing or is too generic to have put Plaintiffs on notice (at least at this stage). *See* Swiss

Financial Market Supervisory Authority (FINMA), *Foreign Exchange Trading at UBS AG:*

*Investigation Conducted by FINMA*, at 12 (November 12, 2014),

https://www.finma.ch/en/news/2014/11/mm-ubs-devisenhandel-20141112/. FINMA Report at

12 (describing "repeated front running (especially in the back book) of silver fix orders of one

client."). The FINMA report also alludes to manipulation in the precious metals spot markets

more generally, but it does not provide key details such as the commodities or financial products

---

[22] The contemporaneous press accounts cited in the TAC are similar. They focus on potential manipulation of the Gold and Silver Fixings, not episodic manipulation in the silver-denominated derivatives markets. *See* TAC ¶ 337 & nn.185-86.

[23] Defendants appear to appreciate this distinction—at least when it is in their interest. In pointing to silver-related lawsuits filed against JP Morgan in 2010 and 2011, Defendants distinguish the Court's previous discussion of these lawsuits in *Silver I* as evaluating them relative to Plaintiffs' Silver Fixing claims. That distinction is a meaningful one, but it cuts both ways.

involved, the markets in which they were traded, or the frequency or approximate dates of the manipulation. At this stage in the proceedings and without additional information, the Court cannot conclude that in 2014 a reasonable investor would have been aware of the probability that they had traded in the silver markets at artificial prices.[24]

In sum, at the motion to dismiss stage, none of the articles and press releases contained in the TAC is sufficiently on point for the Court to conclude that a reasonable investor would have been on notice of the probability that the silver markets in which they traded were being episodically manipulated or that they had traded at artificial prices.[25]

## B. Extraterritoriality

The private right of action under the CEA does not apply to extraterritorial transactions. *See Loginovskaya v. Batratchenko*, 764 F.3d 266, 272 (2d Cir. 2014) ("Given the absence of any 'affirmative intention' by Congress to give the CEA extraterritorial effect, we must 'presume it is primarily concerned with domestic conditions.'" (quoting *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 255 (2010))). The "focus" of the private right of action under the CEA, 7 U.S.C. § 25 ("Section 22"), is on "domestic conduct, domestic transactions, or some other phenomenon localized to the United States." *Loginovskaya*, 764 F.3d at 272. First in *Loginvoskaya*, and then

---

[24]     In 2010 and 2011, several of the Plaintiffs sued JP Morgan Chase and HSBC, alleging that they conspired to suppress the price of silver and silver-denominated instruments traded on COMEX between 2008 and 2010 through an outsized net-short position. Joint Mem. at 30 & n.18; *see In re Commodity Exch., Inc. Silver Futures & Options Trading Litig.*, No. 11-MD-2213 (RPP), Dkt. 85 (Consolidated Class Action Complaint) ¶¶ 3-7, 68-69. Those claims were precipitated by a CFTC investigation of manipulation of the silver markets by JP Morgan Chase. *See id.* at 1 n.1. The only connection between those claims and this case (at least against the Non-Fixing Banks) appears to be that JP Morgan was accused of manipulating one of the markets in which Plaintiffs traded during a discrete period that overlaps with the class period in this case. The Court cannot say that, as a matter of law, a reasonable investor would infer from this connection that there was a probability that he or she had been injured at other times, in other markets, or by different trading behavior by other banks.

[25]     Because Plaintiffs were not on inquiry notice, the Court need not address whether the statute of limitations was tolled pursuant to the fraudulent concealment doctrine or whether Plaintiffs' claims against UBS relate-back under Rule 15.

more recently in *Myun-Uk Choi v. Tower Research Capital LLC*, 890 F.3d 60, 66 (2d Cir. 2018), the Second Circuit has explained that the CEA applies to "domestic transactions" as that term was defined in *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60 (2d Cir. 2012). *Tower Research Capital*, 890 F.3d at 66 (citing *Ficeto*, 677 F.3d at 67, and *Loginovskaya*, 764 F.3d at 274). A transaction is a "domestic transaction" if "irrevocable liability is incurred or title passes within the United States."[26] *Ficeto*, 677 F.3d at 67.

Whether a transaction is a "domestic transaction" within the meaning of *Ficeto* is not, however, necessarily the end of the inquiry. In *Parkcentral Global Hub Ltd. v. Porsche Automobile Holdings SE*, 763 F.3d 198 (2d Cir. 2014), the Second Circuit held that a "domestic transaction" is necessary but "not alone sufficient to state a properly domestic claim under the [Exchange Act.]." *Id.* at 215. Although *Parkcentral* concerned claims under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j *et seq.*, the holding in *Parkcentral* has been applied to CEA claims as well. *See In re North Sea Brent Crude Oil Futures Litig.*, 256 F. Supp. 3d 298, 307 (S.D.N.Y. 2017). As conceptualized by the Court in *North Sea Brent Crude Oil*, the extraterritoriality analysis under the CEA has two parts: at step one the Court must determine whether the plaintiff's claim involves a "domestic transaction." Assuming this requirement is satisfied, the Court must proceed to step two and consider whether the claims are "so predominantly foreign as to be impermissibly extraterritorial," *Parkcentral*, 763 F.3d at 216. *See In re North Sea Brent Crude Oil Futures Litig.*, 256 F. Supp. 3d at 308-10.

The parties dispute the framework for the Court's analysis and, unsurprisingly, the result at each step. The Non-Fixing Banks contend that both the plaintiffs' and defendants' transactions must be "domestic" under *Loginovskaya*. *See* Joint Supp. Mem. (Dkt. 352) at 2.

---

[26] The locus of irrevocable liability is not disputed in this case. The parties agree that Plaintiffs incurred irrevocable liability in the United States.

Because Plaintiffs do not allege that they were counterparties to the Non-Fixing Banks' alleged manipulative trades, the Non-Fixing Banks' position is that the transactions at issue are "domestic" only if both the manipulative trading activity (e.g., spoofing) and the transaction in which the Plaintiff was injured are domestic. Even assuming Plaintiffs' claims involve a "domestic" transaction, the Non-Fixing Banks contend that the underlying conduct is so predominantly foreign that, under *Parkcentral*, the CEA does not apply. Joint Mem. at 46. Plaintiffs, on the other hand, take the position that the extraterritoriality analysis begins and ends with whether their transactions are "domestic." The parties agree that Plaintiffs transacted on COMEX and so, according to Plaintiffs, that is the end of the analysis. Opp'n at 39-40. Plaintiffs contend *Parkcentral* does not apply to the CEA because Plaintiffs transacted on a "domestic exchange," rather than through domestic, over-the-counter transactions. Opp'n at 39-40.

Although the issue is a close one, the Court finds that the relevant transaction for purposes of Section 22 is the transaction in which the plaintiff is injured—in this case Plaintiffs' trades of COMEX and CBOT futures and options. So far as the Court is aware, this issue has been squarely presented only once before, in *In re North Sea Brent Crude Oil Futures Litigation*. *See* 256 F. Supp. 3d at 308-09 (assuming, without deciding, that the relevant transaction is the futures or options transaction in which plaintiff is injured). Nevertheless, the result clearly follows from the text of Section 22 and the Supreme Court's analysis in *Morrison*. As relevant here, Section 22 provides a private right of action to "[a]ny [] person . . . who purchased or sold [any contract of sale of any commodity for future delivery (or option on such contract or any commodity) or any swap] . . . if the violation constitutes . . . (ii) a manipulation of the price of

any such contract or swap or the price of the commodity underlying such contract or swap."[27]  7

U.S.C. § 25(a)(1)(D)(ii).  The statute is concerned with the protection of market participants

injured by manipulation of the price of the "contract or swap" itself.  As Judge Carter explained

in *North Sea Brent Crude Oil*, the Supreme Court understood similar language in the Exchange

Act to be focused on the plaintiff's transaction, rather than the manipulation itself.  *See In re*

*North Sea Brent Crude Oil Futures Litig.,* 256 F. Supp. 3d at 308 (citing *Morrison*, 561 U.S. at

266-67); *but see Loginovskaya v. Batratchenko*, 936 F. Supp. 2d 357, 370 (S.D.N.Y. 2013)

(Oetken, J.) (describing Section 22 as "an explicit, statutory right of action framed in terms of

prohibited conduct").  Because the "manipulation" referenced in Section 25(a)(1)(D)(ii) is not

necessarily manipulative trading (i.e., a transaction), the alternative understanding of the statute

would untether the analysis from a "transaction" as required by *Loginovskaya*.

     Having determined that the relevant transaction is the plaintiff's, there is no dispute that

these Plaintiffs' claims involve "domestic transactions," and the Court proceeds to step two of

the analysis.  Plaintiffs contend that *Parkcentral* is inapplicable to their claims because they

traded on a "domestic exchange."  *See* Opp'n at 40.  Plaintiffs' reference to a "domestic

exchange" derives from *Morrison*, which interpreted the Exchange Act to be focused on

"transactions in securities listed on domestic exchanges, and domestic transactions in other

securities, to which § 10(b) applies."  *Morrison*, 561 U.S. at 267.  Because *Parkcentral*

---

[27]     The bracketed language is cross-referenced from subsection (a)(1)(B) of Section 22.  The Court assumes for purposes of analysis that the statute permits a plaintiff to sue if he has been injured by defendant's manipulation, even if the plaintiff and defendant are not counterparties.  *See In re Amaranth Nat. Gas Commodities Litig.*, 587 F. Supp. 2d 513, 537 (S.D.N.Y. 2008) ("buyers and sellers of commodities can sue a trader who was not their counterparty only under section 22(a)(1)(D)").  Nonetheless, there is a textual argument that the statute requires a plaintiff proceeding under subsection 22(a)(1)(D) to be the counterparty of the defendant.  Subsection (a)(1)(D) provides a private right of action to persons "who purchased or sold a contract referred to in subparagraph (B) hereof."  7 U.S.C. § 25(a)(1)(D).  In turn, subsection (B) provides a cause of action for any person "who made through such person any contract of sale of any commodity for future delivery . . . ."  7 U.S.C. § 25(a)(1)(B).  The "such person" referred to in subsection (B) is the defendant.  The Non-Fixing Banks have not made this argument, and the Court does not resolve it.

considered a "domestic transaction," rather than a transaction on a "domestic exchange," Plaintiffs contend it is distinguishable.

Plaintiffs' argument is unconvincing, and likely foreclosed by the Second Circuit's recent decision in *Tower Research Capital*. As *Tower Research Capital* explained, the Supreme Court's reference to transactions on a "domestic exchange" is rooted in the language of the Exchange Act, which applies to deceptive conduct "in connection with the purchase or sale of any security registered on a national securities exchange . . . ." 15 U.S.C. § 78j(b); *Tower Research Capital*, 890 F.3d at 67. The language of the CEA is different. Section 22 does not reference an exchange. Instead, it creates a private right of action for four categories of injured persons: plaintiffs who "(A) received trading advice from Defendants for a fee; (B) traded through Defendants or deposited money with Defendants in connection with a commodities trade; (C) purchased from or sold to Defendants or placed an order for purchase or sale of a commodity through them; or (D) [suffered actual damages resulting from] certain market manipulation activities in connection with the purchase or sale of a commodity contract."[28] *Starshinova v. Batratchenko*, 931 F. Supp. 2d 478, 487 (S.D.N.Y. 2013) (citing 7 U.S.C. § 25(a)(1)(A)-(D)); *but see LIBOR I*, 935 F. Supp. 2d at 696 (analyzing the substantive provision of the CEA underlying plaintiff's claims and concluding that a commodities transaction is domestic under the CEA if it "involves (1) commodities in interstate commerce or (2) futures contracts traded on domestic exchanges").

---

[28] Where a plaintiff alleges he traded on a domestic exchange, this distinction is unlikely to be of practical significance. A transaction on a "domestic exchange" is almost certain to be a "domestic transaction" within the meaning of *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60 (2d Cir. 2012).

But, in any event, nothing in *Parkcentral* limits the Court's holding to "domestic transactions," as Plaintiffs insist.[29] *Parkcentral* recognizes the possibility that a claim based on a technically "domestic" transaction can be so rooted in foreign conduct that the claim itself is an extra-territorial application of the statute. *See Parkcentral*, 763 F.3d at 215-16. As *Parkcentral* explained, the motivating concern in *Morrison* was that application of U.S. securities laws to foreign conduct where it was not intended by Congress is likely to run the risk of incompatibility with foreign law and unduly intrude upon the sovereignty of foreign nations. *Id.* at 215-16. A claim may be based on a transaction that is technically "domestic" or that occurred on a "domestic exchange" and nonetheless raise this concern. *Id.*; *see also id.* at 214 ("If a domestic transaction in a security is not only necessary but also sufficient to justify the application of § 10(b) to otherwise foreign facts . . . [t]he mere fact that the plaintiffs based their suit on a domestic transaction would make § 10(b) applicable to allegedly fraudulent conduct anywhere in the world."). The facts in *Morrison* did not require the Supreme Court to address this scenario because in that case the underlying bad conduct was primarily domestic, while the transaction was foreign. Like *Parkcentral*, this case raises the opposite fact-pattern: a domestic transaction and a claim based primarily on foreign bad acts. But nothing in *Parkcentral* indicates its discussion was limited to "domestic transactions;" rather, the Court referred to "a domestic transaction or *listing*," *id.* at 216, and held "that, while [*Morrison*] unmistakably made a domestic securities transaction (or transaction in a domestically listed security) necessary . . . , such a transaction is not alone sufficient to state a properly domestic claim under the statute," *id.* at 215.

---

[29]     Plaintiffs do not contend that *Parkcentral* is distinguishable because it analyzed the Exchange Act and not the CEA. As discussed below, the same concerns apply whether the statute at issue is the Exchange Act or CEA, and there is nothing in the CEA that indicates Congress intended to include within its reach a broader class of predominantly foreign transactions than are covered under the Exchange Act.

Taking a step back, adopting Plaintiff's understanding of *Morrison* would raise exactly the same concern that animated the Circuit's decision in *Parkcentral.* Under Plaintiffs' reading, a course of conduct that is entirely foreign—undertaken by foreign actors, executed in foreign transactions, and intended to have an impact primarily on foreign interests—could be deemed domestic, and subject to U.S. law, simply because it had an effect on a U.S.-based transaction. *See Parkcentral*, 763 F.3d at 215 (explaining that such a holding would "seriously undermine" the presumption against extraterritoriality). *Morrison*'s most colorful passage addresses this approach directly: "the presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever *some* domestic activity is involved in the case." *Morrison*, 561 U.S. at 266. In sum, the Court finds that *Parkcentral* applies to claims under the CEA. *Accord In re North Sea Brent Crude Oil Futures Litig.*, 256 F. Supp. 3d at 309-10 (*Parkcentral* applies to CEA claims).

Applying *Parkcentral*, the Court concludes that Plaintiffs' CEA claims against Barclays, Standard Chartered, and BNP Paribas are impermissibly extraterritorial. The TAC's factual allegations against these three defendants have only an attenuated connection to Plaintiffs' domestic transactions. The factual allegations against Barclays relate to thirteen chat conversations in which Barclays traders shared confidential information or coordinated trading strategies with traders at Deutsche Bank. *See* Declaration of Michael S. Feldberg ("Feldberg Declr.") (Dkt. 313) Ex. C. The chat messages involve traders in London and Singapore. It is entirely speculative whether the silver products discussed in the chat messages include COMEX or CBOT futures or options; Plaintiffs have made no factual allegations from which the Court could infer that these traders manipulated COMEX- or CBOT-traded products directly. Plaintiffs also do not allege they were the counterparties to any of the manipulative conduct

described in the chats. The only connection between the chats and Plaintiffs' domestic transactions appears to be the alleged "ripple" effect of the manipulation referenced in the chats on the COMEX and CBOT markets. Even that potential impact on Plaintiffs' domestic transactions is not free from doubt. Plaintiffs do not allege the frequency of the Non-Fixing Banks' manipulation, the persistence of the impact of episodic manipulation in the relevant silver market (much less in related silver markets), or that Plaintiffs traded close in time to the alleged manipulation (other than a few occasions on which the chats took place on the same day as Plaintiffs traded).

What has been said about Barclays is true for Standard Chartered and BNP Paribas as well: there are only eight chat messages involving BNP Paribas traders, *see* BNP Paribas Supp. Mem. (Dkt. 306) at 1, and no indication that any of the misconduct discussed in the chats involved COMEX- or CBOT-traded products, *see* Declaration of Joshua A. Goldberg ("Goldberg Declr.") (Dkt. 314) Ex. A. For example, the most egregious message involving BNP Paribas states: "CANT WAIT FOR ANOTHER DAY WHEN WE GET THE BULLDOZER OUT THE GARAGE ON GOLD OR SIL, THEY ARE MY FIRST PORT OF CALL HAHAHAHAHAH LET ME KNOW WHEN THEY START QUOPTING [sic] 10K'S THO." TAC ¶ 300. But Plaintiffs do not allege that the trader ever, in fact, took his "bulldozer" out of the garage relative to silver, and if he did, in which silver market, or when the alleged manipulation occurred. *See* TAC ¶¶ 286-90; *see also* Declaration of Hannah Chouikhi ("Chouikhi Declr.") (Dkt. 317) Ex. A. The chats describe sharing information, *see* TAC ¶¶ 286-90, but do not describe any particular manipulative trading tactics or reference particular silver products (much less domestic silver products). The only inference that can be gleaned from the messages is that BNP Paribas and Standard Chartered traders, like Barclays traders, engaged in

what appears to be wrongful conduct abroad. How or whether that conduct affected any domestic transactions, let alone Plaintiffs' specifically, is entirely speculative.

Plaintiffs do not respond directly to these arguments. Instead, they cite to three categories of evidence that are either inapposite under *Parkcentral* or too general to be persuasive. *See* Opp'n at 40. Although Plaintiffs claim the "defendants" (which defendant is not specified) traded COMEX futures during the class period, they provide no factual allegations to substantiate this claim or to link Defendants' COMEX trades to the manipulation at issue in their CEA claims. Plaintiffs contend the "defendants" "conspired to illegitimately increase profits on their silver trading positions," but the paragraphs of the TAC cited for support concern the Silver Fixing. *See* Opp'n at 40 (citing TAC ¶¶ 14, 164-67, and 172-75). For the reasons given above (at length), Plaintiffs' allegations regarding the Non-Fixing Banks' involvement in a conspiracy to manipulate the Silver Fixing are implausible.[30] Next, Plaintiffs focus on the domestic trading operations maintained by UBS, Barclays, BNP Paribas, and Standard Chartered during the class period. The TAC includes no factual allegations that U.S.-based traders from Barclays, BNP Paribas, or Standard Chartered were involved in the manipulation alleged in the TAC; U.S. based traders are included in none of the referenced chats. Finally, Plaintiffs rely on the chats themselves, and a blanket reference to a "conspiracy," but, for the reasons discussed above, the chats involving Standard Chartered, Barclays, and BNP Paribas do not reference manipulation connected to the Plaintiffs' domestic transactions. Furthermore, the existence of a conspiracy writ large does not connect these Plaintiffs to the more specific allegations of CEA violations.

---

[30] The Fixing Banks did not argue that Plaintiffs' Silver Fixing-related claims were impermissibly extraterritorial. Because the Silver Fix has a direct and persistent correlation to the price of domestic silver futures, *see* TAC ¶ 137, and Plaintiffs contend that the Fixing Banks profited from their manipulation of the Silver Fixing by trading in the silver futures markets (among other markets), Plaintiffs' claims against the Fixing Banks involve bad acts with a significantly closer connection to domestic transactions.

By contrast, there are sufficient facts alleged (although barely) for the Court to find that Plaintiffs' CEA claims against UBS and BAML are plausibly domestic. Although the chats involving UBS and BAML do not specifically reference manipulation of COMEX or CBOT-futures (or any domestic market for that matter), recent enforcement actions by the CFTC and Department of Justice indicate that UBS and BAML traders manipulated the domestic markets in which Plaintiffs traded. These allegations are sufficient—at this stage—to allege that Plaintiffs claims are not "so predominantly foreign as to be impermissibly extraterritorial." *Parkcentral*, 763 F.3d at 216. On January 29, 2018, UBS settled the CFTC's allegations that UBS traders manipulated the price of precious metals futures contracts, including silver-denominated futures on COMEX, the same platform allegedly used by the Plaintiffs. *See* UBS CFTC Order at 2-3. The conduct alleged in the CFTC's accompanying order is similar to the conduct alleged in the TAC, and the Order appears to quote some of the same chat messages. *See* UBS CFTC Order at 5-6; *see also* Letter from Eric J. Stock (Dkt. 347) at 2 (acknowledging on behalf of UBS that the UBS CFTC Order describes some of the same incidents as in the TAC). The conduct alleged in the Order includes "spoofing" futures markets, coordinated trading, and coordinated price manipulation intended to trigger stop-loss orders. *See* UBS CFTC Order at 3 ("Generally, the Traders placed relatively large bids or offers in the futures market with the intent to cancel before execution."), 4 (describing incident in which a UBS trader colluded with a trader at another bank to trigger a stop-loss order in the precious metals futures market).[31] Similarly, the Department of Justice indicted two BAML traders who are alleged to have "spoofed" COMEX futures between

---

[31]    The CFTC also brought a civil action against Stamford, Connecticut-based UBS trader, Andre Flotron. The CFTC's complaint alleges that Flotron manipulated the COMEX silver futures market on an "ongoing basis" between 2008 and 2013. Dkt. 344 Ex. 4. Although the CFTC's allegations are just that, the fact remains that they are supported by factual allegations that describe manipulation of domestic transactions by UBS traders, at times in the United States.

2010 and 2014. *See* BAML Complaint at 1-2. The spoofing alleged by the Department of Justice includes silver futures. BAML Complaint ¶ 15. This conduct, involving manipulation of the domestic markets using the same tactics and involving some of the same individuals as alleged in the TAC, is sufficient at this stage to establish that Plaintiffs' claims against UBS and BAML are not "predominantly foreign."

### C. Failure to State a Claim

Regardless of whether any of Plaintiffs' CEA claims pass muster under *Parkcentral*, however, they fail because Plaintiffs do not plausibly allege the elements of a claim under the CEA against any of the Non-Fixing Banks. Section 9(a)(2) of the CEA makes it unlawful for "[a]ny person to manipulate or attempt to manipulate the price of any commodity in interstate commerce." 7 U.S.C. § 13(a)(2). There are four elements to a manipulation claim. *See Silver I*, 213 F. Supp. 3d at 566. "Plaintiffs must allege that: '(1) Defendants possessed an ability to influence market prices; (2) an artificial price existed; (3) Defendants caused the artificial prices; and (4) Defendants specifically intended to cause the artificial price.'" *Id.* (quoting *In re Amaranth Nat. Gas Commodities Litig.*, 730 F.3d 170, 173 (2d Cir. 2013)) (additional citations omitted). In addition, Plaintiffs must allege "actual damages resulting from" the alleged manipulation. *In re Amaranth Nat. Gas. Commodities Litig.*, 269 F.R.D. 366, 378 (S.D.N.Y. 2010) (quoting 7 U.S.C. § 25(a)(1)(D)). The actual damages requirement is often referred to as "CEA standing." *See In re LIBOR-based Fin. Instruments Antitrust Litig.*, 962 F. Supp. 2d 606, 620 (S.D.N.Y. 2013) ("*LIBOR II*"). Although described as an aspect of standing, CEA standing is actually an element of the substantive cause of action. *Total Gas & Power N. Am., Inc.*, 889 F.3d at 112. Market manipulation claims sounding in fraud must be pleaded with particularity in

accordance with Rule 9(b) of the Federal Rules of Civil Procedure.[32] *See LIBOR I*, 935 F. Supp. 2d at 713-14; *Silver I*, 213 F. Supp. 3d at 565.

The TAC asserts two theories of market manipulation. The more prominent theory is that the Non-Fixing Banks conspired with the Fixing Banks to suppress the Silver Fixing. *See* TAC ¶¶ 398, 401-02. The TAC also alleges that the Non-Fixing Banks manipulated the silver markets through a campaign of episodic market manipulation. *See* TAC ¶¶ 399-402. For the reasons the Court has already discussed, the alleged connection between the Non-Fixing Banks and a conspiracy to suppress the Silver Fixing is implausible. *See supra* at 12-20. To summarize briefly: the chat messages referencing the Silver Fixing describe bilateral and unilateral attempts to manipulate the Silver Fixing and are inconsistent with a broader conspiracy to suppress the Fix Price; Plaintiffs' econometric analysis does not tie the Non-Fixing Banks to a conspiracy to suppress the Fix Price;[33] and, the manipulative conduct referenced in the chat messages was profitable to the traders involved regardless of whether they also were part of a conspiracy to suppress the Fix Price. Accordingly, because Plaintiffs have not plausibly linked the Non-Fixing Banks to a conspiracy to suppress the Silver Fixing, Plaintiffs also have not plausibly alleged a CEA claim based on that theory.

Plaintiffs have not plausibly alleged that they suffered actual damages from episodic manipulation of the silver markets. Plaintiffs' allegations of the impact of Defendants' manipulation on prices in the COMEX futures market (or CBOT futures market) depend almost entirely on an econometric analysis of the impact of the Silver Fixing on the price of COMEX

---

[32]     The Court need not determine whether Plaintiffs' claims sound in fraud because Plaintiffs' allegations fail under either Rule 8 or Rule 9(b).

[33]     The TAC includes a few charts that show a few parallel quotes on a few days by BNP Paribas and UBS. TAC ¶¶ 181-83. While the parallel quotes could be evidence of collusion, it is also possible that they are just the result of random chance.

futures. *See* Opp'n at 36 (citing econometric analysis of the impact of the Silver Fixing on other markets contained in TAC ¶¶ 143-98). Stripped of this analysis—which is irrelevant to Plaintiffs' episodic manipulation theory—the TAC alleges essentially no connection between Defendants' manipulative conduct and trades by the Plaintiffs. Plaintiffs have made no factual allegations of the frequency of episodic manipulation or the predicted impact of episodic manipulation on silver prices. For similar reasons, and even assuming Plaintiffs alleged actual damages, they have not alleged a connection between the alleged episodic market manipulation by the Non-Fixing Banks and the existence of artificial prices in the COMEX silver futures market.

In order to plead "actual damages" under Section 22, Plaintiffs must make "a showing of actual injury caused by the violation." *CHF LIBOR*, 277 F. Supp. 3d at 570 (quoting *Harry v. Total Gas & Power N. Am., Inc.*, 244 F. Supp. 3d 402, 412-13 (S.D.N.Y. 2017)) (additional citation omitted). As the Second Circuit recently explained in *Total Gas*, the relative difficulty of pleading actual damages depends on the predictability of the impact of the defendant's manipulation on a market and the connection between that market and the plaintiff's trades. 889 F.3d at 112 ("In some contexts, the alleged facts can be quite general statements . . . . Suffice it to say that the more overlap [between a plaintiff's trades and a defendant's manipulation], the more plausible a defendant's effect on a plaintiff will be."); *see also id.* at 113 ("When a plaintiff seeks to make plausible a connection between distinct contract types traded on distinct exchanges without a formal rule-based price linkage she will have to plead with greater detail."). Although this statement is a truism to a degree, it is borne out by other benchmark-fixing cases in this district. In *LIBOR I*, Judge Buchwald concluded that allegations of persistent suppression of the LIBOR benchmark were sufficient to allege actual injury in LIBOR-denominated assets. *See*

*LIBOR I*, 935 F. Supp. 2d at 718-19; *see also Silver I*, 213 F. Supp. 3d at 564-65; *In Platinum & Palladium Antitrust Litig.*, 2017 WL 1169626, at *29 (concluding plaintiffs adequately alleged actual damages in a persistent suppression case by cross-referencing the days on which they traded with a preliminary list of "suppression[] dates"); *Sullivan*, 2017 WL 685570, at *31. The *LIBOR* plaintiffs were not required to identify specific manipulative transactions (or transactions in which they suffered an injury) because the persistent suppression they alleged would necessarily have had an impact on LIBOR-linked contracts sold during the suppression period. *Id.* Nor could plaintiffs identify with precision their injury, because information regarding the "true," *i.e.*, un-manipulated, level of LIBOR was known only to the defendants, if at all. *Id.* at 716, 718-19; *see also id.* at 719 n.17. In each of these cases the impact of the defendant's manipulation was well-defined, and the plaintiffs traded in the same or closely linked markets.

Alleging actual damages in an "episodic manipulation" case is more difficult. As the name suggests, episodic manipulation does not warp market forces continuously throughout the class period or in a predictable manner. *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 27 F. Supp. 3d 447, 461 (S.D.N.Y. 2014) ("*LIBOR III*") ("[S]ince LIBOR was allegedly artificial only for discrete days during the Class Period, by their own reckoning, plaintiffs may have transacted on many days when LIBOR was 'true.'"); *see also CHF LIBOR*, 277 F. Supp. 3d at 570-71 (finding plaintiff did not allege actual damages from episodic manipulation because the complaint lacked "any details of his [the plaintiff's] transactions [because] it is just as likely he was a beneficiary of defendants' misconduct—substantially reducing the already questionable likelihood of harm from manipulation on the dates of [plaintiff's] transactions"). Manipulative trading strategies like "spoofing" or triggering stop-loss orders depend for their profitability on a reversion of prices to the market-level, meaning that the period of artificiality may be brief.

Market liquidity is also relevant, because the impact of manipulation in highly liquid markets (like the silver markets, *see* TAC ¶ 125), is likely to be less than the impact of manipulation in less liquid or illiquid markets. Because episodic manipulation—unlike persistent suppression— may move the market in either direction, it is not always clear that every trader who was affected by the manipulation was harmed; "[o]ne trader cannot ride the wave of another trader's scheme and then drag the manipulator to court for having caused her good fortune." *Total Gas & Power N. Am., Inc.*, 889 F.3d at 112; *LIBOR III*, 27 F. Supp. 3d at 461 ("Moreover, because the manipulation was allegedly varying in direction, there may be some days when plaintiffs were actually *helped*, rather than harmed, by the alleged artificiality, depending on their position in the market."). While *Total Gas* primarily concerned the linkage (or lack thereof) between the manipulated market and the market in which the plaintiffs traded, there is a rough analogy between the "formal rule-based price linkage" missing in *Total Gas* and a defined and predictable market impact from the manipulative tactics alleged in the TAC. Where, as in this case, plaintiffs do not plausibly allege a predictable and persistent market impact from manipulation, relatively more detailed allegations are required.[34] *Cf. Total Gas & Power N. Am., Inc.*, 889 F.3d at 113 ("When a plaintiff seeks to make plausible a connection between distinct

---

[34] That is not to say that Plaintiffs must necessarily allege "the specific transactions on which they were injured." *See FOREX III*, 2016 WL 5108131, at *22 (rejecting this argument). Although information regarding particular transactions is a straightforward method of pleading actual damages, it is not the only means of doing so. Among other things, statistical analysis of market prices and quotes or allegations based on government enforcement actions may suffice to allege the expected impact of a manipulative tactic on a given market and the expected frequency of manipulation. As explained below, in this case Plaintiffs have made no factual allegations regarding the frequency of manipulation, their trading practices in the silver markets (other than a list of days included in Appendix D to the TAC on which they traded and on which they allege there was suppression of the Fix Price), or the expected impact of particular manipulative tactics on the market. At bottom, Plaintiffs' theory appears to be that the Court can infer from the chat messages and government enforcement proceedings both that the chat messages are the "tip of the iceberg" and, that given this presumed frequency of manipulation, Plaintiffs must have been injured.

contract types traded on distinct exchanges without a formal rule-based price linkage she will have to plead in greater detail.").

As in *LIBOR III*, Plaintiffs have alleged a "conceivable" theory of actual damages, but have not alleged a theory that is "plausible" and survives a motion to dismiss. *See id.* There are no facts alleged in the TAC that connect Barclays's, Standard Chartered's or BNP Paribas's episodic manipulation to prices of COMEX futures at all, let alone to Plaintiffs' alleged trades. It is a closer case as to UBS and BAML because, buttressed by the CFTC settlements, Plaintiffs are at least able to connect UBS and BAML to manipulation of the COMEX futures market generally. Nonetheless, the Court finds the numerous inferences required to connect UBS's and BAML's manipulative conduct to Plaintiffs' alleged injury (if they suffered any injury at all) to be too attenuated and speculative to survive a motion to dismiss.

There are no facts alleged in the TAC to connect Barclays to artificial prices in the COMEX silver futures market, much less to an injury suffered by the Plaintiffs.[35] To be sure, there are adequate allegations that Barclays traders engaged in misconduct, *see* TAC ¶¶ 263-64, 291-96, but it is entirely guesswork to conclude that those traders' misconduct included COMEX silver futures or that their misconduct had any effect in the futures market. None of the chat

_____

[35] The shortcomings in the TAC also go to the second and third elements of a CEA manipulation claim: whether artificial prices existed and whether they were caused by the defendants. As the Court has previously noted, the elements of a CEA claim are closely related. *See Silver I*, 213 F. Supp. 3d at 566. Thus, even if the Court were to find that Plaintiffs alleged actual damages, their claims would fail as to BNP Paribas, Standard Chartered, and Barclays, both because those Defendants' conduct is entirely extraterritorial and because the TAC does not allege that these Defendants caused artificial prices in the COMEX silver futures markets.

For this reason the Court rejects Plaintiffs' contention that the adequacy of the TAC's allegations of actual damages was raised improperly by notice of supplemental authority. *See* Dkt. 356 at 1 n.1. Although it is true that the Non-Fixing Banks (inexplicably) did not argue in their opening brief that Plaintiffs had failed to allege actual damages, they raised the closely related issues of whether Plaintiffs had suffered an injury in fact under Article III and whether Plaintiffs alleged the elements of a claim for CEA manipulation. *See Total Gas & Power N. Am., Inc.*, 889 F.3d at 111 ("The 'actual injury' analysis looks very similar to the 'injury in fact' analysis used to determine constitutional standing."). To the extent the issue was not clearly raised by the Non-Fixing Banks' initial papers, the Court provided Plaintiffs with an opportunity to file a response. *See* Dkt. 355.

messages involving Barclays indicates the traders planned to manipulate COMEX futures. Plaintiffs' theory appears to be that manipulation of any silver-denominated product that is sold anywhere in the world would necessarily influence the price of COMEX silver futures. *See* Opp'n at 36. Acknowledging that the various silver-denominated financial markets are linked, as Plaintiffs' econometric analysis demonstrates, does not plausibly lead to the conclusion Plaintiffs urge—that episodic market manipulation in unspecified silver products, with no factual allegations related to the frequency or magnitude of the manipulation, necessarily caused persistent artificiality in prices on COMEX and CBOT. Even assuming Plaintiffs' allegations were sufficient to allege that at some point in time Barclays caused artificial prices in the COMEX or CBOT silver markets, the TAC does not allege the direction of the artificiality, *see Total Gas & Power N. Am., Inc.*, 244 F. Supp. 3d at 416, or that the artificiality can be connected to trades by the Plaintiffs.

The chat messages involving BNP Paribas and Standard Chartered also do not support an inference that their misconduct caused Plaintiffs actual damage. Plaintiffs do not allege plausibly that BNP Paribas or Standard Chartered caused artificiality in the COMEX silver markets, much less explain how that artificiality affected trades by the Plaintiffs. The chat messages involving BNP Paribas and Standard Chartered describe various types of misconduct. *See* TAC ¶¶ 236, 297-99, 300, 306-07, 310. But none of the chat messages appears to reference silver futures or describes a transaction from which the Court could infer any effect at all on the price of COMEX silver futures. Assuming that Plaintiffs had adequately alleged artificiality, it would still require additional logical leaps to connect that artificiality to a negative impact on specific trades by the Plaintiffs. Tellingly, to support their allegations of a connection between manipulative conduct by BNP Paribas and their injury, Plaintiffs cite only the econometric

analysis of the impact of suppression of the Silver Fixing, which is entirely inapposite. *See* Opp'n at 31 n.32 (citing TAC ¶¶ 125-98), 32 (citing TAC ¶¶ 143-98); *see also* Dkt. 356 at 2-3 (citing to Appendix D to the TAC (a list of days of alleged Fix-manipulation)).

Plaintiffs' claims against BAML (and UBS, as discussed below) present a closer case because the DOJ Complaint and CFTC orders make it plausible that BAML and UBS manipulated the COMEX futures markets. The chats contained in the TAC itself are of limited evidentiary value. Only six chat messages involve BAML traders and most do not reference silver futures. It is speculative to infer that the traders were discussing manipulation of COMEX products. Nonetheless, the Department of Justice's complaint charges BAML traders with spoofing of COMEX silver futures between 2010 and 2014, and the Department's Complaint is supported by a detailed analysis of spoofed orders placed by the traders on specific days during the class period. BAML Complaint ¶ 18-19. Accepting that those allegations are sufficient for the Court to conclude that Plaintiffs have alleged the existence of artificial prices in the COMEX silver futures markets caused by BAML, the series of inferences required to connect that artificiality to actual damage suffered by Plaintiffs is collectively implausible. First, the Court would be required to assume that spoofing—or other manipulative conduct that is entirely unalleged—occurred on more occasions than are alleged in the Department of Justice complaint. Next, the Court would be required to infer that the artificiality caused by these spoofs altered market prices for an unspecified period of time. The Court would then need to infer a connection between the artificiality-of-unknown-duration and a specific trade by Plaintiffs. And finally, the Court would need to infer that this artificiality moved the market *against* Plaintiffs' position. In isolation the Court might draw any of these four inferences in Plaintiffs' favor, but collectively they amount to rank speculation.

Plaintiffs' allegations against UBS require the Court to draw a similar series of collectively implausible inferences. To begin with, Plaintiffs' theory requires the Court to infer that the manipulation described in the chat messages occurred in the COMEX silver futures markets, despite the fact that the chat messages do not indicate what financial instruments (or markets) were the subject of manipulation. *See* TAC ¶¶ 252 (coordinating trading to maximize market impact), 256-64 (describing manipulative tactics with colorful names). The CFTC proceedings against UBS and the Department of Justice's criminal complaint against a UBS trader who was acquitted make it plausible that at least some of the conduct referenced in the chat messages occurred in the COMEX futures market or that UBS traders engaged in similar behavior affecting the COMEX futures market. *See* TAC ¶¶ 342-44; UBS CFTC Order at 2-3. But, again, a plausible allegation that UBS manipulated the COMEX silver futures market is insufficient to allege plausibly that UBS caused Plaintiffs to suffer actual damages. Despite the fact that the chat messages are time-stamped and that the CFTC UBS Order and the criminal complaint identify specific dates and times on which alleged manipulation occurred, Plaintiffs have made no attempt to connect those identified instances of manipulation to artificial prices at the time of any of their trades.[36] *Cf. LIBOR II*, 962 F. Supp. 2d at 621 ("despite the fact that plaintiffs indisputably have access to their own Eurodollar futures contract trading records, the [complaint] is devoid of any references to particular Eurodollar contracts"); *Total Gas & Power N. Am., Inc.*, 244 F. Supp. 3d at 416 ("[Plaintiffs] have their own trading records, the precise

---

[36]     As noted *supra* note 6, it is possible to cross-reference the chat messages to the list of days in Appendix D on which Plaintiffs allege they traded. A few of the chat messages occurred on the same day as trades by Plaintiffs. But the TAC does not connect the chat messages to any specific manipulative trades or to the same markets in which Plaintiffs traded, and the TAC does not explain whether the impact of market manipulation would have been persistent such that it could have had an impact on market participants other than the counterparties to the manipulated transactions. The fact that Plaintiffs may have traded in the same 24 hour period as traders at the Non-Fixing Banks discussed manipulation of the silver markets is simply too thin a basis for the Court to infer that it is plausible that the traders' employers caused the Plaintiffs actual damages.

trades that are alleged to have been made in an attempt to manipulate prices . . . ."); *CHF LIBOR*, 277 F. Supp. 3d at 571("[Plaintiff] must at minimum provide some details regarding his transactions that are within his knowledge and bear on the plausibility that the alleged manipulation caused actual damage to his trading positions.").  Nor have the Plaintiffs included any other evidence—statistical analyses, discrete examples, or otherwise—to explain the duration and persistence of artificial prices caused by the relevant manipulative tactics so that the Court could plausibly infer that episodic manipulation could injure market participants (other than the counterparties to the manipulative transactions), and that it is more than merely possible that this impact harmed Plaintiffs (rather than benefiting their positions).

In sum, the TAC fails to allege that episodic manipulation by the Non-Fixing Banks caused Plaintiffs any actual damages.  Because Plaintiffs' vicarious liability, aiding-and-abetting, and Rule 180.1 claims rise and fall with Plaintiffs' primary liability theory, those claims fail as well.  Plaintiffs' CEA claims against the Non-Fixing Banks are DISMSSED.

### III.     Unjust Enrichment

For the reasons stated in *Silver I*, Plaintiffs' unjust enrichment claim is DISMISSED.

### IV.     Leave to Amend

Under Rule 15(a) of the Federal Rules of Civil Procedure, "[t]he court should freely give leave" to a party to amend its complaint "when justice so requires."  Fed. R. Civ. P. 15(a)(2).  "Leave may be denied 'for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party.'"  *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007)) (additional citation omitted).  Ultimately, "the grant or denial of an opportunity to amend is within the discretion of the District Court."  *Foman v. Davis*, 371 U.S. 178, 182 (1962).

Plaintiffs have not requested leave to amend, and they have not attached a proposed, fourth amended complaint for the Court's review. Given that Plaintiffs have already amended three times, including based on discovery from Deutsche Bank, and that Plaintiffs have not requested leave to amend, the Court denies leave to amend. Plaintiffs are represented by competent, experienced counsel. If they had the facts necessary to plug the holes that exist in the TAC, the Court is confident those facts would have been included in the pleadings filed to date.

## CONCLUSION

The Non-Fixing Banks' motion to dismiss is GRANTED. Plaintiffs' claims against the Non-Fixing Banks are DISMISSED WITH PREJUDICE. The Clerk of the Court is directed to close the open motion at docket entry 302 and terminate defendants Barclays, Standard Chartered, BNP Paribas, BAML, and UBS from the case.

The remaining parties are directed to appear for a status conference with the Court at **11:00 a.m. on August 24, 2018**. By **August 17, 2018**, the parties must submit a joint letter of not more than 5 pages setting forth a proposed schedule for discovery in this action.[37] The parties are forewarned that the Court will not accept dueling letters; the parties are required to work together to produce a *joint* letter.

**SO ORDERED.**

Date: **July 25, 2018**
     **New York, New York**

**VALERIE CAPRONI**
**United States District Judge**

---

[37] The parties are encouraged to coordinate discovery with the parallel gold fixing case pending before the Court.