UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 05/22/2023
```

------------------------------------------------------------ X
IN RE:                                                       :
                                                             :        14-MD-2573 (VEC)
LONDON SILVER FIXING, LTD.,                                  :        14-MC-2573 (VEC)
ANTITRUST LITIGATION                                         :
                                                             :        OPINION AND ORDER
*This Document Relates to All Actions*                       :
------------------------------------------------------------ X
VALERIE CAPRONI, United States District Judge:

For nearly one hundred years, the daily price of silver bullion was fixed through a

"Walrasian" auction conducted in London by a few silver dealers who comprised an association

known as the London Silver Fixing ("the Fix"); the dealers that participated included Defendants

HSBC and Scotiabank ("Fixing Banks").[1]  Third Am. Compl. ("TAC"), Dkt. 258 ¶¶ 118–19.  As

relevant to this motion, Plaintiffs allege that the Fixing Banks violated the Sherman Act and the

Commodity Exchange Act ("CEA") by manipulating the Fix and trading on their foreknowledge

of the Fix Price.  Defendants have moved for judgment on the pleadings.  Mot., Dkt. 604.  For

the reasons discussed below, the motion for judgment on the pleadings is GRANTED, and the

case is DISMISSED.

## BACKGROUND

The Court assumes the parties' familiarity with the underlying facts and procedural

posture of this case.  To briefly recap the facts most relevant to this motion, the third amended

complaint ("TAC"), which is the operative complaint, alleges that the Fixing Banks conspired to

---

[1]        Claims remain against multiple entities affiliated with Scotiabank and HSBC, including: HSBC Holdings
Plc, HSBC North America Holdings Inc., HSBC U.S.A. Inc., and HSBC Bank (U.S.A), N.A., (collectively
"HSBC"), as well as Scotia Capital (USA) Inc., Scotiabanc Inc., Scotia Holdings (US Inc.), the Bank of Novia
Scotia Trust Company of New York, and the Bank of Nova Scotia (collectively "Scotiabank").

        Deutsche Bank, which had also been a Fixing Bank, settled with Plaintiffs at the outset of the case, and all
claims against it were dismissed.  *See* Order, Dkt. 537.

episodically depress the Silver Fix, which set the benchmark price for London "Good Delivery" silver bars[2] and influenced the price of silver and silver derivatives worldwide.  TAC ¶¶ 2, 124. Plaintiffs also allege that the Fixing Banks improperly traded silver derivates on their advance knowledge of the Fix Price.  *Id.* ¶¶ 4, 164, 211–13; *see also In re: London Silver Fixing, Ltd., Antitrust Litig.* ("*Silver I*"), 213 F. Supp. 3d 530, 546 (S.D.N.Y. 2016).  The Fix occurs at noon London time, well before U.S. markets open.

Plaintiffs sue pursuant to Section 1 of the Sherman Act[3] as well as section 6(c)(1) and section 22 of the CEA.[4]  *See, e.g.*, TAC ¶¶ 382–95, 408–10, 413.  After nearly five years of litigation, only claims regarding Fix-related manipulation against two Fixing Banks, Scotiabank and HSBC, remain.[5]  *See In re London Silver Fixing, Ltd., Antitrust Litig.* ("*Silver II*"), 332 F. Supp. 3d 885, 890 (S.D.N.Y. 2018).

In relevant part, the TAC analyzes publicly-available data to provide a factual basis from which the Court could infer that Defendants conspired to suppress periodically the Fix price of silver.  *See, e.g.*, TAC ¶¶ 144–56, 401; *see also Silver I*, 213 F. Supp. 3d at 545–46 (describing in detail the TAC's statistical analysis showing volume spikes in trading of silver futures before and during the Silver Fixing).  According to Plaintiffs, this is all circumstantial evidence of improper

---

[2]      London Good Delivery silver bars are silver bullion that is acceptable in the settlement of a Loco London contract where the bullion is physically held in London.  *See* TAC, Dkt. 258 ¶ 124 n.48; Defs. Mem., Dkt. 605 at 27 n.13 (citing *About Good Delivery*, LBMA, https://www.lbma.org.uk/good-delivery/about-good-delivery (last visited May 18, 2023)).

[3]      Section 4 of the Clayton Act establishes a private right of action to enforce Section 1 of the Sherman Act. 15 U.S.C. § 15.

[4]      Plaintiffs also assert aiding and abetting claims pursuant to section 13c(a) of the Commodity Exchange Act ("CEA"); they allege that each Defendant aided and abetted section 22(a)(1) violations by other Defendants.  TAC ¶ 409.  In what appears to be a typographical error, Plaintiffs also bring a claim pursuant to section 2(a)(1) of the CEA, which sets forth the jurisdiction of the Commodity Futures Trading Commission.  *Id.* ¶ 405.

[5]      Plaintiffs have withdrawn their claims regarding manipulation in the physical silver market following the Second Circuit's decision in *In re Platinum and Palladium Antitrust Litigation* ("*Platinum*"), 61 F.4th 242 (2d Cir. 2023).  Pls. Platinum Letter, Dkt. 617 at 2 n.1.

trading by the Fixing Banks to profit from their advance knowledge of the Fix Price to the detriment of others who were trading silver derivatives at that time. *See* TAC ¶¶ 174, 199; *see also Silver I*, 213 F. Supp. 3d at 545–46.

### I.  Procedural History

The Court has previously decided two motions to dismiss directed at the second and third amended complaints. In *Silver I*, the Court held that Plaintiffs' Fixing-related allegations contained in the Second Amended Complaint, which alleged substantially similar facts to those presently at issue, adequately, albeit barely, stated claims for violations of the Sherman Act and the CEA. *See* 213 F. Supp. 3d at 550, 564–65. In *Silver II*, the Court dismissed Plaintiffs' claims against a group of banks that were not involved in the Fix, noting that Plaintiffs were indirect, "umbrella" purchasers who did not directly transact with the non-Fixing Banks. *See* 332 F. Supp. 3d at 890, 926.

Following recent developments in Second Circuit caselaw, Defendants moved for judgment on the pleadings, arguing that Plaintiffs do not have standing to assert their CEA or antitrust claims and, even if they do, Plaintiffs' CEA claims are impermissibly extraterritorial.[6] *See* Defs. Mem., Dkt. 605 at 1. The Court has not previously decided these questions with respect to Plaintiffs' claims against the Fixing Banks in the Third Amended Complaint but has extensively discussed these issues with respect to Plaintiffs' claims generally.[7]

---

[6]      Defendants previously filed motions for judgment on the pleadings on February 28, 2022, Mot., Dkt. 584, and September 30, 2022, Mot., Dkt. 600. The Court denied both motions without prejudice and with leave to refile in light of the Second Circuit's then-recent decisions in *Gamma Traders – I LLC v. Merrill Lynch Commodities, Inc.*, 41 F.4th 71 (2d Cir. 2022), and *Laydon v. Coöperatieve Rabobank U.A.*, 51 F.4th 476 (2d Cir. 2022), *amended* 55 F.4th 86 (2d Cir. 2022), respectively. *See* Order, Dkt. 599; Order, Dkt. 603.

[7]      To the extent that the Court's prior rulings are relevant to the current motion, it may appropriately revisit its decision in light of intervening changes in the governing law. *See Aviles v. S&P Glob., Inc.*, No. 17-CV-2987, 2020 WL 1689405, at *3 (S.D.N.Y. Apr. 6, 2020).

3

The portion of the TAC focused on the Fixing Banks' alleged manipulation of prices of silver derivatives via the Fix substantively overlaps with the Second Amended Complaint's allegations regarding Defendants' alleged conspiracy to manipulate the Fix.  Those claims were discussed at length in *Silver I*; the Court noted that it was "extremely skeptical that *all* market participants who sold silver or silver instruments on alleged manipulation days" had sufficiently alleged proximate causation to "be able to move forward with their claims."  *Silver I*, 216 F. Supp. 3d at 555 (citing *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 779 (2d Cir. 2016)).  The Court deferred further analysis of the proximate cause issue to the class certification stage, however, to permit discovery on how long the anticompetitive effect of Defendants' alleged conduct persisted and, by extension, the days on which Plaintiffs could plausibly establish that they had been harmed by Defendants' conduct.  *See id*.

In *Silver II*, the Court discussed but did not decide whether Plaintiffs' claims against the Fixing Banks alleged sufficient domestic conduct by Defendants to be cognizable under the CEA.  The Court noted, however, that the Fixing Banks' alleged manipulation had a "closer connection to domestic transactions" than conduct by the non-Fixing Banks, which was impermissibly extraterritorial.  *Silver II*, 332 F. Supp. 3d at 919 n.30 (noting that "the Silver Fix has a direct and persistent correlation to the price of domestic silver futures," and that the Fixing Banks had allegedly cashed in on the alleged manipulation "by trading in the silver futures markets . . . .").

Since the Court's decision in *Silver II* nearly five years ago, the Second Circuit has further clarified the requirements for antitrust and CEA standing, as well as the degree of domestic conduct necessary to bring manipulative activity within the scope of the CEA.  Several of these decisions are discussed below.

## II.        Second Circuit Decisions Post-*Silver II*

Through a series of decisions following *Silver II* — primarily, but not exclusively, in other commodities benchmark cases — the Second Circuit has clarified the requirements for private plaintiffs seeking to bring antitrust or CEA claims:  they must plausibly allege facts from which the court can reasonably infer that their alleged injury was directly connected to the challenged conduct, and any claims of unlawful manipulation of a commodities market must include manipulation in the United States to fall within the scope of the CEA.

The first case in the series is *Prime International Trading, Ltd. v. BP P.L.C.* ("*Prime*"), 937 F.3d 94 (2d Cir. 2019).  In *Prime*, the Second Circuit held that section 22 of the CEA, which creates a private right of action, and section 6(c)(1), which prohibits manipulation or deception "in connection with any swap, or a contract of sale of any commodity" do not have extraterritorial reach.  *Id.* at 102–03 (quoting 7 U.S.C. § 9(1)).  The Second Circuit made clear that an allegation that the defendant engaged in a domestic transaction was insufficient, standing alone, to state a claim under the CEA; rather, private plaintiffs are required to allege "domestic — not extraterritorial — *conduct* by Defendants that is violative of a substantive provision of the CEA."  *Id.* at 105.  The *Prime* plaintiffs had not met that requirement because their claims centered around manipulation of a European benchmark price for crude oil that was physically traded in Europe.  *See id.* at 106–07.  That was insufficient, even though the benchmark price was incorporated into the price of oil derivatives traded in the United States.  *See id.*  According to the Circuit, defendants' conduct was "predominantly foreign" and was not covered by the CEA.  *See id.* at 106 (quoting *Parkcentral Glob. Hub Ltd. v. Porsche Auto Holdings SE*, 763 F.3d 198, 216 (2d Cir. 2014)); *see also id.* at 107–08.

The next case in the series is *In re American Express Anti-Steering Rules Antitrust Litigation* ("*Amex*"), 19 F.4th 127 (2d Cir. 2021).  In *Amex*, the Court rejected merchants' theory that they had "umbrella standing" to challenge American Express's ("Amex") "anti-steering rule;" that "rule" prevented merchants that accepted Amex cards from favoring other cards that had lower merchant fees.  *See id*. at 134, 136.  Although plaintiffs did not accept Amex cards, they argued that they were harmed because Amex's anti-steering rule enabled other credit card providers to raise their merchant fees.  *See id*. at 134.  The Second Circuit held that the *Amex* plaintiffs lacked standing because they were not efficient enforcers of antitrust laws.  *See id*. at 139.  Because they did not directly contract with Amex, their injury — higher fees charged by other credit card companies — did not occur at the "first step" of Amex's anticompetitive conduct; merchants who did accept Amex cards were better suited to enforce antitrust laws.  *See id*. at 139–41.

*Schwab Short-Term Bond Market Fund v. Lloyds Banking Group PLC* ("*Schwab II*"), 22 F.4th 103 (2d Cir. 2021), another benchmark case, concerned claims that the banks responsible for setting LIBOR (a London-based benchmark interest rate) had manipulated that benchmark. Building on *Amex*, the Second Circuit again "drew a line between Plaintiffs who transacted directly with Defendants and those who did not."  *Id*. at 115–16 (cleaned up).  Although the LIBOR rate was incorporated into numerous financial instruments, including some traded in the United States, plaintiffs who did not directly transact with the banks that set the LIBOR rate were not efficient enforcers primarily because their injury was not proximately caused by the banks' allegedly anticompetitive conduct.  *See id*. at 114.  The Second Circuit emphasized that plaintiffs' injury was caused by their transactions with third parties and occurred "merely

because of LIBOR's unlimited availability as a reference point for innumerable transactions." *Id*. at 117.

In *Laydon v. Coöperatieve Rabobank U.A.*, 55 F.4th 86 (2d Cir. 2022), the plaintiffs claimed that the defendants violated CEA by manipulating the Yen-LIBOR rate, a London-based benchmark for lending Yen outside of Japan; plaintiffs alleged that manipulated rate influenced the Euroyen TIBOR rate that underlay futures the plaintiffs traded.  *See id*. at 92–93.  The Second Circuit held that the defendants' scheme had only an "attenuated" connection to the plaintiffs' alleged injury, which stemmed from the impact of a "distorted benchmark rate" on "the market's perception of the value of Plaintiffs' . . . futures contract."  *Id*. at 98–99.  The Second Circuit again emphasized that "[s]imply pleading a domestic transaction . . . is not enough," and held that the defendants' conduct, which "occurred almost entirely abroad" and was "predominantly foreign," fell outside the scope of the CEA.  *Id*. at 96–97.  *Laydon* also held that the plaintiffs' theory of causation was too attenuated to confer antitrust standing because defendants neither sold nor controlled plaintiffs' futures contracts, rendering plaintiffs indirect victims who suffered only speculative harm from defendants' conduct.  *See id*. at 98–99.

The next in the series is *Gamma Traders – I LLC v. Merrill Lynch Commodities, Inc.* ("*Gamma Traders*"), 41 F.4th 71 (2d Cir. 2022).  In *Gamma Traders*, plaintiffs alleged that defendants violated the CEA by spoofing[8] in several precious metals markets, including the market for silver derivatives.  *See id*. at 76.  The Circuit held that plaintiffs failed to establish CEA standing because they failed adequately to allege they were actually injured by defendant banks' allegedly manipulative behavior.  *See id*. at 78.  The court rejected plaintiffs' argument

---

[8]        Spoofing is "a fraudulent practice in which the spoofing traders send false supply and demand signals to the market by placing orders to buy or sell that they never intend to execute."  *Gamma Traders – I LLC v. Merrill Lynch Commodities, Inc.* ("*Gamma Traders*"), 41 F.4th 71, 75 (2d Cir. 2022).

that the relationship of their injury to defendants' conduct could reasonably be inferred based on the high volume of defendants' trades and the fact that plaintiffs traded on the days defendants spoofed the market.  *See id*.  *Gamma Traders* emphasized that the CEA requires plaintiffs plausibly to establish that the allegedly artificial prices caused by the challenged manipulative conduct persisted through the time of plaintiffs' trades.  *See id*. at 80–81 ("Even pleading same-day, post-spoof trades does not justify an inference without any factual allegations to support the inference that the effects of the spoof linger for the remainder of the trading day."  *Id*. at 80.)

Finally, *In re Platinum and Palladium Antitrust Litigation* ("*Platinum*"), 61 F.4th 252 (2d Cir. 2023), another benchmark manipulation case, concerned allegations that the defendant banks ("Platinum Fixing Banks") manipulated the Platinum and Palladium Fix (the "Platinum Fix") in violation of the Sherman Act and CEA.  *See id*. at 254–55.  The Platinum Fix, another Walrasian auction conducted in London, occurred twice daily, the latter of which took place near the opening of U.S. markets.  *See id*. at 254; Defs. Platinum Letter Ex. 1 ("Platinum Third Am. Compl."), Dkt. 618 ¶ 57.  The Fixing Banks allegedly distorted the price of the physical metals by manipulating the Fix price and manipulated the futures markets by "engag[ing] in collusive trading to move the NYMEX market downward."  *Platinum*, 61 F.4th at 263.

The Second Circuit held that plaintiffs who traded in the physical platinum and palladium market but did not directly transact with the Platinum Fixing Banks were not efficient enforcers and, accordingly, lacked standing to bring an antitrust claim.  *See id*. at 259–60.  Plaintiffs who traded platinum and palladium derivatives on the NYMEX, in contrast, did have antitrust standing even though the NYMEX clearinghouse was formally the counterparty to plaintiffs'

trades, not the Platinum Fixing Banks.[9]  *See id.* at 263.  Moreover, because the *Platinum*

plaintiffs had also plausibly alleged that the Platinum Fixing Banks directly manipulated the

futures markets by collusively trading to alter the price of platinum and palladium derivatives on

the NYMEX market and coordinated the scheme from within the United States, the *Platinum*

court also found that defendants' alleged manipulative conduct was sufficiently domestic to

bring their claims within the scope of the CEA.[10]  *See Platinum*, 61 F.4th at 268.

## DISCUSSION

"Judgment on the pleadings is appropriate where material facts are undisputed and where

a judgment on the merits is possible merely by considering the contents of the pleadings."

*Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988) (citation omitted).  "The

standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that of

a Rule 12(b)(6) motion for failure to state a claim."  *Patel v. Contemp. Classics of Beverly Hills*,

259 F.3d 123, 126 (2d Cir. 2001) (citation omitted).  The Court must "accept all factual

allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor."

*Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 305 (2d Cir. 2021) (cleaned up).  In

adjudicating a Rule 12(c) motion, the court examines "the complaint, the answer, any written

documents attached to them, and any matter of which the court can take judicial notice."  *L-7*

*Designs, Inc. v. Old Navy LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (internal quotation omitted).

---

[9]     The Second Circuit reasoned that, given the existence of the clearinghouse, there were no more direct victims than traders on the NYMEX.  *See In re Platinum and Palladium Antitrust Litigation* ("*Platinum*"), 61 F.4th 252, 264–65 (2d Cir. 2023).

[10]     The timing of the Platinum Fixing Banks' trading on the NYMEX is unclear from the various opinions, but it is clear that plaintiffs in that case alleged that the defendant banks engaged in manipulative trading to move the prices of platinum and palladium derivatives on the NYMEX market.

## I.      Plaintiffs Lack Antitrust Standing

 "Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation."  *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters* ("*AGC*"), 459 U.S. 519, 534 (1983) (internal quotation omitted).  Accordingly, a private plaintiff only has standing to bring a Sherman Act claim if he "show[s] (1) antitrust injury, which is injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful, and (2) that he is a proper plaintiff in light of four efficient enforcer factors."  *Schwab II*, 22 F.4th at 115 (internal quotation marks omitted).  If plaintiffs fail to make the requisite showing, the Court must dismiss the case because "[a]ntitrust standing is a threshold, pleading-stage inquiry . . . ."  *Gatt Comm'ns, Inc. v. PMC Assocs., L.LC.*, 711 F.3d 68, 75 (2d Cir. 2013) (internal quotation omitted).

### A.  Plaintiffs Have Not Plausibly Pled an Antitrust Injury

To plead the existence of an antitrust injury, a "plaintiff must identify the practice complained of and the reasons such a practice is or might be anticompetitive."[11]  *Harry v. Total Gas & Power N. Am., Inc.* ("*Total Gas*"), 889 F.3d 104, 115 (2d Cir. 2018) (internal quotation omitted).  The Court must then "identify the actual injury by looking to the ways in which the plaintiff claims it is in a worse position as a consequence of defendant's conduct," and "compare the anticompetitive effect of the specific practice at issue to the actual injury the plaintiff alleges."  *Id*. (cleaned up).  While antitrust standing is generally limited to "those that are participants in the defendants' markets," there is a "narrow exception to the market participant

---

[11]      As Plaintiffs note, Defendants do not dispute that if the alleged conduct occurred, it would constitute unlawful anticompetitive behavior.  *See* Pls. Opp., Dkt. 606 at 19 n.10.

requirement for parties whose injuries are 'inextricably intertwined' with the injuries of market participants." *Id*. at 115–16 (cleaned up).

As discussed in *Silver I*, Plaintiffs' alleged injuries in the silver derivatives market are "'inextricably intertwined' with the Defendants' alleged manipulation of the Fix Price for antitrust standing purposes."[12] 213 F. Supp. 3d at 552.  Plaintiffs lack antitrust standing, however, because the TAC does not adequately trace the alleged harm to Defendants' conduct. "Plaintiffs do not even present evidence that they traded at 'artificial prices'" as required to plead antitrust injury.  *Total Gas*, 889 F.3d at 116.

Plaintiffs' claim that they traded at distorted prices relies on their allegations that they traded on the days Defendants allegedly fixed the Fix and their statistical analyses purportedly demonstrating that artificial prices persisted throughout the trading day.[13]  *See* Pls. Platinum Letter, Dkt. 617 at 4; *see also, e.g.*, TAC ¶¶ 163, 194–98, 330.  The Court previously noted that it was "extremely skeptical" that Plaintiffs could plausibly allege that the anticompetitive effects of Defendants' conduct persisted throughout the trading day in the United States, *Silver I*, 213 F. Supp. 3d at 555, especially because "Plaintiffs' allegations of 'persistence' are in tension with their allegations that the Fixing marked a uniquely dysfunctional period of the trading day," *see id*. at 564–65.  This is precisely what Plaintiffs continue to ask the Court to infer, as they do not allege the timing of their trades or provide any facts to allow the Court plausibly to conclude that

---

[12]     The district court in *In re Platinum and Palladium Antitrust Litigation*, 449 F. Supp. 3d 290 (S.D.N.Y. 2020), similarly held that the injuries of plaintiffs who traded on NYMEX were "inextricably intertwined" with Defendants' "manipulation of the [fix] price for physical platinum and palladium."  *Id*. at 313 n.16.  The Second Circuit did not disturb that conclusion and held that plaintiffs who traded on NYMEX had antitrust standing.  *See Platinum*, 61 F.4th at 263.

[13]     Because the Fix occurred consistently at noon London time, before markets in the United States were open, the relevant trading period is hours after the Fix.  *See* TAC ¶ 149.

the dysfunction in the market caused by alleged manipulation of the Fix persisted through the end of the trading day in the United States. *See* Pls. Opp., Dkt. 606 at 6 (citing TAC ¶¶ 195–98).

Although the Court previously deferred its concerns regarding the duration of the alleged artificial prices to the class certification stage, the Second Circuit has since made clear that this a threshold inquiry. The persistence of anticompetitive effects must be established in the pleadings to the extent that Plaintiffs rely on the argument that they were injured by the persistent effects of the defendants' anticompetitive conduct in an otherwise efficient market. *See Total Gas*, 889 F.3d at 116; *see also Gamma Traders*, 41 F.4th at 81 ("[B]efore proceeding to discovery, it is the plaintiff's burden 'to provide facts sufficient to allege a plausible connection between their trading and [Defendants' misconduct].'" *Id*. (citing *Total Gas*, 889 F.3d at 114).). Plaintiffs' conclusory allegations do not meet that mark.

The TAC sets forth a series of statistical analyses that purport to demonstrate that the manipulation of the Fix caused silver prices in the futures market to be artificial for the rest of the trading day. *See, e.g.*, TAC ¶¶ 195–98. These analyses show, in sum, on days on which there were large price drops during the Fix, the price of silver did not recover to pre-Fixing levels by the close of the trading day in the United States. *See, e.g.*, *id*. ¶ 196; *see also* Pls. Opp. 14–15. These statistical analyses do not control at all for the "exogenous factors [that] affect price movements in most antitrust cases." *Silver I*, 213 F. Supp. 3d at 557.

In *Platinum*, the Second Circuit found that the plaintiffs had antitrust standing because, in addition to manipulating a twice-daily fix (the second of which occurred around the time most markets opened in the United States), the Platinum Fixing Banks "engaged in collusive trading to move the NYMEX market downward" to "profit from futures contracts transactions." 61 F.4th at 263; *see also id*. at 254, 264 n.3; Platinum Third Am. Compl. ¶ 57. Under those

circumstances, it was not a stretch to infer that the plaintiffs, traders on the NYMEX, were harmed by the defendants' manipulative conduct.  *See Platinum*, 61 F.4th at 254.

The gravamen of Plaintiffs' claim is quite different.  Plaintiffs here allege that "Defendants agreed to suppress silver prices, and took advantage of their foreknowledge of the Silver Fixing's outcome by taking large . . . futures positions" — trading that necessarily occurred before markets in the United States were open.[14]  Pls. Opp. at 6 (internal citations omitted).  Unlike the *Platinum* plaintiffs, Plaintiffs here do not allege any manipulative conduct directly in the United States silver derivatives markets that might have injured the putative class.  Furthermore, it was more plausible that the manipulation of the Platinum Fix itself would have affected traders in the United States because the P.M. Fix would have distorted market prices right around the time the markets in the United States opened.  *See* Platinum Third Am. Compl. ¶ 57.

In sum, the TAC does not allege sufficient facts to allow the Court to infer that it is plausible, as opposed to merely possible, that the artificial pricing conditions caused by Defendants' episodic conduct persisted long enough to affect Plaintiffs' trades, regardless of how long after Defendants' manipulative conduct Plaintiffs' trades occurred.  As noted in *Silver II*, the TAC alleges only that the effect of the manipulation of the Fix abated gradually over time. *See, e.g.*, TAC ¶¶ 196, 198.  Because there were undoubtedly other market forces that affected prices in the market on days on which Defendants purportedly manipulated the Fix, those vague

---

[14]     The Court previously dismissed Plaintiffs' claims that Defendants engaged in manipulative trading of silver derivatives as part of a conspiracy to manipulate the Silver Fix, holding that Plaintiffs had alleged, at most, "unrelated, internally inconsistent efforts to manipulate the silver markets episodically."  *In re London Silver Fixing, Ltd., Antitrust Litig.*, 332 F. Supp. 3d 885, 897 (S.D.N.Y. 2018) ("*Silver II*").  The Court further held that "[t]he manipulative techniques described . . . lack a connection to Plaintiffs' theory that the Fixing Banks conspired to depress the Fix Price;" thus, they cannot save Plaintiffs' antitrust claims based on manipulation of the Fix.  *Id.* at 898.  Moreover, the vast majority of the alleged manipulative trading of silver derivatives involved banks other than HSBC and Scotiabank.  *See, e.g.*, TAC ¶¶ 250–60.

allegations are insufficient for the Court to infer that Plaintiffs, in fact, traded "at 'artificial prices.'" *Total Gas*, 889 F.3d at 116.

### B.  Plaintiffs Are Not Efficient Enforcers

Regardless of whether Plaintiffs have suffered an antitrust injury, Plaintiffs lack antitrust standing because they are not efficient enforcers.  "The key principle underlying the efficient enforcer test is proximate cause": a plaintiff must allege a "direct connection between the harm and the alleged antitrust violation." *Platinum*, 61 F.4th at 262–63 (cleaned up).  Courts look to four factors in determining whether a plaintiff is an "efficient enforcer":

> (1) the directness or indirectness of the asserted injury; (2) the existence of more direct victims or the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement; (3) the extent to which the claim is highly speculative; and (4) the importance of avoiding either the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of damages on the other.

*Amex*, 19 F.4th at 138 (internal quotations omitted).  Courts do not assign a fixed weight to any individual factor; rather, "the weight to be given the various factors will necessarily vary with the circumstances of particular cases." *Platinum*, 61 F.4th at 259 (internal quotation omitted).

#### 1.  Plaintiffs' Alleged Injury Is Indirect

Evaluating the directness of an antitrust injury is essentially a proximate cause analysis that hinges on "whether the harm alleged has a sufficiently close connection to the conduct the statute prohibits." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014); *see also AGC*, 459 U.S. at 540 (evaluating directness in light of the "chain of causation" between the asserted injury and the alleged restraint of trade); *Lotes Co., Ltd. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 412 (2d Cir. 2014) (considering, *inter alia*, whether the alleged injury "was within the scope of the risk created by the defendant's wrongful act" or

"anything more than an antecedent event without which the harm would not have occurred" (quoting *CSX Transp., Inc. v. McBride*, 564 U.S. 685, 719 (2011) (Roberts, C.J., dissenting)) (internal alterations omitted)).  "For the purposes of antitrust standing, proximate cause is determined according to the so-called first step rule, under which injuries that happen at the first step following the harmful behavior are considered proximately caused by that behavior." *Laydon*, 55 F.4th at 98 (quoting *Schwab II*, 22 F.4th at 116) (cleaned up).

Plaintiffs argue that they were injured at the first step of Defendants' anticompetitive conduct because there is a direct connection between the Fix Price and the price of silver derivatives, and Defendants' periodic manipulation of the Fix purportedly distorted derivative prices on the days on which Plaintiffs traded.  Pls. Opp. at 22; *see also* Pls. Platinum Letter at 2. Even if the Court found Plaintiffs' allegations sufficiently plausible to credit their argument that the effects of Defendants' periodic anticompetitive conduct persisted in the United States through the unspecified times of Plaintiffs' trades on days on which the Fix was manipulated — and it does not — that would not be enough to establish that Plaintiffs' injury was direct.[15]

Plaintiffs' claims regarding Defendants' manipulative conduct with respect to the Fix focus on the secondary effects of the Fix Price on silver derivatives and, unlike the complaint at

---

[15]    In their initial brief, Defendants argued that Plaintiffs cannot establish that they were directly injured by Defendants' anticompetitive conduct because they do not allege they transacted with Defendants.  *See, e.g.*, Defs. Mem. at 2.  Defendants relied primarily on the Second Circuit's decision in *Schwab II Schwab Short-Term Bond Market Fund v. Lloyds Banking Group PLC* ("*Schwab II*"), 22 F.4th 103 (2d Cir. 2021), for the proposition that the direct injury requirement "drew a bright line between plaintiffs who transacted directly with defendants and those who did not."  Defs. Mem. at 19 (citing *Schwab II*, 22 F.4th at 118); *see also Silver II*, 332 F. Supp. 3d at 905 (noting that "a critical mass of judges within this district have concluded that plaintiffs who are not direct purchasers are not efficient enforcers in a benchmark manipulation case").

   As noted above, the Second Circuit recently held that no such bright line exists with respect to individuals who transact on a securities exchange.  *Platinum*, 61 F.4th at 263–64.  Anyone who buys or sells securities on an exchange formally transacts with a clearinghouse which "serves only as a conduit" between parties.  *Id.* at 263. Imposing a bright-line rule for transactions on a securities exchange would "exalt form over substance."  *Id.* at 264. *Platinum* did, however, establish such a bright-line test with respect to transactions involving physical commodities. *See id.* at 259–60.  Accordingly, Plaintiffs dropped their claims regarding manipulation in the physical silver market. Pls. Platinum Letter at 2 n.1.

issue in *Platinum*, the TAC does not allege that Defendants directly engaged in Fix-related manipulation in derivative markets in the United States. There are no allegations in the TAC that Defendants' in fact traded on any commodities market on which Plaintiffs also traded. *See, e.g.*, TAC ¶¶ 21–30, 195–98. To the contrary, the TAC can only be read to allege that Defendants' manipulative trading, in which they took advantage of their "foreknowledge" of the Fix price to place profitable trades in the minutes leading up to the Fix call at the expense of those without insider knowledge of what the Fix price would be, could not plausibly have occurred on a market in the United States because no United States market was open at that time. *See, e.g.*, TAC ¶ 199. The "incorporation of the benchmark" into Plaintiffs' securities — even when the prices paid or received by Plaintiffs are in "lockstep" with the benchmark price — "does not transform [their] indirect injury into a direct one." *Platinum*, 61 F.4th at 260–61.

In this respect, the allegations in the TAC more closely resemble the allegations that failed to support antitrust standing in *Laydon*. Like the *Laydon* plaintiffs, the TAC's "theory of liability depends on a series of causal steps that separates Defendants' conduct and [Plaintiffs'] purported injury." 55 F.4th at 98. Plaintiffs attempt to distinguish *Laydon* on the grounds that the *Laydon* plaintiffs' injury occurred further down the causal chain than Plaintiffs' injury. *See* Pls. Opp. at 23. The *Laydon* defendants allegedly submitted false rates to the authority that set the Yen-LIBOR rate, creating a manipulated Yen-LIBOR rate, which, in turn, distorted the Euroyen TIBOR rate that was tied to Plaintiffs' futures. 55 F.4th at 92–93. In comparison, the Silver Fixing Banks manipulated the Silver Fix Price, which has a direct relationship to the value of the silver derivatives that Plaintiffs traded. *See* Pls. Opp. at 5, 23.

This is a distinction without a difference. Whether Plaintiffs' injury occurred at the second, third, or fourth step after the alleged manipulation is irrelevant; it did not occur at the

16

first step, which was Defendants' manipulation of the price of London "Good Delivery" silver. *See Laydon*, 55 F.4th at 98 (noting that plaintiff failed to allege antitrust standing because "[h]e did not assert that he transacted directly with any Defendants or that Defendants controlled the . . . futures contract that Plaintiff purchased"). Thus, although Plaintiffs' injuries "might conceivably be traced to an antitrust violation," they are not efficient enforcers of antitrust laws because their purported injuries are caused only by the ripple effects of the alleged violation. *AGC*, 459 U.S. at 534.

### 2. The Remaining Efficient Enforcer Factors Do Not Alter the Conclusion that Plaintiffs Are Not Efficient Enforcers

Failing the first factor alone "furnishes ample justification" for concluding that Plaintiffs are not efficient enforcers, and the remaining three factors do not counsel otherwise. *Schwab II*, 22 F.4th at 118; *see also Silver I*, 213 F. Supp. at 552 (noting that the first efficient enforcer factor "must be met in every case" (quoting *Lexmark*, 572 U.S. at 135)).

The second efficient enforcer factor examines whether there are more direct victims who would be better suited to bring a private antitrust enforcement action. As the Court previously observed, "[t]he most direct victims of Defendants' alleged manipulation would presumably be sellers who transacted at the Fix Price or at a price that incorporated the Fix Price as a component and . . . within a circumscribed time period around the Silver Fixing (before the impacts of Defendants' alleged manipulation had been diluted by extraneous market factors)." *Silver I*, 213 F. Supp. 3d at 556. The TAC is "unclear how many market participants transacted 'at' the Fix Price on 'manipulation days' versus how many Plaintiffs transacted in close temporal proximity to the Fixing window," leaving open the possibility that there are more direct victims. *Id*. This concern is especially acute because Plaintiffs have not plausibly alleged that they were, in fact, victims of the alleged conspiracy. *See Platinum*, 61 F.4th at 265. That said, "[i]nferiority

17

to other potential plaintiffs . . . is not dispositive." *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 689 (2d Cir. 2009).  Accordingly, the Court finds that this factor is largely neutral.

The third factor examines the speculative nature of the injury.  As the Court held in *Silver I*, Plaintiffs' allegations regarding the impact of the Silver Fixing on silver instruments are "highly speculative" and "at a minimum, hyperbolic."  213 F. Supp. 3d at 556–57.  "Plaintiffs do not deny that other market variables may have affected" the price of silver derivatives after the Fix, as reflected by the fact that the price of silver instruments fluctuate continuously in the nearly twenty-four hour over-the-counter market, not just at the once-daily Fix.  *Id.* at 557; *see also id.* at 543.

This factor distinguishes this case from *Platinum*, in which the plaintiffs were purportedly directly harmed by the defendants' coordinated and extended effort to depress prices on the NYMEX on which Plaintiffs traded.  61 F.4th at 263.  Furthermore, the Platinum Fix occurred twice daily, meaning that fix-related manipulation had more frequent and sustained anticompetitive effects on platinum and palladium derivatives; moreover, the P.M. Fix occurred right around the time that the markets opened in the United States.  *See id.* at 254; Platinum Third Am. Compl. ¶ 57.  Unlike the damages alleged by the exchange plaintiffs in *Platinum*, damages in this case are not just "complicated" but fraught with potentially unascertainable questions regarding the degree to which manipulation of the benchmark price continued to influence the price of silver derivatives over the course of the trading day in the United States.  *Platinum*, 61 F.4th at 262 (internal quotation omitted).

The fourth and final factor looks to the risk of duplicative damages and the challenges of apportioning damages among potential victims.  Under this factor, courts consider whether the

damages calculation would require courts to entertain complex theories and significant evidence to apportion damages among "indirect purchasers" in a manner that "create[s] the danger of multiple liability." *AGC*, 459 U.S. at 544 (citation omitted).  As the Court previously noted in *Silver I*, "'it is difficult to see how Plaintiffs would arrive at a just and reasonable estimate of damages,' even with the aid of expert testimony." *Silver I*, 213 F. Supp. 3d at 557 (quoting *Gelboim*, 823 F.3d at 779) (alterations omitted).

In sum, even if Plaintiffs had adequately alleged antitrust injury, they would not be efficient enforcers.  Plaintiffs' alleged injury occurs too far down the chain of causality, and any damages are too speculative due to the lack of allegations that would allow the Court plausibly to infer that Plaintiffs traded at a time during which artificial prices persisted.  Accordingly, Plaintiffs' Sherman Act claims are DISMISSED.

## II.     Commodity Exchange Act Claims

Plaintiffs' CEA claims are premised on the same alleged Fix-related manipulation as their Sherman Act claim.  In order to bring a manipulation claim under the CEA, Plaintiffs must plausibly allege that Defendants engaged in conduct that violated the CEA; to have CEA standing, Plaintiffs must plausibly allege that conduct caused them to suffer "actual damages."  7 U.S.C. § 25(a)(1); *see also Total Gas*, 889 F.3d at 111 (citing, *inter alia*, *Silver I*, 213 F. Supp. 3d at 564).  Plaintiffs must also plausibly allege that Defendants' alleged conduct was sufficiently domestic to bring that conduct within the scope of the CEA.  *See, e.g.*, *Laydon*, 55 F.4th at 96.  Plaintiffs have done neither.

### A.  CEA Standing

Although Plaintiffs need not plead privity with Defendants to successfully plead "actual injury," they must allege some "factual basis that would justify an inference that the market price

was still artificial by the time [Plaintiffs] traded." *Gamma Traders*, 41 F.4th at 80.  For the reasons discussed above, they have not done so.

Plaintiffs rely heavily on a statement in *Total Gas* that a plaintiff may establish CEA standing by "alleg[ing] that she traded (at a detriment) in a contract the price of which was tied . . . to the price of a contract that a defendant was plausibly manipulating."  889 F.3d at 113; *see also* Pls. Opp. at 2, 12.  But to do so, Plaintiffs must plausibly allege that they, in fact, transacted "at a detriment."  *Total Gas*, 889 F.3d at 113.  They have not done so because there are no allegations that would allow the Court plausibly to infer two necessary data points on any given day: the time of a Plaintiff's trade and the endurance of artificial prices caused by manipulation of the Silver Fix.

Plaintiffs argue that the allegations in this case are more like those at issue in *Platinum*, which concerned benchmark-related manipulation in the platinum and palladium markets, than *Gamma Traders*, which found no CEA standing for claims related to spoofing in various precious metal markets, including silver.  *See* Pls. Platinum Letter at 3–4; *Platinum*, 61 F.4th at 255; *Gamma Traders*, 41 F.4th at 76, 78.  But the *Platinum* court expressly noted that its opinion did not address whether "plaintiffs failed to plead the required elements of a CEA claim."  *Platinum*, 61 F.4th at 268.

Although spoofing may have an even more transient effect on the market than manipulation of the benchmark, *Gamma Traders*' logic applies equally to Plaintiffs' claims, which "are based on discrete, episodic instances of manipulation" that occurred through periodic manipulation of the once daily Silver Fix, the effects of which abated over time.  *Silver I*, 123 F. Supp. 3d at 564; *see also id.* at 557.  Plaintiffs acknowledge that the impact of Defendants' alleged manipulative conduct on the price of silver derivatives faded as other market variables

influenced price; as a result, the TAC vaguely alleges only "that prices never *fully* recovered." Pls. Opp. at 18 (emphasis added); *see also* TAC ¶ 196.  As in *Gamma*, plaintiffs "alleg[e] conclusorily that there must have been at least one trade — though [they] ha[ve] no idea which one or when it may have occurred — in which [they] came out on the net losing end of Defendants' market manipulation."  41 F.4th at 78.  Plaintiffs do not account at all for the presence of extraneous market forces; without doing so, the Court cannot plausibly infer that, at the time of Plaintiffs' trades, there was artificiality in the silver derivatives market due to Defendants' manipulative behavior.

### B.  Extraterritoriality

Even if Plaintiffs had adequately alleged CEA standing, they have failed to establish that Defendants' actionable conduct was sufficiently domestic to fall within the scope of the CEA. Plaintiffs argue that the alleged manipulative conduct is sufficiently domestic because Defendants, frequent traders in U.S. markets, must have traded in the United States to profit from their manipulation of the Fix.  *See, e.g.*, TAC ¶¶ 209–19.  Plaintiffs point to a spike in trading activity in COMEX silver futures in the lead-up to the Fix and quantitative analysis demonstrating Defendants' financial incentive to trade on their foreknowledge of the Fixing price.  *See id*.  That Defendants may have traded silver futures on markets in the United States hours after they engaged in manipulative trades elsewhere is, of course, inadequate to establish that the alleged manipulation occurred in the United States.  *Prime* requires courts to examine the location of the conduct that purportedly runs afoul of the CEA.  937 F.3d at 106–07.  "Section 6(c)(1) centers on manipulation in commodities markets," and, as in *Prime*, "[a]ll of the conduct related to *that* focus occurred abroad."[16]  *Id*. at 107.

---

[16]     Plaintiffs also bring claims pursuant to section 22(a)(1) as well as 13c(a) of the CEA for aiding and abetting violations of section 22(a)(1).  *See* TAC ¶¶ 409–10.  The extraterritoriality analysis is the same under both of those

Notably absent from the TAC is any allegation that Defendants actually traded on a market in the United States as part of the conspiracy to manipulate the Fix.[17]  Plaintiffs' failure to allege domestic manipulation distinguishes their claims from those in *Platinum*.  Like in *Platinum*, Plaintiffs allege manipulation of a benchmark rate set in London based on the trading activity of Defendants that also trade precious metals and derivates on markets in the United States.  *See* 61 F.4th at 268.  Crucially, however, Plaintiffs do not plausibly allege that the scheme to manipulate the Fix itself "involved both foreign and domestic activity."  *Id*.  The *Platinum* plaintiffs alleged that defendants engaged in collusive trading, spoofing, and other manipulative techniques on the NYMEX as part of the Fixing conspiracy.  *See id*.  Plaintiffs do not allege any such similar conduct here with the specificity required to make their allegations plausible.

Although Plaintiffs now attempt to characterize Defendants' actions as direct manipulation of the price of silver in the United States, that is not the narrative contained in the TAC.  *See* Pls. Opp. at 12 n.6 ("Plaintiffs' position is that Defendants' manipulation of the domestically traded commodity silver is more than enough 'domestic conduct' to satisfy *Laydon* and *Prime*.").  The TAC alleges that Defendants manipulated a rate-setting process in London for London "Good Delivery" silver bars, the price of which informed the price of physical silver traded in the United States, and by extension, silver derivatives traded in the United States.  *See*

---

provisions.  To satisfy the requirements of Section 22, which provides a private right of action, "Plaintiffs must allege not only a domestic transaction, but also domestic — not extraterritorial — *conduct* by Defendants that is violative of a substantive provision of the CEA, such as Section 6(c)(1) . . . . "  *Prime Int'l Trading, Ltd. v. BP P.L.C.*, 937 F.3d 94, 105 (2d Cir. 2019).

[17]     The chat excerpts involving traders at Defendant banks unhelpfully excised the time and locations stamps from the chat messages that might have otherwise allowed the Court to determine the locations of Defendants' traders.  *See, e.g.*, TAC ¶¶ 281–82 (reproducing chats between a trader at Deutsche Bank, allegedly located in New York, and a trader at HSBC, in an unspecified location).

TAC ¶¶ 2, 124.  All of the relevant conduct underlying the manipulation alleged in the TAC —
deliberate distortion of the Fix Price and manipulative trading that occurred with foreknowledge
of the Fix Price — took place in other overseas markets, including London,[18] where the Fix
occurred.

*Prime* "held that the plaintiffs' CEA claims were impermissibly extraterritorial because
the derivatives at issue were 'pegged to the value of' foreign assets and the alleged misconduct
was foreign because the plaintiffs made 'no claim that any manipulative oil trading occurred in
the United States.'"  *Laydon*, 55 F.4th at 97 (quoting *Prime*, 937 F.3d at 106).  *Laydon*
reaffirmed the Second Circuit's approach in *Prime* and dismissed the plaintiff's CEA claim
premised on the purchase of "a futures contract on a domestic market that incorporated an index
tied to a foreign market, with that index being set by a foreign entity."  *Laydon* at 97 (citing
*Prime*, 937 F.3d at 106–07).

Plaintiffs argue that "it cannot be the case that defendants may deliberately manipulate
the U.S. commodity and exchange markets by simply sitting in another country when they do
so."  Pls. Opp. 12.  That is precisely, however, the rule established by *Prime* and *Laydon* when
the manipulation occurred by a "venerable City of London institution" in London with respect to
a London benchmark for silver traded in London.  TAC ¶ 119.

## IV.    Leave to Amend

Under Rule 15(a) of the Federal Rules of Civil Procedure, courts "should freely give
leave" to a party to amend its complaint "when justice so requires."  Fed. R. Civ. P. 15(a)(2).

---

[18]     It is not clear whether Plaintiffs intended to allege that Defendants' trading in advance of the Fix occurred
in London or in some other trading hub, but critically, they do not allege that Defendants actually traded on COMEX
markets in the lead-up to the Fix, which occurred before the U.S. markets were open.  While COMEX permits
trading in the over-the-counter market on nearly a twenty-four hour basis, Plaintiffs do not allege that Defendants
were actually manipulating the price of silver futures in the United States in early, pre-market hours.  *See Trading
COMEX Gold and Silver*, CME Grp. (June 8, 2018), https://www.cmegroup.com/education/articles-and-
reports/trading-comex-gold-and-silver.html; *see also* TAC ¶¶ 129–30

Leave to amend, however, "may be denied 'for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party.'" *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007)). Ultimately, "the grant or denial of an opportunity to amend is within the discretion of the District Court . . . ." *Foman v. Davis*, 371 U.S. 178, 182 (1962).

Plaintiffs have requested, in two footnotes, leave to amend to support their argument that the effects of Defendants' manipulative and anti-competitive conduct persisted throughout the trading day in the United States and to add allegations of domestic conduct. Pls. Opp. at 12 n.6, 18 n.9. Plaintiffs' counsel, who are competent and experienced attorneys, have provided insufficient details to reasonably suggest that, if given yet another chance to address issues of which they had notice as early as *Silver I*, they could allege sufficient facts to address the TAC's failure adequately to allege antitrust or CEA standing. While Plaintiffs' counsel suggest, in a conclusory way, that their "allegations of domestic conduct are buttressed by the post-complaint discovery record," Pls. Opp. at 12 n.6, they did not attach "a proposed, fourth amended complaint for the Court's review" as required by the Undersigned's Individual Rules. *Silver II*, 332 F. Supp. 3d at 926. Accordingly, the Court denies leave to amend.

## CONCLUSION

The motion for judgment on the pleadings is GRANTED. As this resolves all remaining claims raised in the Third Amended Complaint, the case is DISMISSED with prejudice. The Clerk of the Court is directed to terminate the open motion at docket entry 604 and to CLOSE this case and all related and member cases.

SO ORDERED.

Date:  May 22, 2023
       New York, New York

_____
VALERIE CAPRONI
United States District Judge